Adam Brook, M.D., Ph.D.
813 Delmar Way Apt 306
Delray Beach, FL  33483
(646) 774-0971
brook1231@gmail.com
Plaintiff *pro se*

**22 CV 06173**

## UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Adam Brook,<br><br>                 Plaintiff;<br><br>*v.*<br><br>Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, Kenneth Barocas, Esq., Ian Shainbrown, Esq., The Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.L.P., Howard Muser, Allegiant Home Care, L.L.C., Ann Reen, R.N., Mary Manning Walsh Nursing Home, Allen Logerquist, M.D., Florence Pua, M.D., Eric Nowakowski, R.P.A.-C, Towana Moe, R.N., John Michael Natividad, Arthur Akperov, Doris Bermudez, Navjot Sepla, Marie Sweet Mingoa, R.N., and John Does #1-10,<br><br>                 Defendants. | **Complaint and demand for jury trial** |

RECEIVED
SDNY PRO SE OFFICE
2022 JUL 20  PM 3: 12

Plaintiff *pro se* Adam Brook, M.D., Ph.D., both personally, as next of kin of,
and as a personal representative of the Estate of, Dr. Judith Brook, alleges the
following:

### NATURE OF THE ACTION

2. This federal action arises under the Fourth, Fifth, Sixth and Fourteenth
   Amendments to the United States Constitution, the New York State
   Constitution including its Article I, 42 U.S.C. §1983 and §1988, diversity of
   citizenship, and for state common law claims under diversity and supplemental
   jurisdiction.

3. This action seeks injunctive relief, damages, attorneys' fees and costs. The
   claims encompass defendants' conspiracy, by the acts of private parties as
   willful participants in joint action with New York State actors , for a common
   purpose, under color of state law, in a New York state court proceeding , to
   deprive plaintiff Adam Brook ("Adam") and his mother, the late Dr. Judith
   Brook ("Judith"), of their right to due process, a fair trial, and Judith's  right to
   liberty and property, all in violation of the Fourth, Fifth, Sixth, and Fourteenth
   Amendments of the Constitution and by the unconstitutional application of a
   state law relating to the appointment of a guardian for an alleged incompetent
   person (hereinafter collectively "Constitutional violations"). By reason of
   these Constitutional violations, the defendants, as part of the common plan
   and purpose with the State court judge, obtained determinations adverse to
   plaintiff herein and his mother in a proceeding brought by certain of the co-

defendants and assisted by their co-conspirators identified herein as defendants.

4. As more fully alleged herein, the result of the conspiracy was the wrongful declaration of Judith to be "incompetent," appointment of a co-conspirator guardian of her person and property, the taking of over $500,000 of her $8-million assets to pay all the private party conspirators, the Guardian's mismanagement of those assets causing huge losses, damage to her Estate plan, and as a result, incurring hundreds of thousands of dollars in extra Estate legal fees and losses to the Estate and Judith's intended beneficiaries.

5. In addition to these financial harms, the conspiracy caused Judith to be placed under the total control of the court appointed Guardian, Joseph Ruotolo ("Ruotolo"), who breached all his obligations to her, and on January 17, 2020, promptly dumped her in a nursing home against her will. Despite explicit warnings to the Guardian of her mistreatment and worsening medical condition in the nursing home, Ruotolo did nothing and in just 4 day Judith had exsanguinated to the point of unconsciousness, was given CPR, and was transferred by ambulance to New York Presbyterian Hospital ("NYP"), resulting in her premature death on March 15, 2020, only 71 days after Ruotolo's appointment.

6. The common law claims, which also include additional named defendants, include wrongful death, medical malpractice, legal malpractice, breach of fiduciary duty, negligence and other claims as more fully alleged herein.

7.   This Complaint, arising from these tragic, outrageous, and unlawful acts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to 42 U.S.C. §1983 for the Constitutional violations  and applicable state law claims.

**The Conspiracy in the Article 81 Case Between Defendants with the State Court Judge**

8.   As more fully alleged herein, the defendants' conspiracy commenced with the filing of the Petition by defendant Muser and his attorneys on May 9, 2019, to have his sister Judith Brook declared an "incompetent person" ("IP") so that Muser could be appointed her Guardian to take over and misappropriate her assets, change her Will and enrich himself with his sister's assets, and enrich his attorneys with court-awarded fees and compensation. Crucially, under state law applicable to such a Petition, New York Mental Hygiene Law §81.09(f) and 81.10(f) and case law,  provide that "(w)hen judgment grants the petition," the court may grant compensation "payable by the estate" of the alleged incapacitated person ("AIP") to the Court appointed evaluators, and the AIP's court appointed lawyers, typically the New York Mental Hygiene Legal Service ("MHLS"). Granting the Petition also entitles the Petitioner's attorneys to obtain their legal fees from the AIP's estate. Accordingly, when presented with a high net worth individual AIP like Judith, all the participants in the conspiracy, defendants herein, had a strong financial motive to join the conspiracy with the state court judge, for the common purpose and

understanding that they would all do whatever was necessary, including violating due process and other legal and Constitutional protections, to have Judith declared incompetent under state law so that they could be paid by invading her substantial assets, reported early on by the first evaluator as nearly $8-million. The state court judge, although entitled to judicial immunity from monetary damages in this action, had the same incentive because she could use a finding of incompetence to reward her favorite Guardian, Ruotolo, for his repeated assistance in taking on *21 prior* appointed positions in her Court during the two immediately preceding calendar-years (2018–2019). All of these 21 appointments were in guardianship litigation regarding AIPs with much smaller value estates, yielding much smaller compensation to Ruotolo.

9.    Thus a finding of "incompetence" was the common goal of the state court judge and all the co-conspirator defendants, because a finding of "incompetence" would then enable the judge to use the substantial assets of the AIP, Judith, to pay all those defendant participants in their respective roles of Petitioner, appointed court evaluators, appointed counsel for the AIP, appointed Guardian, and their respective attorneys, from Judith's substantial assets for their own financial benefit, in the form of state court-approved legal fees and compensation.[1]

---

[1] Not part of the conspiracy, and actually attempting to oppose it, were the private attorneys, respectively, James Kaplan and Salvatore Candela, for Adam, and Lisa

10.  This conspiracy continued thorough the proceedings commenced in 2019, and included a January 3, 2020 final hearing and Order, without Judith's presence, which had been requested by Judith and Adam, finding Judith "incapacitated," voiding Adam's duly appointed power-of-attorney and healthcare-proxy from years earlier. The conspiracy has continued to date, with rulings preventing Adam from obtaining discovery to show the falsity of the evidence presented and accepted by the Court to find "incapacity", and to challenge the validity of the co-conspirators claims for fees and compensation in excess of $873,774, which is still before the State Court Judge for a Decision.

11.  By the actions herein alleged, the defendants achieved the object of the conspiracy and their common purpose by having Judith declared an "incapacitated person" under New York state law, New York Mental Hygiene Law Art. 81 (the proceeding in which defendants succeeded in having Judith declared "incapacitated" is hereinafter referred to as "the Article 81 case"). The conspirators achieved this goal of the conspiracy by together violating due process, disregarding Judith's own articulate in court testimony that she did not need or want a Guardian and wished Adam to continue with his powers

---

Friedman, for cross-petitioner Nicole Hazard Brook, Adam's sister-in-law and wife of Judith's late son, Jonathan.

granted by her 13 years earlier. The finding of "incapacity" was thus contrary to, and failed to meet the statutory standard of, clear and convincing evidence.

12. In furtherance of this conspiracy, the Court reached its decision to appoint Ruotolo with power over Judith's person and property at a final hearing on January 3, 2020, commenced with barely sixteen hours of notice of the court-evaluator's lengthy report, signed December 31, 2019, but not delivered to Adam's attorney, Mr. Kaplan until 4:14 p.m. on January 2, 2020. (January 3, 2020 hearing, Tr. 5) The court-evaluator's report comprised 29 pages and 67 pages with exhibits, and recommended that Judith be found "incapacitated" and that Ruotolo be appointed as Guardian, so that each of the private party defendants in the conspiracy could be paid out of Judith's $8-million assets for a "successful" Petition. That January 3, 2020 hearing proceeded over the explicit objection of Adam and his attorney that the less than 24 hours service of the court-evaluator report required an adjournment for them to gather opposing witnesses and evidence, and to allow Judith to appear. In the most flagrant violation of due process, the state court judge denied all these requests and insisted Adam and his attorney proceed and complete their case that day.

13. The Court then concluded the hearing that day and, without hearing any argument, immediately entered an Order which Ruotolo had prepared the day before (January 2, 2020) after Ruotolo received a secret telephone call from court-evaluator Salzman (later exposed by Ruotolo's documenting the January 2 Salzman-Ruotolo telephone call in Ruotolo's time records seeking

fees. The prearranged order drafted by Ruotolo was handed up to the judge at the final January 3 hearing and the Court signed and entered it. The rulings and Order that day found Judith "incapacitated", voided Adam's longstanding powers, and appointed Ruotolo with fully expanded powers over Judith's person and substantial assets.

14. Under settled federal law, plaintiffs are not required to show that the state court decisions are incorrect or in violation of the Constitution, although the evidence will show that they are,  but rather the §1983 claim is based on the defendants' "agreement to reach a predetermined outcome" by violating plaintiff's and his mother's Constitutional rights to a fair and due process proceeding, "independently of the subsequent state court decisions."[2] But for those Constitutional violations and acceptance of false evidence, all in contravention of §1983, plaintiff and his mother would not have suffered these adverse rulings on January 3, 2020, Judith would have been found not incapacitated, the financial and personal harms inflicted would have been avoided, and none of the conspirators would have been entitled to such lucrative payments from Judith's estate.

15. Instead, the conspiracy was successful in accomplishing its agreed common goal. The result was substantial personal and financial injury to plaintiff and to

---

[2] *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 172-173 (3d Cir. 2010)

Judith, who died 71 days after Ruotolo's appointment through Ruotolo's breaches of his fiduciary duty to her. Specifically, damage from these conspiratorial unconstitutional acts and guardianship appointment of defendant Ruotolo, with expanded powers, resulted when defendants were complicit in dumping Judith in a nursing home against her will, where she was mistreated, forced to lie in her own stool, not given any of her medications and exsanguinated to the point of unconsciousness only 18 days after Ruotolo's appointment. This led directly to Judith Brook's death only 71 days after the wrongful appointment of a guardian.

16. In their efforts to run up $873,774 in "legal fees" and "guardianship fees" for services provided during the guardianship, Ruotolo and co-conspirator defendants financially damaged Judith Brook's pre-existing estate plan, and cost Judith Brook and her heirs millions of dollars in monetary damages, plus legal fees and related expenses in an effort to mitigate the damages.

17. Further anticipated damage is that the co-conspirator defendants will be paid by the state court as much as $447,344 still held from Judith's estate by the Guardian Ruotolo, or more, pending the final decision on the fee and compensation applications.

18. Accordingly, all of the foregoing constitutes joint state action by all the Article 81 claimants named as defendants, in violation of 42 U.S.C. §1983, depriving plaintiff and his mother of their Constitutional rights under color of state law.

19. In the alternative, if there was no conspiracy with the state court judge in the Article 81 case as herein alleged, Plaintiff and his mother were deprived of their aforesaid federal constitutional rights, including due process, by the private party Defendants identified above participating in the state MHL Article 81 case (the "Guardianship Defendants") and exercising their "rights" created by the state law in their various capacities as Petitioner, Petitioner's counsel, appointed evaluators, appointed counsel, and appointed Guardian of Judith Brook, and "pursuant to rules of conduct imposed by the State". Further, "the procedural scheme created by the statute … obviously is the product of state action."[3] Those rights and rules were imposed under NYMHL Article 81 and in that specific proceeding, instituted, participated in, and supported by each of those "Guardianship Defendants" each acting under color of state law, which as applied in that case failed to provide due process and failed to establish incapacity by clear and convincing evidence, and receiving and relying on false allegations, evidence and reports from those defendants, all to effectuate the involuntary appointment of a Guardian for Judith Brook against her clear and expressed wishes, and vacating all of Adam Brooks previous powers and proxies from Judith Brook. This deprivation of Constitutional rights under color of state law caused Judith Brook to lose all control over her person and property and resulted in her premature death and substantial financial damage to her Estate and to her intended beneficiaries.

---

[3] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

20. In the alternative, defendants Muser, Huth, Huth, Reynolds, L.L.P., Shainbrown, and the Shainbrown Firm, L.L.C. are liable for acting under color of state law in violation of §1983 because they conspired with each other and with the court-appointed Guardianship lawyers acting for the state and obtaining significant aid from the court-appointed Defendants, as hereinafter alleged, to achieve the common, preordained goal of all of them to find Judith Brook incapacitated so that each of them would be paid fees and compensation by Judith's assets and estate.

21. In the alternative, defendants Salzman and Ruotolo are liable for acting under color of state law in violation of §1983 because they were appointed by the Court and conspired with each other and with the court-appointed Guardianship lawyers and Guardianship Defendants, acting for the state and obtaining significant aid from the court-appointed defendants, as hereinafter alleged, to achieve the common, preordained goal of all of them to find Judith Brook incapacitated so that each of them would be paid fees and compensation by Judith's assets and estate. Direct evidence of the conspiracy is shown, as hereinafter alleged, by Ruotolo's January 2, 2020 timesheet entry, "TC [telephone call] from CE [court-evaluator] re hearing of 1/3/20". Thus after Salzman finished and photocopied his court-evaluator report on December 31, Salzman telephoned Ruotolo on January 2 and told Ruotolo that he (Ruotolo) was going to be guardian.

22. Salzman and Ruotolo plotted-out how they were going to rig the January 3 hearing, as shown by Ruotolo's next time entries the same day, still on January 2, that Ruotolo immediately after the call with Salzman "Prepare[d] proposed order for hearing of 1/3/20 (1.3 hours)" in which he appointed himself as Guardian with expanded powers over Judith's person and property and vacating Adam's long standing power and proxy for Judith. Thus, Ruotolo knew in advance of the hearing from his private discussion with Salzman that Salzman was going to see to it that he (Ruotolo) was going to be appointed guardian on January 2, before the January 3 hearing had even occurred. And that is exactly what occurred on January 3, 2020. Ruotolo then used his expanded powers wrongfully, breached his appointed fiduciary duty to his ward to care for her person and protect her assets, but instead sought to enrich himself and the co-conspirators at Judith's expense.

23. In the alternative, defendants Barocas, Rosenthal, Wechsler, and MHLS are liable for acting under color of state law in violation of §1983 because they conspired with each other and with the court-appointed Guardianship lawyers acting for the state and obtaining significant aid from the court-appointed Defendants, as hereinafter alleged, to achieve the common, preordained goal of all of them to find Judith Brook incapacitated so that each of them would be paid fees and compensation by Judith's assets and estate. For example, as hereinafter alleged, Rosenthal and Barocas failed and refused to advocate and support their client Judith Brook's clearly expressed wish that she did not need

or want a Guardian and wanted to Adam to continue with his powers. Rosenthal went so far as to make or support objections by the co-conspirators to evidence offered from Adam and his attorney James Kaplan, and even to misrepresent at the final hearing on January 3, 2020 that Judith was waiving her statutorily guaranteed personal appearance, when Rosenthal had no such conversation or instruction from Judith.

## PARTIES

24. Prior to the wrongful acts of defendants commencing in or about May 2019, and resulting in her death on March 15, 2020, Dr. Judith was an acclaimed researcher and Professor of Psychiatry at such institutions as New York University School of Medicine, Mount Sinai Medical Center, and Columbia University. She had a distinguished reputation, publishing over 357 research reports, securing millions of dollars in research grants from the National Institute of Health as well as other institutions, and frequently traveled the world to present her research findings to her peers. Judge O'Neill-Levy, who heard Judith's live testimony at the October 18, 2019 trial session of the Article 81 proceeding, concluded that "Dr. Judith Brook is a charming and accomplished woman who had an extraordinary career." (January 3, 2020 hearing, Tr.135) As of the time of the commencement of the conspiracy alleged herein, Judith was 79-years-old, and she and her late husband David Brook had amassed a net worth of nearly $8 million.

25. By reason of the actions and conspiracy of defendants, Judith was wrongfully stripped of her civil rights and caused to suffer and die prematurely by the defendant conspirators including the Guardian appointed for her against her will, who was responsible for placing her in a nursing home against her will and choosing, and was obligated to monitor her healthcare providers. At the time of her death, on March 15, 2020, Judith was a citizen of the United States and a citizen and resident of New York.

26. Plaintiff Adam Brook, M.D., Ph.D. is Dr. Judith Brook's sole surviving adult child and a personal representative of Judith Brook's estate. Dr. Brook is a citizen and resident of the state of Florida, with a legal residence and domicile in Delray Beach, Florida. For many years prior to the events commencing in May 2019, Adam held Judith's power-of-attorney and healthcare-proxy, which Judith had executed 13 years earlier. In 2019, Adam lived with Judith in Judith's apartment on Central Park West in Manhattan, New York City, and well-cared for her personal and medical needs.

27. Defendant Joseph Ruotolo, Esq. ("Ruotolo") is an attorney currently licensed by the State of New York and a citizen and resident of New York. Ruotolo was a former New York City Police officer, but obtained his New York license to practice law, and his appointment to the fiduciary list of the New York County Supreme Court, without disclosing that he had been found guilty in NYPD disciplinary proceedings and sanctioned for excessive use of force on multiple occasions. Ruotolo personally paid a settlement of $5000 for his vicious assault

on an elderly African-American civil servant, an innocent bystander. (*Lindo v. Sgt. J. Ruotolo et al.*, Case #1:98-cv-09066-SHS-DF (S.D.N.Y.) docket sheet; the City of New York paid $80,000) Upon information and belief, Ruotolo kept his history of his misconduct secret until it was discovered and documented in the "fee hearings" after Judith's death.

28. Evidence during the fee hearings in the Article 81 case, after Ruotolo's appointment, disclosed that Sergeant Ruotolo was accorded full due process rights in an NYPD disciplinary proceeding in which four eyewitnesses testified against him. Ruotolo unsuccessfully challenged his termination in an Article 78 proceeding, filed as New York County Supreme Court Index number 119209-2000. Mr. Ruotolo failed to disclose his NYPD disciplinary history to the Committee on Attorney Character and Fitness at the time of his application for admission to the bar as an attorney licensed in New York State. Ruotolo also failed to disclose his NYPD disciplinary history in his application for appointment to the New York Supreme Court Part 36 list of individuals eligible for appointment as fiduciaries in guardianship proceedings.

29. As more fully alleged herein, Ruotolo was a favorite appointee of Judge Levy when she was in the Guardianship part of New York State Supreme Court, and Ruotolo was appointed by that Court as of January 3, 2020 with powers over Judith's person and property. Ruotolo was grossly negligent in his role as Judith's Guardian, breached his fiduciary duties to her, and along with the

other defendants, as more fully alleged herein, proximately caused Judith's premature death and the damage to her finances and Estate plan.

30. Defendant Ira Salzman, Esq. is an attorney duly licensed in the State of New York and, upon information and belief, a citizen and resident of New York State. On November 18, 2019, Judge O'Neill-Levy appointed Ira Salzman as successor court-evaluator in the Article 81 case.

31. Defendant Diana Rosenthal, Esq. ("Rosenthal") is an attorney duly licensed in the State of New York. By Order to Show Cause dated May 16, 2019, Judge O'Neill-Levy appointed Mental Hygiene Legal Service as court-appointed attorney for Judith Brook, and Ms. Rosenthal served as one of the Mental Hygiene Legal Service attorneys assigned to represent Judith Brook. Upon information and belief, Rosenthal is a citizen and resident of New York.

32. Defendant Felice Wechsler, Esq. ("Wechsler") is an attorney duly licensed in the State of New York. By Order to Show Cause dated May 16, 2019, J. O'Neill-Levy appointed Mental Hygiene Legal Service as court-appointed attorney for Judith Brook, and Ms. Wechsler served as one of the Mental Hygiene Legal Service attorneys assigned to represent Judith Brook. Upon information and belief, Wechsler is a citizen and resident of New York.

33. Defendant Mental Hygiene Legal Service ("MHLS") is an entity of New York State and therefore a citizen of New York. On May 16, 2019, J. O'Neill-Levy appointed Mental Hygiene Legal Service to represent Judith Brook in the

Article 81 case. At all times relevant hereto, MHLS was responsible for the policy, practice, supervision, implementation and conduct of all MHLS matters and was responsible for the appointment, training, supervision and conduct of all MHLS personnel, including Diana Rosenthal, Esq. and Felice Wechsler, Esq. In addition, MHLS was responsible for enforcing the rules of the MHLS and for ensuring that MHLS personnel obey the laws of the United States and the State of New York.

34. Defendant Kenneth Barocas, Esq. ("Barocas") is an attorney duly licensed in the State of New York. On February 6, 2020, J. O'Neill-Levy appointed Mr. Barocas in place of MHLS and the MHLS lawyers, who resigned, to take over representation of Judith in the guardianship proceeding. Upon information and belief, Barocas is a citizen and resident of New York.

35. Defendant Ian Shainbrown, Esq. ("Shainbrown") is the attorney for petitioner Howard Muser in the Article 81 case and is Muser's son-in-law. Thus, compensation going to Shainbrown benefitted Shainbrown's wife, who was Muser's daughter. Upon information and belief, Shainbrown is a citizen and resident of New Jersey.

36. The Shainbrown Firm, L.L.C. is a purported limited liability company that Ian Shainbrown incorporated in the state of New Jersey on May 8, 2019, six days after Shainbrown began work on the Article 81 case, and that Shainbrown has billed for services commencing on May 2, 2019. The Shainbrown Firm, L.L.C. is, therefore, a citizen of New Jersey. The Shainbrown Firm, L.L.C. is also the

*alter ego* of Ian Shainbrown and was created for the sole purpose of allowing Ian Shainbrown to act as an attorney with his own professional address in the Article 81 case, while he continued employment as an attorney, managing director and executive at Axio Group, L.L.C., a New York financial services corporation. Upon information and belief, the formation of the Shainbrown Firm, L.L.C. was also an effort by Shainbrown to perform wrongful acts without being liable for them.

37. Defendant Karl Huth, Esq. ("Huth") is petitioner Howard Muser's attorney and Mr. Shainbrown's friend and former colleague. Upon information and belief, Huth is a citizen and resident of New York.

38. Defendant Huth, Reynolds, L.L.P. is a New York limited liability partnership and therefore a citizen of New York. At all times relevant hereto, Huth, Reynolds, L.L.P. was responsible for the policy, practice, supervision, implementation and conduct of all Huth, Reynolds, L.L.P. matters and was responsible for the appointment, training, supervision and conduct of all Huth, Reynolds, L.L.P. personnel, including Karl Huth, Esq. In addition, Huth, Reynolds, L.L.P. was responsible for ensuring that Huth, Reynolds, L.L.P. personnel obey the laws of the United States and the State of New York.

39. Defendant Howard Muser ("Muser") is the petitioner in the Article 81 case guardianship matter, and he personally sought by his Petition to be appointed as the guardian of his late sister, Judith Brook, while she was still living. Upon information and belief, Muser is a citizen and resident of New Jersey.

40. Defendant Allegiant Home Care, L.L.C. ("Allegiant") was at all relevant times, and still is, a New York State limited liability company duly existing under and by virtue of the laws of the State of New York, having its principal place of business at 641 Lexington Ave. Fl. 27, New York, NY 10022. Allegiant is therefore a citizen of New York. At all times relevant hereto defendant Allegiant was authorized to do business as a homecare agency. Allegiant was the homecare agency Mr. Ruotolo chose to provide homecare services to Dr. Judith Brook after Ruotolo was appointed temporary guardian of Judith Brook in the Article 81 case. At all times relevant hereto Allegiant was responsible for the appointment, training, supervision and conduct of all Allegiant personnel, including Allegiant's employees and contractors. In addition, Allegiant was responsible for enforcing Allegiant's policies and procedures and for ensuring that Allegiant personnel obey the laws of the United States and the State of New York and all New York State rules and regulations.

41. Defendant Ann Reen, R.N. ("Reen") was at all times duly licensed as a registered nurse in the State of New York. Ms. Reen was at the relevant times Allegiant Homecare's Vice President. Reen was directly involved with Allegiant and Ruotolo providing homecare services to Judith and, with other Allegiant employees, responsible for billing and invoicing for such services for Allegiant. As hereinafter alleged, the care and billing was done in a negligent or

willfully fraudulent manner. Upon information and belief, Reen is a citizen and resident of New York.

42. Defendant Mary Manning Walsh Nursing Home ("Mary Manning") was, and still is, a New York State corporation duly existing under and by virtue of the laws of the State of New York, having its principal place of business at 1339 York Ave. at 72nd St., New York, NY 10021. Mary Manning is therefore a citizen of New York. At all times relevant hereto defendant Mary Manning was authorized to do business as a nursing home. Mary Manning was the nursing home where Ruotolo placed Dr. Judith Brook shortly after Ruotolo obtained expanded powers over Judith's person by the state court's order of January 3, 2020. At all times relevant hereto Mary Manning was responsible for the appointment, training, supervision and conduct of all Mary Manning personnel, including Mary Manning's employees and contractors. In addition, Mary Manning was responsible for enforcing Mary Manning's policies and procedures and for ensuring that Mary Manning personnel obey the laws of the United States and the State of New York and all New York State rules and regulations.

43. Defendant Allen Logerquist, M.D. ("Logerquist") was and is a physician duly licensed to practice medicine in the State of New York. Upon information and belief, Logerquist is a citizen and resident of New York.

44. Florence Pua, M.D. ("Pua") was and is a physician duly licensed to practice medicine in the State of New York. Upon information and belief, Pua is a citizen and resident of New York.

45. Eric Nowakowski, R.P.A.C. was and is a physician assistant duly licensed to practice as a physician assistant in the State of New York. Upon information and belief, Nowakowski is a citizen and resident of New York.

46. Towana Moe, R.N. was and is a nurse duly licensed to practice nursing in the State of New York. Upon information and belief, Moe is a citizen and resident of New York.

47. John Michael Natividad, R.N. was and is a nurse duly licensed to practice nursing in the State of New York.  Upon information and belief, Natividad is a citizen and resident of New York.

48. Arthur Akperov, R.N. was and is a nurse duly licensed to practice nursing in the State of New York. Upon information and belief, Akperov is a citizen and resident of New York.

49. Doris Bermudez, R.N. was and is a nurse duly licensed to practice nursing in the State of New York. Upon information and belief, Bermudez is a citizen and resident of New York.

50. Navjot Sepla, R.N. was and is a nurse duly licensed to practice nursing in the State of New York. Upon information and belief, Sepla is a citizen and resident of New York.

51. Marie Sweet Mingoa, R.N. was and is a nurse duly licensed to practice nursing in the State of New York. Upon information and belief, Mingoa is a citizen and resident of New Jersey.

52. At all times relevant hereto, defendants John Does #1-10, whose actual names plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John Doe", were personnel of Allegiant and of Mary Manning, acting in the capacity of agents, servants, and employees of defendants Allegiant and Mary Manning, and within the scope of their employment as such and involved with the healthcare of the late Judith Brook.

## **JURISDICTION AND VENUE**

53. This action arises under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the New York State Constitution including its Article I, 42 U.S.C. §1983 and §1988, and state common law.

54. This Court has subject matter jurisdiction over the federal and Constitutional claims in this Complaint pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(a)(3) and (4) (federal questions).

55. This Court also has subject matter jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship between plaintiff and the defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

56. This Court has supplemental jurisdiction over the claims in this Complaint that arise under the common law, statutes and Constitution of the State of New York pursuant to 28 U.S.C. §1367, because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

57. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **FACTUAL ALLEGATIONS**

**On June 15, 2006 Dr. Judith Brook chose Dr. Adam Brook to be her successor power-of-attorney and healthcare-proxy.**

58. On June 15, 2006, long before the events described in this Complaint, Dr. Judith Brook, being of undisputed sound mind and body and cognizant of the need for proper estate planning, executed a "Durable General Power of Attorney" appointing her husband Dr. David Brook to be her attorney-in-fact for all matters as well as her Healthcare-Proxy. Judith appointed her sons, Adam Brook, M.D., Ph.D. and his brother Jonathan Brook, Esq., as her

substitute attorneys-in-fact and healthcare-proxies. Mary Beth Ritger, Esq., a highly experienced and qualified trust and estates attorney, oversaw this process. Adam Brook played no role in the process. Jonathan died prematurely on July 3, 2015 due to myocardial infarction (survived by his wife, Nicole Hazard-Brook, Esq., who has degrees in both law and social work, and their two young daughters, Juliette Brook and Cassie Brook). David Brook died at age 82 on November 20, 2018, leaving Judith and Adam as the two remaining members of the immediate Brook family. By reason of the 2006 appointments, Adam was the appointee of Judith's Power-of-Attorney and Healthcare-Proxy since November 20, 2018.

59. Conspicuously missing from serving in any capacity as Judith Brook's signed designations of healthcare agent or attorney-in-fact were her brother, Howard Muser and his wife Fran Muser. This omission was deliberate as Howard Muser frequently asked David and Judith Brook for money, as shown by the record in the Article 81 case.

60. The Muser Petition filed May 9, 2019 made many false allegations against Adam, including many that Muser and his attorneys, Ian Shainbrown and Karl Huth, knew were false, in a fraudulent effort to have the Court believe that Adam was taking advantage of his parents' financial wealth for his own purposes. Among these claims was that Adam was improperly taking his parents' money to fund two litigations Adam had brought in 2012, with other counsel, against a former employer, Peconic Bay Medical Center, and against

federal defendants for accepting, maintaining, and republishing the employer's false reports about Adam.  Incredibly, although these claims were fully refuted on the record in the Article 81 case, Judge O'Neill-Levy still ruled that Judith was incapacitated and removed Adam's designated powers granted by Judith. To understand the falsity of these allegations in the Petition, this Court needs to know the true facts as hereinafter set forth.

**In 2009 Peconic Bay Medical Center ("PBMC") deceived Dr. Adam Brook into continuing his resignation from the Hospital during an investigation which PBMC told him was not occurring. Adam's parents David and Judith Brook begin paying for Adam's litigation against PBMC starting in June 2010.**

61. In October 2009, Dr. Adam Brook was employed by, and had medical staff privileges at, PBMC. At that time, Dr. Brook learned he would need to leave that employment to undertake a fellowship as a requirement for his further Board certification by the American Board of Thoracic Surgery.  Before leaving, Dr. Brook wanted to be certain there were no pending investigations of his practice at PBMC. PBMC's Chief Medical Officer Dr. Richard Kubiak, in response to Dr. Adam Brook's direct questions, told Dr. Adam Brook that he was not, and would not be, under investigation for a complication in a recent laparoscopic appendectomy case, and that nothing would be reported anywhere. In reliance on Dr. Kubiak's statements, Dr. Adam Brook then continued his resignation from PBMC to attend the fellowship. Then, on

December 3, 2009, PBMC reported Dr. Brook to the National Practitioner
Databank ("NPDB"), a division of the U.S. Health and Human Services
Dept. ("HHS"), for a "surrender of clinical privileges while under, or to
avoid, investigation" even though Dr. Kubiak had told Dr. Brook that he was
not, and would not be, under investigation.

62. Dr. Adam Brook contested the report to NPDB in an administrative
proceeding before HHS, and also in a 2012 state court action that Dr. Brook
filed against PBMC, charging fraud, breach of contract and other claims.
Dr. Brook's suit against PBMC and certain of its doctors and administrators is
still pending in New York State Supreme Court and a Note of Issue has been
filed that the case is ready for jury trial. Summary judgment motions were
made and the decisions on appeal are currently being briefed.

63. As early as June 2010, Dr. Adam Brook's parents Drs. David and Judith Brook
were fully supportive of Adam and his claims against PBMC and NPDB/HHS.
Over the years, Drs. David and Judith Brook provided Adam over 1-million
dollars for these litigations. Based on the evidence in the Article 81 case, the
judge in the Article 81 case agreed that these funds were provided voluntarily
based on Adam's parents' love and support for him and their desire for their
son to receive justice.

64. For example, on March 15, 2011, Dr. David Brook wrote a letter to Dr. Bobby
Goodale, Chairman of the Board of PBMC, saying:

Dr. Brook then asked Dr. Kubiak if he would be investigated because of this complication, Dr. Kubiak assured him on two occasions that he would NOT be investigated. Therefore, Dr. Brook resigned in October, 2009, in order to complete another year of fellowship as requested of the American Board of Thoracic Surgery.

Dr. Brook learned only seven months later in June, 2010, that PBMC had filed an Adverse Action against him with the National Practitioners' Data Bank only because he resigned while he was being investigated, even though Dr. Kubiak had told him twice he would not be investigated. If he had known he was being investigated, he would not have resigned. In effect, this listing on the Databank means that Dr. Brook will never be able to practice medicine in this country again, despite his having performed over 4,000 operations and that he has never been sued for malpractice. This listing is a misuse of the Databank, which was meant to identify physicians who were repeatedly sued, made gross errors leading to repeated patient injury and death, had mental, behavioral or drug problems, or the like.

65. Dr. David Brook's letter demonstrates Adam's parents' commitment to Adam's pursuing his litigation against PBMC and restoring his career. The David Brook letter was proffered in evidence in the Article 81 case.

66. In addition, both Dr. David Brook and Dr. Judith Brook attended court hearings in the PBMC litigation in support of Dr. Adam Brook.

**Defendant Howard Muser's discontent over Judith Brook's 2016 Will**

67. The Muser Petition also reflected Muser's dissatisfaction with his sister's Will provisions. On August 10, 2016, Dr. Judith Brook executed her last Will and Testament ("Will"), prepared by her trust and estates attorney Mary Beth Ritger. Dr. Adam Brook was not involved in the drafting or execution of the

Will. Under her Will, Judith Brook left Howard Muser and Howard Muser's children small testamentary bequests and did not name Howard Muser as an executor or successor executor. Judith Brook left nothing to Howard Muser's wife, Francine Muser, who Muser's Petition also sought to have appointed by the Guardianship Court as a successor guardian.

68. Judith Brook's assets consisted of what she owned in her own name and what she was entitled to from her husband David Brook's estate. As of Muser's commencement of the Article 81 case in May 2019, these assets amounted to approximately $8,000,000.00. A substantial portion of these assets was invested in long-term TIAA annuities and publicly traded securities. As part of Judith Brook's estate plan, most of these assets had designated Adam Brook and Judith's two granddaughters, Juliette Brook and Cassie Brook, as the beneficiaries upon her death.

69. In July 2018, Howard Muser asked Judith Brook to amend her Will to increase the amount given to Howard Muser's children (including Muser's daughter Ilyse Shainbrown, who is the wife of Muser's son-in-law and lawyer, Defendant herein, Ian Shainbrown). Any such bequest would have been at the expense of Adam Brook and Judith Brook's two young granddaughters. Judith Brook asked her daughter-in-law Nicole Hazard what she thought of Howard Muser's request to amend Judith Brook's Will by increasing the amount given to Howard Muser's children at the expense of Adam Brook, Juliette Brook,

and Cassie Brook. Nicole Hazard told Judith Brook that she thought that was "a bad idea."

70. Judith Brook told Howard Muser that Nicole Hazard thought amending Judith Brook's Will to increase the amount given to Howard Muser's children at the expense of Adam Brook, Juliette Brook, and Cassie Brook was a bad idea.

71. Howard Muser then tried to convince Judith Brook to ignore Nicole Hazard's objection to Judith Brook amending her Will to favor Howard Muser's children at the expense of Adam Brook, Juliette Brook, and Cassie Brook. Muser's July 30, 2018 email to Judith Brook says:

> I hope you misunderstood Nicole about bequesting monies to my children – it is none of her business, nor anyone elses. This is your mony [sic?] that you earned and you should do whatever you want with it.

**Judith Brook's illness**

72. For many years prior to filing the Muser Petition, Dr. Judith Brook was employed full time and going to her job as a full professor in the NYU School of Medicine. In September 2018, Judith Brook sustained a spontaneous osteoporotic spinal fracture. Joyce Lovelady, Judith Brook's housekeeper for many years, witnessed the event. Judith was cleaning out a cabinet of her husband David Brook's papers when suddenly she developed a severe pain in her lower back.

73. After an attempt at conservative management was unsuccessful in controlling her pain, Judith was referred for balloon kyphoplasty. The kyphoplasty procedure was performed at NYU-Langone Hospital. As a complication of the kyphoplasty procedure, Judith Brook suffered a second spinal fracture at a different spinal level.

74. After the procedure Judith had significant pain. An NYU pain management physician attempted to treat this pain with overlarge doses of gabapentin, even though gabapentin is not FDA-approved for the treatment of pain resulting from a spinal fracture.

75. The large dose of gabapentin put Judith in a coma.

76. After 3 days in a coma, Judith Brook woke up. However, when she was in a coma, Judith had developed deep vein thromboses.

77. Shortly thereafter NYU-Langone staff discharged Judith Brook to the Riverside Rehabilitation facility in Manhattan.

78. Dr. Adam Brook was unhappy with his mother's condition, and took her by ambulance from the Riverside Rehab to New York Presbyterian Weill-Cornell Hospital ("NYP").

79. Physicians at NYP diagnosed Judith Brook as having bilateral deep vein thromboses and pulmonary emboli. NYP physicians made the reasoned decision to treat the pulmonary emboli with anticoagulation with warfarin for 5

months. While this treatment had success in treating the pulmonary emboli, as a complication of the warfarin treatment Judith Brook developed bleeding from gastric telangiectasias resulting from her hereditary hemorrhagic telangiectasia disease. This gastric bleeding was treated successfully with endoscopy.

80. In May 2019, prior to Dr. Adam Brook or Judith Brook being informed of the Petition of Muser in the Article 81 case, Judith Brook was in the Riverside Premier Rehabilitation and Healing Center ("Riverside") recovering from the osteoporotic spinal compression fractures and pulmonary emboli. She was making a steady recovery, and about to be discharged home.

81. In conjunction with her discharge, Dr. Adam Brook was arranging for his mother Judith Brook to have supervision at home 24 hours-a-day/7 days-a-week since this was the Riverside staff's recommendation.

82. Judith Brook and Adam Brook also agreed to follow Riverside medical-staff's advice that she not have a home health aide ("HHA") *while in Riverside*, since Riverside staff could assist her while she was in Riverside and having an HHA could interfere with her recovery.

83. The decision of whether to obtain a HHA *while a patient is in a facility* can be difficult, as this case demonstrates. As physicians know, when there is a HHA in the patients' room, nurses will enter the room less often since they think the HHA will take care of problems. For patients *in a facility*, HHAs are no

substitute for nurses (with nurses' education and training) going into the room and seeing the patient. Indeed, in February 2020, while Judith Brook was in New York Presbyterian Hospital ("NYP"), Dr. Adam Brook discovered his mother unresponsive. Judith Brook had an HHA (provided by defendant Allegiant Home Care, L.L.C.) with her the entire night, but the HHA did not report that Judith Brook was unresponsive. Judith Brook's nurse did not enter her hospital room often because there was a HHA there.

**On May 9, 2019, Shainbrown and Muser filed a knowingly false and misleading petition, intended to strip Judith Brook of her decision-making power and all of her civil rights, so that Muser would be appointed Judith Brook's guardian and could rewrite Judith Brook's Will, and so that the attorneys could collect legal fees for doing so.**

84. On May 9, 2019, Dr. Judith Brook's brother, defendant Howard Muser, filed a petition with the New York State Supreme Court guardianship court to have Judith Brook declared incapacitated; to void the power-of-attorney and healthcare-proxy held by Judith Brook's son, plaintiff Dr. Adam Brook; and to have Muser himself appointed Judith Brook's guardian and his wife Fran as "backup guardian." Mr. Muser did so because he wanted to change Judith Brook's Will to favor Muser's children at the expense of Judith Brook's son Adam Brook and her young granddaughters Juliette and Cassie Brook.

85. The Petition was prepared by Muser's son-in-law, defendant Shainbrown, and Shainbrown's colleague and friend, defendant Huth.

86. The petition also sought the appointment of a temporary guardian "until resolution" of the guardianship matter. Mr. Shainbrown and Mr. Muser requested this so they could obtain information to "spy" on Judith Brook and Adam Brook, and enable Mr. Shainbrown to email the Court about Dr. Adam Brook's purported maltreatment of Dr. Judith Brook with lies and half-truths about what occurred.

87. The petition that Shainbrown and Huth drafted contained numerous false and misleading allegations that Shainbrown, Howard Muser, and Huth knew, or should have known, were false and misleading.  Some of these were conceded as such in the Article 81 case, or shown to be hearsay, but were accepted by the assigned J. O'Neill Levy as part of the conspiracy hereinabove alleged to have Judith declared incapacitated, appoint Ruotolo, and pay fees or compensation to the identified co-conspirators appearing in the Article 81 case.

88. The petition that Shainbrown and Huth drafted was inflammatory and contained false allegations, and intended to deceive the Court and the attorneys in this matter so that Muser and Shainbrown would be able to have Judith Brook declared incapacitated and, against her will, appoint a guardian over her person and property and loot her assets, by charging Judith Brook millions of dollars in legal fees and appointee fees and compensation. Examples of these false statements in the Petition include the following.

89. The petition falsely alleged that Judith Brook's "medical treatment and support is being withheld by Judith Brook's adult son, Adam Brook." (page 1)

90. The petition falsely claimed that "while in an incapacitated state, Judith executed a Power-of-Attorney, Health Care Proxy, and other documents granting total control of her personal and property management needs to Adam." (May 9, 2019 Petition, ¶32). This was entirely false. The Petitioner's exhibits show those papers were executed by Judith in 2006, prepared and supervised by Judith Brook's trust and estates attorney, Ms. Ritger, who served as an attesting witness to Judith Brook's healthcare-proxy and as the notary public who acknowledged Judith Brook's signature on the power-of-attorney. As petitioner Howard Muser and his attorney Shainbrown knew, and Huth knew or could have learned had he exercised the most basic effort to ensure accuracy of court filings (which is required of attorneys as officers of the court), on June 15, 2006, at the time of executing those papers, Judith Brook was of sound mind and body, and was employed and functioning as a full professor at New York University School of Medicine, and in fact published 136 papers in peer-reviewed scientific journals in the time period after June 15, 2006.

91. Defendants Shainbrown, Muser, and Huth intentionally sought to mislead the Court into believing that in December 2018 Adam Brook coerced his mother into signing new documents appointing him power-of-attorney and healthcare proxy. Among the false allegations, written by Shainbrown and Huth and sworn to by Muser (unless Shainbrown forged Muser's signature) were the following:

> Adam exercises control over Judith's care and assets since December, 2018, when he unexpectedly arrived in Judith's hospital room with a Notary Public and directed Judith, who had no other visitors present at the time, to sign a set of documents (documents that Judith now states she didn't read or understand). ... [unpaginated eighth page]

> 13. On or about December, 2018, Muser visited a distraught sister Judith in her hospital room. When asked what was wrong, Judith stated that Adam had recently visited her hospital room with a Notary Public and had her sign "a bunch of papers".

> 14. Judith was unaware as to what she signed when she spoke with Muser. [page 5]

92. The petition further falsely claimed that "[o]ver the subsequent 5 months, Muser repeatedly asked Adam as to the nature of these documents". (¶14) In fact, Muser never discussed any documents with Adam Brook in 2019 or 2020.

93. The state court judge saw the actual evidence of Judith's appointments of Adam in 2006, and heard Judith's in person testimony in October 2019 that she wanted Adam to remain with those powers, yet the Court in furtherance of the conspiracy to find "incapacity" and award lucrative fees, voided those duly signed powers and appointed Ruotolo to reward him and the others with lucrative fees and compensation.

94. The petition continued these false narratives with the claim that Judith Brook opposed Adam Brook being power-of-attorney and healthcare-proxy that Adam purportedly obtained from Judith by duress, including the following false statements:

21. Judith has also asked Adam for copies of the papers she was forced to sign while in the hospital. Adam has refused. Judith has also demanded Adam sign control of Judith's assets and healthcare decision making authority back to her. Adam has refused, claiming she "doesn't know what she's doing".

22. As Judith's condition worsened, Adam forbade any of Judith's doctors from discussing Judith's condition with anyone other than Adam.

23. Currently, Judith is constantly distraught, stating that "Adam is crazy" and asking to "sue Adam" for seizing control of her assets and seizing decision making authority.

95. None of these allegations were true, but they caused the court on May 28, 2019 to enter an order appointing a temporary Guardian, Ruotolo. The court did so without hearing from Adam or Judith.

96. The petition falsely claimed that Adam Brook was withholding healthcare from his mother. (Petition, ¶3) In fact, Adam Brook had spent hundreds of hours over many months caring for his mother during her illness.

97. The petition attempted to mislead the Court into believing that Adam Brook was wrongfully taking money from his mother to fund his purportedly frivolous litigation against a former employer, Peconic Bay Medical Center ("Peconic" or "PBMC").

98. The petition falsely claimed that Adam Brook's lawsuit against Peconic "was dismissed in its entirety by the United States District Court for the District of Columbia". (¶9) In fact, Adam Brook's lawsuit in the U.S. District Court is against HHS, and on the date of the petition, May 9, 2019, had not been

"dismissed in its entirety" but was *sub judice* in the U.S. District Court regarding whether the PBMC report maintained in HHS's files should be modified or stricken.

99. The petition falsely claimed that Adam Brook's lawsuit against Peconic "remains in the New York Supreme Court as a result of multiple appeal attempts and motions to reargue by Adam". (¶9) In fact, on October 13, 2016, the New York Supreme Court had only dismissed certain claims against Peconic while maintaining other claims, and on July 13, 2017, the Appellate Division, First Department of the Supreme Court reinstated many of the dismissed claims and the case was ongoing as of the time of the Petition (and to date), which Shainbrown and Huth knew or should have known from the public record of the case on file in the New York County Clerk's office.

100. The petition falsely claimed that "[Adam Brook's] litigation [against Peconic] revolves around Adam's forced resignation from his then-position" (¶9), when in fact that litigation is not concerning a "forced resignation", and Dr. Adam Brook was never forced to resign from Peconic. As already explained, *supra*, the litigation revolves around, among other things, Peconic's Chief Medical Officer's fraud in telling Dr. Adam Brook that he was not, and would not be, "under investigation", and then reporting Dr. Adam Brook to a national database, the NPDB, for resigning "while under investigation".

101. The petition falsely claimed, at ¶10, "Adam is also threatening other, unrelated pro se litigations against other medical centers." This false allegation

was to cast Dr. Adam Brook as a "crazy *pro se*", even though that false

allegation of "threatening other, unrelated pro se litigations" was without any

evidentiary foundation. Adam never threatened other, unrelated *pro se*

litigations against other medical centers.

102.     The petition falsely claimed that Judith Brook suffered "cracks in her

vertebrae due to her attempts to walk unassisted." (¶11) In fact, as hereinabove

alleged, with medical certainty and based on imaging results, Judith Brook

suffered a spontaneous osteoporotic spinal fracture in September 2018, and

suffered additional osteoporotic spinal fractures in October 2018 while

hospitalized after undergoing balloon kyphoplasty.

103.     The petition falsely claimed that prior to the date of the petition that

"Judith moved from hospitalizations to rehab and back again (after the

expected falls and other accidents she endured as a lack of appropriate care)".

(¶16) In fact, Judith Brook was continuously hospitalized or in a rehabilitation

facility between October 2018 and May 2019 due to the osteoporotic spinal

fractures, pulmonary embolism, and an episode of gastrointestinal bleeding,

and it was not until May 2019 that she recovered. Judith Brook's only fall was

on May 30, 2019, at Riverside Rehabilitation Center, *after* court-appointed

guardian Joseph Ruotolo cancelled Judith Brook's discharge home with home

health aides. The petition's claim that Judith Brook had falls prior to this is

completely false and was a willful misrepresentation by the Petition's drafters,

Petitioner's son-in-law/lawyer Ian Shainbrown, and Shainbrown's attorney/pal Huth.

104.    The petition falsely claimed that "Adam directed Judith's nurses to only provide her with pureed food. ... Adam has failed to provide a colorable explanation for such imposing dietary limitations against Judith's will." In fact, Judith Brook's physicians at New York Presbyterian Hospital had directed that Judith Brook have pureed diet due to risk of aspiration. After Judith Brook recovered, she was reassessed by a speech therapist at the rehabilitation facility and found to no longer require a pureed diet, and was placed back on a regular diet. Mr. Muser never discussed the issue of Judith Brook's diet with Adam Brook, and Mr. Shainbrown and Mr. Muser's claim that Adam failed to provide a "colorable" explanation for the "dietary limitations" was a knowingly false fabrication by Mr. Shainbrown and Mr. Huth.

105.    The petition claimed that there were "multiple instances of visitors, who will testify at the hearing, coming to see Judith only to find her laying in her own urine and excrement, as she is unable to move." (¶18) But Judith Brook was continuously hospitalized or in a rehabilitation facility between October 2018 and May 2019. Accordingly, to the extent the rehabilitation facility failed to assist Judith Brook going to the bathroom in less timely a fashion than they should have, that was not due to any neglect by Adam Brook, as the petition implies. In fact, Adam Brook did discover that this had happened on several occasions, and, on those occasions, Adam Brook

immediately reported it to the rehabilitation facility staff and insisted that Judith Brook be assisted to the bathroom. In addition, Mr. Muser never reported to Adam Brook that he found Judith Brook lying in her own stool; had Mr. Muser reported this to Adam Brook, Adam Brook would have addressed this immediately.

106.    The petition falsely claimed that Adam Brook refused to arrange for home health aides for Judith Brook. To the contrary, while Judith Brook was still in the Riverside rehabilitation facility, Adam Brook was working with the Riverside social worker Tara Diamond to arrange home health aides for Judith Brook, and Adam Brook had in fact discussed with Joyce Lovelady that Ms. Lovelady be one of Judith Brook's aides. Ms. Lovelady has significant experience caring for elderly individuals.

107.    The petition falsely claimed that "Muser and multiple other individuals, many of whom will testify, have also pled with Adam to provide such an aid[e], to be paid for by Judith's assets. He has refused." (¶20) In fact, Dr. Adam Brook discussed this issue one time with Howard Muser in April 2019, and told Howard Muser that Judith Brook would have home health aides when she was discharged home from the rehabilitation facility. At trial, petitioner Muser produced only Muser himself, not "multiple other individuals", to testify that "they pled with Adam Brook" to supply a home health aide. In fact, the discharge plan that Adam Brook was arranging with Riverside social worker Tara Diamond was for Judith Brook to have home health aides at home 24

hours-a-day, 7 days-a-week. Neither Muser nor Shainbrown nor Huth knew the discharge plan, but this did not stop Shainbrown and Huth, in drafting the petition, from falsely claiming that Adam Brook refused to provide home health aides for his mother.

108.    The petition falsely claimed that "Judith has also asked Adam for copies of the papers she was forced to sign while in the hospital. Adam has refused. Judith has also demanded Adam sign control of Judith's assets and healthcare decision making authority back to her. Adam has refused, claiming she "doesn't know what she's doing"." (¶21) In fact, Judith Brook was never forced to sign any papers, Judith Brook never demanded Adam Brook "sign control of Judith's assets and healthcare decision making authority back to her", and Adam never claimed that Judith ""doesn't know what she's doing"."

109.    The petition claimed falsely that "As Judith's condition worsened, Adam forbade any of Judith's doctors from discussing Judith's condition with anyone other than Adam." (¶22)

110.    The petition claimed falsely: "Judith is constantly distraught, stating that "'Adam is crazy" and asking to "sue Adam" for seizing control of her assets and seizing decision making authority." (¶23)

111. The petition claimed falsely: "Whenever Judith is lucid, she is consistently agitated and begging for an aid to help her with her daily functions." (¶24)

112.   The petition claimed falsely: "Judith is likely to suffer harm because she cannot adequately provide for her personal needs and property management, and the individual who has assumed control, Adam, has made and continues to make a series of decisions not in Judith's best interest." (¶25)

113.   The orders requested by the petition were those to strip Judith Brook of all of her decision-making powers and all of her civil rights so that Muser could rewrite Judith Brook's Will to favor Muser's children, including Ilyse Muser, who is Shainbrown's wife. These powers requested included:

   "i. determine who shall provide personal care or assistance;

   ii. authorize access to or release of confidential records;

   iii. apply for government and private benefits;

   iv. act as Judith's surrogate for healthcare decisions and to consent to or refuse generally accepted routine or major medical or dental treatment;

   v. choose the place of abode.

   vi. provide support for persons dependent upon the her for support, whether or not she is legally obligated to provide that support;

   vii. convey or release contingent and expectant interests in property, including marital property rights and any right of survivorship incidental to joint tenancy or tenancy by the entirety;

   viii. exercise or release powers held by her as trustee, personal representative, guardian for minor, guardian, or donee of a power of appointment;

   ix. enter into contracts;

   x. create revocable or irrevocable trusts of property of the estate which may extend beyond her incapacity or life;

xi. exercise options to purchase securities or other property;

xii. make gifts;

xiii. exercise rights to elect options and change beneficiaries under insurance and annuity policies and to surrender the policies for their cash value;

xiv. exercise any right to an elective share in the estate of her deceased spouse;

xv. renounce or disclaim any interest by testate or intestate succession or by inter vivos transfer consistent with paragraph (d) of section 2-1.11 of the estates, powers and trusts law;

xvi. authorize access to or release of confidential records;

xvii. apply for government and private benefits;

xviii. marshal assets;

xix. transfer assets;

xx. pay funeral expenses;

xxi. pay such bills as may be reasonably necessary;

xxii. invest funds as permitted by section 11-2.3 of the estates, powers and trusts law;

xxiii. lease the primary residence;

xxiv. retain an accountant;

xxv. pay bills after her death provided the authority existed to pay such bills prior to death until a temporary administrator or executor is appointed; and

xxvi. defend or maintain any judicial action or proceeding to a conclusion until an executor or administrator is appointed." (¶27)

114.    The petition brazenly requested that Judith Brook "never be able to make any decision regarding her personal care or property management."

115.    The New York Mental Hygiene Law requires that the petition be personally delivered to the alleged incapacitated person MHL §81.07(e)(2). But neither petitioner, nor his attorneys Shainbrown and Huth, nor anyone else, personally delivered the petition to Judith Brook.

116.    In addition, in order to deprive Judith Brook and Adam Brook of the opportunity to be heard, petitioner secretly filed the petition and order to show cause *ex parte* with the Court.

**The case is assigned to Justice Kelly O'Neill-Levy**

117.    Justice Kelly O'Neill-Levy is a justice of the New York Supreme Court, and at all relevant times was the justice assigned to the Article 81 case in the Guardianship Part 19 of the New York County Supreme Court, and subsequently assigned to Part 31 of New York Supreme Court. Justice O'Neill-Levy appointed Joseph Ruotolo, Esq. as temporary guardian of Judith Brook with limited powers on May 28, 2019, and expanded those powers with orders on May 30, 2019, January 3, 2020, and February 14, 2020. After a trial and final hearing lacking in due process and based on false testimony of various defendants, on January 3, 2020, Justice O'Neill-Levy formally issued an Order depriving Adam Brook of his power-of-attorney and healthcare-proxy for his mother Judith, as hereinabove set forth, and expanded the powers of Ruotolo

to have guardianship and power over Judith's person and property. The evidence will show that this was all pursuant to the joint plan of defendants and Justice O'Neill-Levy to reward Ruotolo and the non-judicial defendants with lucrative fees and compensation taken from the assets of Judith Brook, without regard for her health and welfare, and resulting in her premature death. While Justice O'Neill-Levy has "judicial immunity" from monetary damages under §1983, and is not named as a defendant, under settled law, "the private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages."[4]

**Court-evaluator Margaret Crowley falsely informed the Court that Dr. Adam Brook was opposed to 24-7 care for Judith Brook**

118.    On May 16, 2019, Justice O'Neill-Levy signed petitioner's order to show cause, appointing defendant Mental Hygiene Legal Service to represent Judith Brook, and appointing Margaret Crowley, Esq. as court evaluator. Ms. Crowley subsequently died on August 3, 2020.

119.    On May 24, 2019 1:54 PM court-evaluator Crowley emailed Justice O'Neill-Levy's Law-Clerk Ms. Reddy with the following hearsay:

> Judith Brook could be discharged soon and she needs 24/7. *According to social work, Adam Brook does not agree with 24/7.* I have not seen any

---

[4] *Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980)

financials and I recommend a temporary guardian if Adam Brook does not
come forward with the financials shortly or refuses to obtain an aide 24/7.
(Emphasis added.)

120.    But Tara Diamond, the social-worker Crowley spoke with at Riverside on
May 24, 2019, did not tell Crowley that Dr. Adam Brook disagreed with
"24/7" supervision for his mother.

121.    That very same day, May 24, 2019, at 6:11 PM, Dr. Adam Brook
interviewed social worker Tara Diamond. Dr. Adam Brook took notes in front
of Tara Diamond while he interviewed her.

122.    Tara Diamond told Dr. Adam Brook that she had told Crowley that the
discharge-plan that Riverside social work and Dr. Adam Brook were
developing was adult-daycare during the day, and supervision at night because
Judith Brook required 24-hour supervision.

123.    Tara Diamond told Dr. Adam Brook that *she did not tell Crowley that
Dr. Adam Brook disagreed with "24/7" supervision.*

124.    When Dr. Adam Brook met with Crowley on June 5, 2019 in the presence
of his then attorney Harvey Corn, Dr. Adam Brook explicitly told Crowley
that he believed his mother needed a home health aide 24 hours-a-day, 7 days-
a-week.

125.    Yet Crowley's July 11 court-evaluator report provides:

> On June 5, 2019, I had the opportunity to interview DAVID BROOK, MD,
> CROSS-PETITIONER. ... He does not feel his mother has needed an aid
> thus far and he does not want her to become dependent on an aid.

126.   Leaving aside that Dr. David Brook was deceased and Crowley had met
       with Dr. Adam Brook, Crowley continued to falsely claim that Dr. Adam
       Brook was opposed to a home health aide.

127.   When it came time for Crowley to be cross-examined, Crowley repeatedly
       claimed to be too ill to undergo cross-examination on the court-evaluator
       report she had written.

128.   Judge O'Neill-Levy asked Dr. Adam Brook's then attorney James Kaplan
       if Dr. Adam Brook would accept Crowley's court-evaluator report without
       cross-examining Crowley. Mr. Kaplan attorney refused. (November 6 email
       from attorney Kaplan)

129.   Judge O'Neill-Levy stated that her primary concern was Crowley's health,
       and allowed Crowley to withdraw as court-evaluator without being subject to
       cross-examination.

130.   Appointed Successor court-evaluator Ira Salzman then expressly stated in
       his first successor court-evaluator report that he was relying on Crowley's
       report, notwithstanding that Crowley's report had never been subject to cross-
       examination and Salzman did not independently confirm what was asserted in
       the Crowley report:

1. I am the successor court evaluator …

2. In conducting my investigation, I have relied upon the report of the prior court evaluator …

131.   Crowley's motive was to take Judith Brook away from her family and have Judith Brook declared "incapacitated", so that Crowley and Judge O'Neill-Levy's other appointees could plunder Judith Brook's substantial assets as claimants.

**Review of Judge O'Neill-Levy's appointments demonstrates that she appoints the same attorneys again and again to positions in her court**

132.   Review of Judge O'Neill-Levy's public record of appointments demonstrates that Judge O'Neill-Levy appoints the same attorneys again and again in guardianship litigation. These attorneys work therefore have the same financial motive to conspire with the Court and work together to enrich themselves at the expense of alleged incapacitated persons and their families in guardianship litigation. In one case Ruotolo could request payment of $318,129.81 after an expanded guardianship of the person and property that lasted 2 months (as Ruotolo did in this case); court-evaluator Salzman knew that in the next case it might be Salzman as guardian with Ruotolo as court-evaluator, so they would support each other.

**Judge O'Neill-Levy appointed defendant Joseph Ruotolo to be Judith Brook's temporary guardian on May 28, 2020, and expanded Ruotolo's powers on May 30, 2020**

133.    On May 28, 2020, without according Dr. Judith Brook or Dr. Adam Brook any opportunity to be heard or to refute all the false allegations in the Petition, Judge O'Neill-Levy appointed Joseph Ruotolo as temporary guardian of Judith Brook, and on May 30, 2020, again without according Dr. Judith Brook or Dr. Adam Brook any opportunity to be heard, J. O'Neill-Levy expanded Mr. Ruotolo's powers.

134.    Review of Ruotolo's public record of appointments indicates that Judge O'Neill-Levy appointed Ruotolo *21 times* to guardianship positions in the years 2018–2019, notwithstanding former Chief Judge Judith Kaye's admonition that guardianships not become fonts of patronage. (J. Fritsch, "*Chief Judge Calls for Measures To Thwart Guardianship Abuses*", *New York Times*, December 6, 2001)

**Defendant Ruotolo's first action was to cancel Judith Brook's discharge home with 24-7 home health aides**

135.    On May 29, 2020, Ruotolo's first action upon being appointed temporary guardian was to cancel Judith Brook's long-planned discharge home (with 24-7 home health aides) from Riverside.

136.    Then, at approximately 4 AM on May 30, 2020, while at Riverside, Judith Brook got out of bed, walked down the hall, and fell.

137.    Riverside staff called Dr. Adam Brook, who called an ambulance and accompanied Judith Brook by ambulance to New York Presbyterian Hospital.

138.    Judith Brook was hospitalized. She was found to have a hairline fracture of her humerus, which required that her arm be in a sling for 3 days, and a cosmetic fracture to her nose.

**Howard Muser promises Judith Brook that he will withdraw the guardianship petition**

139.    On May 31, 2019, Adam Brook went to visit his mother at New York Presbyterian Hospital. On arrival at the hospital, he found Howard Muser visiting Judith Brook.

140.    Judith asked Howard to withdraw the guardianship petition. Howard said he would withdraw the guardianship petition. Howard said he would call his son-in-law/lawyer Shainbrown and ask him to withdraw the guardianship petition, and then Howard telephoned Shainbrown.

141.    At this point Adam activated his iPhone to record the ensuing conversation between Judith Brook, Howard Muser, and Adam Brook. Howard Muser was on the telephone with his son-in-law/lawyer Ian Shainbrown during the recording, but the recording does not record what Ian Shainbrown said. The recording transcript provides:

> HOWARD MUSER:  Hi.  Um.  Adam is here.  And Judy is saying that she wants me out of it now.  How do we do that or is it … She doesn't want – I'm not sure.
>
> JUDITH BROOK:     I don't want the courts involved.

HOWARD:    And now she's saying she doesn't want the court involved. So in other words she wants it to go back the way it was, where everything is under Adam's control. Yeah. That's her, that's her choice, that's her choice. What am I gonna do? OK. Yup. OK. Yup, you sure did. OK. Yup. No, it's not getting me. This is what she wants, let her do it. I mean, I've done all I can. I'm out of it. OK. Bye. Alright, all you have to do when the …

JUDITH:    Howard …

HOWARD:    … when the guardian comes to see you, he said he might come Sunday, if not Sunday, Monday, all you have to do is tell him you don't want him and you don't want the court involved.

JUDITH:    Ok. Could you please write that down for me?

ADAM BROOK:    Um. Sure. Let me get a, a piece of paper and a pen.

HOWARD:    It's over there in that blue folder.

HOWARD:    There's a pad with paper there.

JUDITH [SPEAKING TO HOME HEALTH AIDE]:    Would you mind waiting outside … [indistinct]

HOWARD:    And with that, I'm going home.

JUDITH:    What?

HOWARD:    I'm going home.

JUDITH:    No, don't, you said you weren't going home 'till, uh … for two hours.

ADAM:    Mom, what did you want me to …

HOWARD:    Adam is here. There's no reason for me to stay.

JUDITH:    Please stay. I'd like you to be here.

HOWARD:    I been here since 10 o'clock this morning.

JUDITH:      I know that.

HOWARD:   I'm tired.

JUDITH:      Howard.  Do me a favor.  Look, your wife has been here since 9 o'clock this morning.

HOWARD:   That was yesterday.

JUDITH:      Oh please, Howie …

HOWARD:   We were here all day yesterday.

ADAM:       Mom?

JUDITH:      Howard, you're my brother!

HOWARD:   I understand, but you have your son.

JUDITH:      Please, please stay.

HOWARD:   I'm not staying.

ADAM:       Mom, what do you want me to … what, what am I supposed to write down?

JUDITH:      Whatever you think is correct in terms of what we want Adam to do.  And what we want …

ADAM:       You mean what we want Howard to do.

JUDITH:      I mean Howard to do.

ADAM:       OK.

JUDITH:      And what we want Howard to do is not to be involved.

ADAM:       Alright, I will write that down.

JUDITH:      In any court decision.

[44 Seconds of silence, background noise]

[MALE COUGH]

ADAM:       OK. I wrote it down.

JUDITH:     Alright, can now, could you read it out loud?

ADAM:       Uh, this is what you, Judith Brook, said, is "what we want Howard to do is not to be involved in any court decision."

JUDITH:     OK. That's it?

ADAM:       That's what you told me to write. That's what I wrote.

JUDITH:     Is there something wrong with what I wrote?

ADAM:       No, I don't think so.

JUDITH:     That's accurate?

ADAM:       I think that's accurate.

JUDITH:     Then, it seems to me ... First of all, I can't get my hand out of this ...

ADAM:       Yeah, that's only, Mom, that's only for a couple days. That, that will um ... They're going to take that off in a couple days.

JUDITH:     [Indistinct]

ADAM:       Um, I think, uh, so today's Friday, so I think Sunday morning I would guess.

JUDITH:     What I want ...

ADAM:       Yes?

JUDITH:     Cause I have a -- a right here too.

ADAM:       You have all the rights.

JUDITH:     OK. Well, what I want here is for my ... Adam Brook to be involved. Ugh. This room is disgusting. Uh, Adam Brook to be involved when I want him to be.

ADAM:      And Adam Brook is me?

JUDITH:     Yeah, when ...

ADAM:      You want me to continue ... you want me to continue as power of attorney, as I have been, correct?

JUDITH:     Yes.

ADAM:      OK.

JUDITH:     So can you write that down now?

ADAM:      I'll write that down.

HOWARD:    You know what? I'm getting outta here. The only thing I want is visitation rights. Write that down for me. Can I have my phone, please?

ADAM:      It's my phone.

HOWARD:    It's all yours.

142.    Howard then stormed out of the hospital room.

143.    However, despite Muser's clear recorded statement to his attorney that "she's saying she doesn't want the court involved. So in other words she wants it to go back the way it was, where everything is under Adam's control. Yeah. That's her, that's her choice, that's her choice. ... This is what she wants, let her do it. I mean, I've done all I can. I'm out of it. OK. Bye." Muser and Shainbrown did not thereafter withdraw the petition as Muser had told his attorney. Muser thus failed to withdraw from the conspiracy as his sister had requested and was convinced by Shainbrown to continue the conspiracy, resulting in the adverse findings against Adam and Judith and

requests for court-approved compensation to be paid by Judith to Shainbrown, Ruotolo and the other identified co-conspirators.

**When Judith Brook is ready for discharge from New York Presbyterian Hospital, without consulting with Judith Brook Mr. Ruotolo decides that Judith Brook should go to a rehabilitation facility rather than home. When Judith Brook insists that she wants to go home, four large men physically drag 100 pound Judith onto a gurney, strap her down, and cart her off to the rehabilitation facility. As a result of being dragged and forcibly tied down to a gurney, Judith develops left arm pain and pain over her forehead.**

144.    Ruotolo decided that he wanted Dr. Judith Brook to be discharged from New York Presbyterian Hospital to the Riverside Rehabilitation facility. Ruotolo never discussed Judith Brook's discharge with her. Judith Brook did not want to go back to the Riverside Rehabilitation facility.

145.    Because Ruotolo had provided paperwork or the Court's January 3, 2020 appointment order stating that he was Judith Brook's temporary guardian, none of the New York Presbyterian Hospital physicians would discuss Judith Brook's discharge with Dr. Adam Brook.

146.    Judith Brook made multiple telephone calls to her court-appointed attorney Diana Rosenthal in order to enlist her court-appointed attorney's assistance in preventing her discharge back to the Riverside Rehabilitation

facility. Ms. Rosenthal did not return any of Judith Brook's telephone calls because Rosenthal was part of the conspiracy to have Judith declared incompetent so the conspirators could be paid.

147.     On June 8, 2019, four large men in fact forcibly dragged 100-pound Judith Brook out of her hospital room, strapped her down to a gurney, and carted her off to the Riverside Rehabilitation facility on Ruotolo's instructions. Judith's friend Liz Rubenstone was a witness to these events.

148.     When Dr. Adam Brook asked Dr. Uchida, the medical attending at NYP taking care of Judith Brook, why his mother Judith Brook was dragged off to a rehabilitation facility against her will, Dr. Uchida responded that the "paper" the Hospital had received stated that there was a guardian and that meant that the medical team and social work was to speak with the guardian and not with Dr. Judith Brook's son Dr. Adam Brook, notwithstanding Dr. Judith Brook's wishes that the medical team and social work speak with her son Dr. Adam Brook. Dr. Uchida said to Dr. Adam Brook that Dr. Judith Brook was placed in the Riverside facility because defendant Ruotolo made the decision to place her in the Riverside facility.

**Mental Hygiene Legal Service's refusal to advocate for Judith Brook's clearly articulated wishes that she did not want to be declared incapacitated and did not want a guardian**

149.   Judge O'Neill-Levy appointed the Mental Hygiene Legal Service (a
       defendant in the case at bar) to represent Dr. Judith Brook in the guardianship
       proceeding. Mental Hygiene Legal Service assigned their employee attorneys,
       Diana Rosenthal and Felice Wechsler (defendants in the case at bar), to
       represent Judith Brook.

150.   Diana Rosenthal met with Judith Brook only twice during this entire
       guardianship proceeding: once in May 2019 for 10 minutes, and once in
       June 2019 for 30 minutes. (Felice Wechsler never met with Judith Brook.) This
       short amount of time meeting with Judith Brook was insufficient for adequate
       and current legal representation and current assessment of her condition and
       her wishes.

151.   Moreover, when Diana Rosenthal met with Judith Brook on or about
       June 14, 2019, Judith Brook told Diana Rosenthal that she wanted her son
       Dr. Adam Brook to continue as her power-of-attorney and healthcare-proxy.
       Diana Rosenthal told Judith Brook that her son Adam Brook was taking
       advantage of her. Judith Brook did not agree with Diana Rosenthal that Adam
       Brook was taking advantage of her, and Judith Brook became very upset during
       her meeting with Diana Rosenthal.

152.   Diana Rosenthal should have been exploring what her client Judith Brook
       knew and then asking her client what results her client desired. Diana
       Rosenthal should not have been informing her client Judith Brook first of
       Diana Rosenthal's own conclusion, and which was erroneous in fact.

153. In addition, Judith Brook repeatedly expressed that she wanted a jury trial, rather than a trial by a judge. But Diana Rosenthal failed to inform the Court of her client's clearly expressed wish for a jury trial.

154. On June 10, 2019, 11:10 AM Dr. Adam Brook emailed Diana Rosenthal:

Since my mother is your client, you need to be in regular contact with my mother.

155. Rather than reassure Dr. Adam Brook that she would be in contact with her client, Diana Rosenthal responded:

As you are represented by counsel, I am not authorized to speak with you.

156. By email dated July 7, 2019, 3:22 PM, Dr. Adam Brook's attorney Harvey Corn emailed Diana Rosenthal:

I know that you were away last week and may not be able to answer my question immediately but it would be helpful to know prior to the Hearing on Thursday whether you will take the position that the health care proxy and power of attorney singed by your client in 2006 should be implemented in lieu of guardianship and whether you oppose my client serving in those capacities.

157. Diana Rosenthal, Felice Wechsler, and MHLS refused to take a position advocating for their client Judith Brook's wishes. Rosenthal responded to Harvey Corn's email with a July 8, 2019, 11:12 AM email, on which she copied

the court-evaluator and all parties and which exhibited her failure to advocate for her client's wishes:

> I cannot take a position as to the validity or implementation of advance directives signed in 2006. That will be up to the court to decide.

158.    By email dated July 9, 2019, 1:55 PM, Rosenthal also stated her opposition to Judith Brook's daughter-in-law Nicole Hazard, Esq. testifying by mischaracterizing the Mr. Corn's intentions with that witness:

> Mr. Corn previously stated that the primary purpose of the witness' testimony would be to describe the relationship between Judith and Adam Brook. I do not feel it is pertinent to the issue of capacity.

159.    By email dated July 9, 2019, 2:13 PM, Dr. Adam Brook's then attorney Harvey Corn responded:

> I said more than that so please don't mischaracterize what was said. The witness will speak to all of what I previously described plus her observations of Judith's functional level which is an essential finding under MHL 81.02 Any objections that you want to raise can be made on the record in open court at the time the witness appears. She will be available next week and should not impact the schedule as the time allotted is not sufficient to complete the testimony of all the witnesses who will be appearing in this matter. What you are seeking to do is to deny Judith's daughter in law the standing to testify and to destroy due process in what is supposed to be an attempt to find what is the least restrictive form of intervention for an alleged AIP. I think what you are trying to do is shameful.

160.    Thus, even though Diana Rosenthal's legal and ethical obligation was to be
        a vigorous advocate for her client's clearly articulated wishes, Diana Rosenthal
        actively sought for Judith Brook's daughter-in-law not to be permitted to
        testify, so that Judge O'Neill-Levy would declare Judith Brook incapacitated,
        strip her of all of her civil rights, and seize control of Judith Brook's assets.
        Rosenthal thus breached her fiduciary obligation to her client and committed
        legal malpractice in order to facilitate Judge O'Neill-Levy appointing as
        guardian O'Neill-Levy's favorite appointee, Ruotolo, so that Ruotolo could be
        rewarded with lucrative compensation from Judith's assets.

161.    Judith Brook was distressed that her court-appointed attorney Diana
        Rosenthal was not advocating for Judith's wishes. On August 29, 2019, Judith
        Brook called Diana Rosenthal by telephone. A transcription of the August 29,
        2019 audio recording of that call provides the following:

        Diana Rosenthal: Hello.

        Judith Brook: Hello, is this Diana Rosenthal?

        Diana Rosenthal: It is Diana Rosenthal. How are you Dr. Brook?

        Judith Brook: I'm not very well thank you given the fact of how you've
        been treating me and my book.

        Diana Rosenthal: You are your what?

Judith Brook: First of all, I am not happy with you, OK? The first thing is you say that I'm incapacitated. There is no way in the world that I am incapacitated.

Diana Rosenthal: Dr. Brook I'm just going to cut you off I never said that you're incapacitated.

Judith Brook: You never said that.

Diana Rosenthal: No, I'm your counsel, and we discussed that your position on this petition and I understand that you want—what you previously told me is that you would like your son to remain your healthcare-proxy and your power of attorney.

Judith Brook: Now wait a minute, hold on a minute, OK, so you're saying I'm not incapacitated? And you never said that I was incapacitated? Is that correct?

Diana Rosenthal: Um, that's not my job to make that call, my job is to represent you so I don't take a position on your capacity.

Judith Brook: Oh, so you wouldn't—you're not the person who said that I was incapacitated is that correct?

Diana Rosenthal: You are correct. I am not the person who said you are incapacitated.

Judith Brook: OK, now let me just write this down, OK. Number 2 you're supposed to represent me but you are working against me. Now is that true or not true?

Diana Rosenthal: Um, I am not working against you, you're correct, my job is to represent you and that's what I'm doing.

Judith Brook: Well, that's great. And tell me, how are you representing me?

Diana Rosenthal: I'm not, that's a big question, I'm not sure what you mean, I'm representing you as an attorney.

Judith Brook: As an attorney. And I don't want you representing me as an attorney.

Diana Rosenthal: You don't want me representing you.

Judith Brook: I don't want you representing me. Period. (transcription of audio recording of telephone conversation)

162.     NYMHL §81.10 and the Law Revision Commission comments to §81.10 are clear: court-appointed attorneys for "alleged incapacitated persons" are legally mandated to vigorously represent their clients' wishes:

> The role of counsel, as governed by this section, is to represent the person alleged to be incapacitated and ensure that the point of view of the person alleged to be incapacitated is presented to the court. At a minimum that representation should include conducting personal interviews with the person; explaining to the person his or her rights and counseling the person regarding the nature and consequences of the proceeding; securing and presenting evidence and testimony; providing vigorous cross-examination; and offering arguments to protect the rights of the allegedly incapacitated person. (Law Revision Commission comments to NYMHL §81.10)

163.    The New York Mental Hygiene Law, Article 81, wisely recognizes that in many situations the person assigned to investigate and report to the court may have conclusions or recommendations at odds with the wishes of the alleged incapacitated person, and acknowledges the alleged incapacitated person's right to have those wishes and desires vigorously advocated by counsel whose sole loyalty is to the alleged incapacitated person.

164.    As Judith Brook's court-appointed attorneys, defendants Mental Hygiene Legal Service, Diana Rosenthal, and Felice Wechsler were mandated by law, including NYMHL §81.10, to advocate for their client's wishes. Judith Brook clearly and repeatedly stated, including on the record in open court as quoted *infra*, that she did not want a guardian appointed and that she wanted her son Dr. Adam Brook to continue as her healthcare-proxy and power-of-attorney.

165.    Defendants Diana Rosenthal, Felice Wechsler, and MHLS failed to represent Judith Brook and ensure that Judith Brook's point of view was presented to the court. Diana Rosenthal, Felice Wechsler, and MHLS failed to explain to Judith Brook her rights. Diana Rosenthal, Felice Wechsler, and MHLS failed to counsel Judith Brook regarding the nature and consequences of the proceeding. Diana Rosenthal, Felice Wechsler, and MHLS failed to secure and present evidence and testimony to support their client's wishes. Diana Rosenthal, Felice Wechsler, and MHLS failed to provide vigorous cross-examination. Diana Rosenthal, Felice Wechsler, and MHLS failed to offer arguments to protect Judith Brook's rights. In these omissions, Diana

Rosenthal, Felice Wechsler, and MHLS were acting as part of the aforesaid conspiracy so that Judith would be declared incapacitated which would then authorize the Court to charge Judith's estate with the expense of paying Diana Rosenthal, Felice Wechsler, and MHLS as well as the other co-conspirators.

166.    In facilitating Judith Brook being declared incapacitated, Rosenthal hoped to advance her own career. Rosenthal's conduct in the Article 81 case facilitated the other guardianship attorneys being awarded Judith Brook's assets. Should Rosenthal subsequently decide to enter private practice in guardianship law in New York, Rosenthal could expect that the other guardianship attorneys would repay the favor of Rosenthal's assistance in the Brook case. Rosenthal could reasonably expect that those attorneys who Rosenthal helped would in subsequent cases serve as court evaluators and other roles in cases where Rosenthal was serving as an attorney for a petitioner or as a court-appointed guardian, and thus the attorneys who Rosenthal helped in the Brook Article 81 case would be well-positioned to repay Rosenthal's favor.

167.    Diana Rosenthal refused to advocate for Judith Brook's position that she was not incapacitated, and refused to advocate for Judith Brook's position that she wanted her son to continue to be her power-of-attorney and healthcare-proxy.  Diana Rosenthal left Judith Brook, in a proceeding at which all her civil rights were at stake, with no meaningful representation whatsoever. MHLS, Diana Rosenthal, and Felice Wechsler's failure to advocate for their client's

wishes constituted not only legal malpractice, but a violation, under color of
law, of Dr. Judith Brook's Constitutional right to assistance of counsel as part
of their conspiracy with the other defendants to have Judith declared
incapacitated so that all the defendants could file claims for fees and
compensation against her substantial assets. This conduct violated 42 U.S.C.
§1983. This is not a case of Judith Brook simply being poorly assisted by
counsel who through negligence failed to present an effective defense for
Judith Brook. This is a case of Judith Brook's appointed counsel intentionally
refusing to advocate for their client's wishes as part of a conspiracy. Worse yet,
as discussed *infra* in the section on the January 3, 2020 hearing, MHLS,
Rosenthal, and Wechsler actively worked on that day against their client Judith
Brook's clearly expressed wishes that she not be declared incapacitated, that a
guardian not be appointed, and that the power-of-attorney and healthcare-
proxy held by Judith Brook's son Dr. Adam Brook not be voided.

168.     On January 3, 2020, at a hearing which Judith Brook stated she wished to
attend but needed a postponement because of her health, Judge O'Neill-Levy,
entered orders "finding" Dr. Judith Brook to be incapacitated and stripped
Dr. Judith Brook of all of her civil and Constitutional rights. The active efforts
by Judith Brook's court-appointed attorneys, MHLS, Rosenthal, and
Wechsler, in conspiracy with the other defendants and the state court judge to
have Judith Brook declared incapacitated, and to have Judith's existing power-
of-attorney and healthcare-proxy appointing her son Adam voided, constitute

violations of Judith Brook's Constitutional rights under color of law pursuant to 42 U.S.C. §1983.

**Ian Shainbrown, Howard Muser, and Karl Huth committed further deceit in filing a "Verified Petition in Opposition to Cross-Petition of Adam Brook"**

169.   On June 10, 2019, Shainbrown, Howard Muser, and Huth filed and submitted further false inflammatory accusations, in their efforts to conspire with the Court and codefendants, in their filing called a "Verified Petition in Opposition to Cross-Petition of Adam Brook".

170.   The June 10 Petition in Opposition falsely claimed, at ¶1, that Adam Brook had "history of withholding care and demonstrated unwillingness to release appropriate amounts of his mother's money for her benefit" despite Dr. Adam Brook having spent hundreds of hours providing excellent care for his mother during her illnesses. There was no history of Dr. Adam Brook's doing anything contrary to what his mother's physicians said to do; nor was there any history of unwillingness to spend appropriate amounts of his mother's money for her benefit; nor did Muser or Shainbrown produce any *evidence* of Adam Brook withholding care or demonstrating unwillingness to release appropriate amounts of his mother's money for her benefit.

171.   Muser's June 10 Petition in Opposition falsely claimed, at ¶3, "As I have stated repeatedly to Judy, Adam, Margaret Crowley, and Joseph Ruotolo, and

others, my sole purpose in seeking appointment of a guardian is to provide Judith with the appropriate healthcare." In fact, this self-serving statement was refuted not only by the petition's request for Howard Muser, or in the alternative his wife Francine Muser, to be appointed Judith Brook's guardian with the power to change Judith Brook's will and to have complete control over Judith Brook's assets, but also by Ian Shainbrown's May 30, 2019 3:21 PM email to Adam Brook's then attorney Harvey Corn, demanding monetary payments to Shainbrown and Muser and demanding revoking Adam Brook's ability to make treatment decisions for his own mother.

172.    The June 10 Petition in Opposition falsely claimed in inflammatory language, ¶4: "Over the past several months, I have seen my beloved sister deteriorate into a shell of who she once was. The fact her son refused so many of her requests and allowed her to almost wither away is something I could not bear to watch any longer." In fact, Judith Brook was not "deteriorating into a shell" but was gradually recovering from a serious illness and ultimately testified competently and articulately in Court that she wished Adam to continue with his appointed powers. Adam Brook also did not "refuse so many of her requests".

173.    The June 10 Petition in Opposition falsely claimed in inflammatory language, ¶7: "The situation became so dire that I wound up paying out of my own pocket to purchase (or reimburse Judy's friend, Liz Rosenstone [*sic*, her name is Rubenstone] for things Judy wanted, such as clothing, food, and other

items." This was to make it appear as if Adam Brook were denying Judith Brook clothing or food. In fact, Judith Brook was in a rehabilitation facility and was never lacking for clothing or food; the petition in opposition falsely implies that Adam Brook was depriving his own mother of food and clothing.

174.    The Petition in Opposition falsely claimed in inflammatory language, ¶8: "So much of Judy's current condition could have been avoided by Adam simply giving Judy what she asked for, especially 24/7 care." In fact, Judith Brook always had 24/7 care from when she became ill in October 2018 since she was hospitalized continuously from October 2018–June 2019. As alleged above, this was due to a series of illnesses, including osteoporotic spinal fractures, a coma from an overdose with gabapentin while she was hospitalized at NYU Medical Center, deep vein thromboses and pulmonary emboli that developed during the coma, and an episode of gastrointestinal bleeding that occurred after she was anticoagulated to treat the pulmonary emboli, and then her subsequent recovery from the illness. The false claim that but for Judith Brook lacking in 24-7 care (which in fact she always had) Judith Brook would not have sustained these illnesses was not merely false, but deceitful and part of the conspiracy to have her declared incapacitated

175.    The Petition in Opposition falsely claimed in inflammatory language, at ¶10, that Adam Brook was visiting his mother solely to "check the box", *i.e.*, that Adam Brook was visiting his mother not out of a desire to help his mother or wanting to see her, but rather for the purpose of getting credit with the

Court for seeing her. This was false since Adam was caring for his mother as she had appointed him to do.

176.     The Petition in Opposition, at ¶12, also falsely claimed that Dr. David Brook had asked Howard Muser for money to fund Dr. Adam Brook's litigation against Peconic Bay Medical Center. This was untrue.

177.     The Petition in Opposition, at ¶13, also falsely claimed that Judith Brook only said that she wanted Dr. Adam Brook in charge of Dr. Judith Brook's healthcare when Dr. Adam Brook purportedly pressured Dr. Judith Brook to do so. In fact, Judith Brook always wanted Dr. Adam Brook in charge of her healthcare since as early as the documents she signed in 2006.

**Temporary Guardian Ruotolo manufactures a controversy on Friday, June 21, 2019 to prevent Judith Brook's discharge home**

178.     On Friday, June 21, 2019, New York Presbyterian physicians decided that Judith Brook was ready for discharge home from New York Presbyterian Hospital. Judith desperately wanted to go home.

179.     On June 21 at 10:36 AM, defendant Ruotolo emailed Dr. Adam Brook's attorney Harvey Corn that Judith Brook would be discharged at noon, and that he (Ruotolo) expected Dr. Adam Brook to be at their apartment when Judith Brook returned home. Ruotolo threatened not only to cancel the discharge if Dr. Adam Brook was not present at noon, but to place Judith Brook in the Riverside Rehab instead of sending her home. Judith Brook was desperate to

go home and not to be returned to the Riverside Rehab. (June 21, 2019
Ruotolo-Corn email chain)

180.    Dr. Adam Brook was unable to be present until the early evening because
he was seeing cancer patients as a thoracic surgeon in Northport, New York,
almost 2 hours away. It is a common practice in hospitals for individuals to be
discharged in the early evening when the person needed to pick the patient up
is unavailable earlier. But Ruotolo wanted to manufacture a phony controversy,
so that he could falsely blame Dr. Adam Brook for Judith Brook not being able
to return home and being placed in a rehab center. Ruotolo's ultimate
objective, as part of the conspiracy, was the voiding of the power-of-attorney
and healthcare-proxy held by Dr. Adam Brook so that Ruotolo could be
appointed to the lucrative position of Judith Brook's permanent guardian and
make a claim for large fees and compensation.

181.    While Ruotolo did not send Judith Brook to the Riverside Rehab, not only
did he refuse to allow Judith Brook to be discharged on Friday, June 21, he
refused to allow Judith Brook to be discharged home over the June 22–23
weekend.

182.    Then, on Monday, June 24, 2019, at 9:18 AM, Ruotolo emailed Adam
Brook's attorney Harvey Corn that "Dr. Brook is slated for discharge today",
but that Ruotolo would only authorize Judith Brook's discharge home if Adam
Brook was at the apartment at 12 noon. Dr. Adam Brook was seeing patients at
the Northport VA and was unable to be at the apartment at 12 noon, but he

was available to pick Judith Brook up from the hospital in the early evening
which the New York Presbyterian medical staff were in agreement with. But
Ruotolo wanted to manufacture a controversy as part of the conspiracy to have
Judith declared incapacitated, so he would not allow Judith Brook's discharge
home in the early evening. Ruotolo's conduct using his temporary
appointment to prevent Judith Brook's discharge home in order to
manufacture a controversy also constituted intentional infliction of emotional
distress, or in the alternative negligent infliction of emotional distress.

183.     On June 24, 2019 at 7:29 PM Judith Brook left a voicemail for Adam
Brook: "I need your help. Desperately. I'm suffering beyond what anybody is
capable of suffering. Love you."

184.     Eventually Mr. Ruotolo relented and did not insist on Judith Brook being
discharged to Riverside but allowed her to be discharged home.

185.     These controversies manufactured by Ruotolo were part of the conspiracy
with co-defendants to make it appear Adam Brook was not caring for his
mother so that a permanent guardian (Ruotolo) would be appointed and all
defendants could make substantial claims for compensation out of her assets.

**The manufactured controversies in late June 2019**

186.     By email dated June 26, 2019, 10:03 AM, Ruotolo sent a widely distributed
email with false statements to Dr. Adam Brook's attorney Harvey Corn, court-
appointed attorney for Judith Brook Diana Rosenthal, court-evaluator

Margaret Crowley, and petitioner's attorney Ian Shainbrown to create a false record:

> Dr. Brook is at home. The aide, thru the RN, has notified me there is only ice cream in the refrigerator. Ice cream is not appropriate for the only food for Dr. Brook to be consuming, so I have advised the home care agency to put in food delivery- Fresh Direct, immediately.

187.    The claim that there was only ice cream in the refrigerator was false, and the house was well-stocked with food, including perishable and non-perishable foods, as was demonstrated not only by other testimony but also by documentation of orders for groceries and other food.

188.    In addition, on June 6, 2019 Dr. Adam Brook had provided an unlimited credit card authorization to Allegiant Homecare which gave Allegiant the ability to make charges not only for the payment of Allegiant home health aides, but also to pay for whatever necessities Judith Brook might need such as food, so that if the Allegiant home health aide was unable to find a particular food that Judith Brook wanted, Allegiant would be able to order that food for Judith Brook.

189.    Ruotolo made certain not simply to email Adam Brook's attorney Harvey Corn this incorrect story of "no food" so that the purported problem—which was non-existent in reality—could be rectified. Instead, Ruotolo made certain to widely copy this email with false statements to Judith Brook's court-appointed attorney Diana Rosenthal, court-evaluator Margaret Crowley, and

petitioner's attorney Ian Shainbrown so that the story of "no food" could be used later as "evidence" as part of the conspiracy to justify the voiding of the power-of-attorney and healthcare-proxy that Adam Brook held for his mother so that Ruotolo could be appointed to the lucrative position of guardian of Judith Brook.

190.  Significantly, Ruotolo sent this email even though he had not personally witnessed food lacking in the home, and the nurse who had communicated this information to him (presumed to be defendant Ann Reen, R.N.) also had not personally witnessed food lacking in the home. Indeed, rather than communicate this purported problem of "no food" to Dr. Adam Brook or his attorney so that a problem—if such a problem had existed which it did not— could be rectified simply by ordering food, defendant Reen, whose agency Allegiant Home Care was selected by Ruotolo, chose to communicate this information to Ruotolo instead. Reen, as vice president of Allegiant Home Care, also had a financial interest in Ruotolo being appointed Judith Brook's permanent guardian because Ruotolo had selected Allegiant for Judith's care and would direct Allegiant to charge Judith Brook for nurses 12 hours-a-day at $125 per hour, in addition to home health aides 12 hours-a-day at $32 per hour, 7 days-a-week, with the intention of doing so 365 days-a-year. Allegiant Vice President Ann Reen, R.N. and Allegiant Home Care, L.L.C. knew that private-duty nurses (as opposed to home health aides) were not needed, but insisted

on private-duty nurses anyway to increase their compensation at Judith

Brook's expense.

191.    Ruotolo's June 26, 2019, 10:03 AM email claiming that there was "only

ice cream in the refrigerator" was followed 91 minutes later by (now deceased)

court-evaluator Crowley's June 26, 2019 11:34 AM email again demonstrating

the conspiracy by these parties to have Ruotolo appointed and so all the

defendants could receive compensation:

> As court evaluator, I recommend that this Court expand the powers of the
> temporary guardian to include financial powers.  The guardian estate is
> valued at approximately $8,000,000.  I recommend a conference call for
> this afternoon to discuss this issue.

192.    Ms. Crowley's June 26, 2019 11:34 AM email was followed 132 minutes

later by Joe Ruotolo's June 26, 2019 1:46 PM email to the Court's Law Clerk

Premila Reddy, the court-evaluator, and all parties:

> The court has scheduled a conference call for tomorrow regarding
> expanding property powers of the temporary guardian.
>
> This communication is in regards to personal needs powers. The AIP was
> discharged home yesterday in the care of the Adam Brook, cross-
> petitioner. The hospital recommended, to Mr. Brook, a twice-daily
> injection to the AIP, of Octreotide for GI issues. The 10-page discharge
> papers were missing from the AIP's home, and the home care agency was
> not informed of the need for the injectable nor the other 11 discharge
> medications. Additionally, the only food in the home, for Judith Brook

today, was soda and ice cream. Now, the AIP is being brought to the ER for severe diarrhea and pain.

A discharge of Judith Brook back to home, in my opinion, would place her health in danger. Therefore, I am respectfully requesting an expansion of powers and a revocation of cross-petitioner's health care proxy. My apologies in advance for not making a formal application for the requested relief, but any delay may jeopardize the health of Judith Brook.

193.    Ruotolo sent this email to the Court without discussing any of these claims with Dr. Adam Brook's attorney Harvey Corn or with Dr. Adam Brook, and without investigating to determine whether there was any truth to these allegations. Accordingly, Ruotolo's sending the June 26, 2019 1:46 PM email to the Court and court-evaluator was in furtherance of the conspiracy to have Judith Brook declared incompetent and appoint Ruotolo so he and all co-conspirator defendants could make claims for compensation.

194.    New York Presbyterian physicians had prescribed octreotide off-label in the hopes that it would prevent gastrointestinal bleeding.

195.    Octreotide for injection is a peptide hormone that must be refrigerated, and octreotide is not a commonly prescribed medication. Because of this, no pharmacy in Manhattan stocked octreotide. Rather, octreotide for injection needed to be specially ordered, and required several days for delivery to a Manhattan pharmacy.

196.    The New York Presbyterian physicians discharged Judith Brook knowing

that there would be a delay of several days in obtaining octreotide. This is not

to assert that New York Presbyterian physicians were negligent in discharging

Judith Brook without octreotide being available. Octreotide was a medication

being used for prophylaxis against gastrointestinal bleeding from Judith

Brook's hereditary hemorrhagic telangiectasia, although there are no studies in

the medical literature supporting this use for a patient with this history.

Accordingly, octreotide was a medication that New York Presbyterian

physicians deemed reasonable to skip for several days.

197.    In fact, Dr. Adam Brook went to multiple pharmacies to see if octreotide

was immediately available, and found that it was not. Dr. Adam Brook directed

Judith Brook's local pharmacy, Duane Reade at 94th Street and Columbus, to

order octreotide, and Duane Reade then ordered octreotide, and informed

Dr. Adam Brook that octreotide would arrive on Friday, June 28, 2019.

198.    But Ruotolo was so eager to be appointed Judith Brook's permanent

guardian, and was eager for the Court to make a rash decision without due

process in appointing him guardian, that he emailed the Court with a request

to have his powers expanded (which would enable him to bill Judith Brook at

massive rates) without finding out the facts of the matter from Dr. Adam

Brook's attorney Harvey Corn or from Dr. Adam Brook.

199.    The discharge papers were not "missing" from the AIP's home, as

Ruotolo falsely informed the Court. Ruotolo emailed the Court that the

discharge papers were missing without asking Dr. Adam Brook's attorney
Harvey Corn or Dr. Adam Brook where the discharge papers were.

200.    Ruotolo's allegation to the Court that "the home care agency was not
informed of the need for the injectable nor the other 11 discharge
medications" was misleading because Dr. Adam Brook was administering all of
Judith Brook's medications to her himself when she was at home, there was no
need for the homecare agency's involvement in medication administration,
and, most importantly, the homecare agency Allegiant Homecare did not ask
Dr. Adam Brook for a list of Judith Brook's medications. Had Allegiant
Homecare asked Dr. Adam Brook for a list of Judith Brook's medications,
Dr. Adam Brook would have readily provided such a list to them.

201.    Judith Brook had diarrhea, but Mr. Ruotolo was incorrect that Judith Brook
was being brought to the emergency room. Upon information and belief, the
Allegiant Homecare agency called an ambulance to take Judith Brook to New
York Presbyterian Hospital because of the diarrhea, but when EMS arrived
Judith Brook refused to go to the hospital, and EMS left. Judith Brook's friend
Liz Rubenstone then came to the home (Dr. Adam Brook was seeing patients
in Northport, New York) and took Judith Brook to Judith Brook's geriatrician
Dr. Cynthia Lien's office, where she was evaluated. Dr. Lien determined that
Judith Brook developed diarrhea and abdominal pain from *Clostridium difficile*
infection, which was not due to any failure of Adam Brook's care. Judith Brook
had become colonized with *C. difficile* when she was in New York Presbyterian

Hospital, and the *C. difficile* colonization progressed to infection as a result of Judith Brook's physicians having given her antibiotics, upon information and belief, to treat a urinary tract infection. It is general medical knowledge that antibiotic treatment frequently may cause the adverse side effect of *C. difficile* colonization, which may progress to gastrointestinal infection.

202.   Ruotolo's June 26, 2019 1:46 PM email to the Court, the court-evaluator, and all parties was followed 25 minutes later by petitioner's counsel/son-in-law defendant Ian Shainbrown's June 26, 2019 2:11 PM email aiding the conspiracy without any first-hand knowledge of the events:

> As Adam Brook -- a physician -- ignored the twice daily injections and 11 other medications on the discharge instructions, petitioner has no objection to the expansion of powers for the temporary guardian and revocation of cross-petitioner's health care proxy.
>
> The AIP is apparently distraught at the prospect of returning to the hospital and just told my client "I'll be dead by next week". As a result, if she is able to be discharged, we respectfully request she would be permitted to return to her apartment, where she has lived for over 40 years, with as many aides as necessary, and that Adam Brook be forced to vacate. Adam's conduct should not result in Judith being barred from her own home.

203.   Shainbrown's email to the Court, the court-evaluator, and all parties was deceitful, false, and inflammatory. As explained *supra*, Dr. Adam Brook did not "ignore" twice daily injections of octreotide—octreotide was unobtainable

from outpatient pharmacies on the day of discharge. Nor did Dr. Adam Brook ignore 11 other medications, as Shainbrown falsely told the Court without any foundation or personal knowledge. Shainbrown's intent was clearly to deceive the other parties and convince the Court with false statements to "expan[d] powers for the temporary guardian and revocation of cross-petitioner's health care proxy" in furtherance of the conspiracy. Shainbrown's false statements also constituted a violation of New York Judiciary Law §487.

204.    Ian Shainbrown's June 26, 2019 2:11 PM email to the Court, the court-evaluator, and all parties was followed 1 hour and 49 minutes later by Ruotolo's June 26, 2019 4:00 PM email to the court-evaluator and all parties which said:

> Judith Brook was speaking with cross-petitioner, via phone, when EMS arrived an hour ago. The AIP [alleged incapacitated person] refused to go to the hospital, and Adam Brook is to take her to her PCP [primary care physician] today. Additionally, Judith Brook's friend, Lynn, it [sic; is] headed to the apartment to take her to the PCP. Starting tomorrow, RN Care [private-duty nurses] will be in place every day, in addition to the HHA [home health aides] for Judith Brook.

> Mr. Corn, please have Adam Brook redo the authorization for the home care agency.

205.    Ruotolo's motives for implementing nurses as opposed to home health aides for Judith Brook, even though no physician had ever said that nurses—as opposed to home health aides—were needed, were severalfold.

206.   As previously alleged, Allegiant charged Judith Brook $125 per hour for private-duty nurses, 12 hours-a-day, 7 days-a-week, with the intention of providing this care 365 days-a-year. The remaining 12 hours-a-day would be covered by Allegiant-provided home health aides at $32 per hour.

207.   Thus, by ordering nurses that were not needed, as opposed to home health aides which were needed, defendant Ruotolo could reward his co-conspirator Allegiant Home Care, with annual payments of $687,660 at Judith Brook's expense. We do not know yet whether Ruotolo was getting a kickback from Allegiant for appointing them to provide care and requesting more expensive services than were necessary.

208.   The decision to implement nurses at $125 per hour was made by Ruotolo and Allegiant Home Care, and Ruotolo notified all parties of implementing nurses at $125 per hour by email dated June 26, 2019. Private-duty nurses at $125 per hour and home health aides at $32 per hour works out to $1884 per day. Thus, Allegiant was billing Judith Brook at a rate of $687,660 per year for homecare services.

209.   Billing Judith Brook quickly at a high rate was critical to Ruotolo and Allegiant Home Care's scheme. Ruotolo and Allegiant wanted to be able to claim that Adam Brook was in arrears in excess of $100,000. Ruotolo and Allegiant's scheme was to manufacture purported "arrears": Ruotolo and Allegiant ran up a high bill with private-duty nurses, Allegiant did not send Adam Brook invoices, and then Allegiant did not use the unlimited credit card

authorization that Adam Brook had provided until suddenly, two weeks before the expected date of the guardianship hearing (September 6, 2019), Allegiant then billed Judith Brook's credit card $348,957.50 in a single day (August 23, 2019), which of course would be rejected by the credit card company; and then Allegiant falsely claimed that homecare services would stop for non-payment, thereby manufacturing a phony "crisis" that would justify Judge O'Neill-Levy voiding Dr. Adam Brook's power-of-attorney and healthcare-proxy and Judge O'Neill-Levy appointing Ruotolo as Judith Brook's guardian.

210.    Ruotolo hoped that such high charges for unnecessary care (private-duty nurses 12 hours-a-day at $125 per hour) would provoke a controversy with Dr. Adam Brook, and would enable a large bill to be run up so that the court-appointees appointed by Judge O'Neill-Levy could falsely claim that Dr. Adam Brook was purportedly refusing to pay for homecare services, as discussed *infra*. Ruotolo learned these dishonest tricks in the approximately 500 guardianships that he had been involved with in the preceding decade.

211.    In fact, after a hospitalization at New York Presbyterian in early July 2019, when Judith Brook was hospitalized for a urinary tract infection, New York Presbyterian social workers arranged for Girling Homecare to provide homecare for Judith Brook. Girling recommended a visiting nurse to come twice-a-week for 30 minutes. But Ruotolo would not allow this because he wanted to pay hundreds-of-thousands of dollars of Judith Brook's assets to his co-conspirators, Allegiant Homecare.

212.    By email dated June 26, 2019 5:38 PM, Dr. Adam Brook's attorney Harvey

Corn responded to the Court, the court-evaluator, and all parties:

> I will try to reach him but I think any decision regarding the RN should be
> made after she is examined by Dr Lien. I think there has been
> misinformation going around concerning many issues. As you may know,
> Judith was not discharged yesterday until after 5PM. Neither the pharmacy
> listed on the prescription nor the other 2 pharmacies that my client went to
> carry it [octreotide] in common stock and for good reason: it is a protein
> that degrades quickly. In fact, one of the reasons for not having her at
> Riverside is that they do not handle it properly. My client ordered it
> immediately after he got the prescription and he is in touch with the
> pharmacy and will obtain it immediately after it has received
> it.  Fortunately, I have been advised that It is a GI medication that is used
> for preventative purposes, and does not require immediate administration.
> I have also been advised that the refrigerator in the apartment has many
> things including yogurt, salmon etc. There is also peanut butter in the
> apartment. You mention that the refrigerator has ice cream and I think it is
> not understood that this is a particularly good food for her because it has
> more calories per ounce than any other food and will help her gain weight.
> It is also a food that Judith likes and will eat. Further, The HHA can charge
> anything she wants for Judith and herself on the credit card given to the
> agency which is unlimited. She can also call my client and he will authorize
> anything they want. The only time there is difficulty in having an extended
> conversation with him is if he is in the car and driving. As to the diarrhea, I
> assume that you were previously told by the medical providers that you
> spoke to that Judith contracted C-diff at either Weill or Riverside and is
> receiving medication regarding same. This is the likely cause of the

diarrhea and an excellent reason to keep her out of institutions and at home. The tone of some of the e-mails seems to imply that my client is trying to harm his mother. In the course of the last 8 months, my client has saved her life on several occasions. The first time was at NYU when they did not diagnose her Deep Vein Thrombosis, which caused pulmonary embolisms to form that would have killed her if she was not removed and subsequently sent to Weill and treated for it.. At numerous times, Riverside put a hold on giving her Metropotol [*sic*: metoprolol] which is a medication that was prescribed to her to slow her heart down so that she would not have a left ventricle obstruction and a heart attack. Had my client not intervened and got the hold countermanded, she also would have died.  We are all on the same page as to doing every thing possible to take care of Judith Brook and my client has and will make it happen. Before you ask, you should know that a physical therapist will be seeing Judith tomorrow at the apartment to make an evaluation and map out a plan of treatment.

**Ruotolo's ordering nursing-services at $125/hour, when only home health-aides were required, was part of Ruotolo's scam**

213.    One aspect of Ruotolo's scam was to order nursing services at $125/hour, 12 hours-a-day, 7 days-a-week (in addition to home health-aides ("HHAs") 12 hours a day), when what was needed was HHAs 24 hours a day (who can be hired privately at $20/hour).

214.    Ruotolo's June 26, 2019 4:00 PM email announcing that private-duty nurses would be hired for Judith Brook did not mention a reason why private-duty nurses would be hired instead of home health aides.

215.    When confronted by Dr. Adam Brook on a recorded telephone call
regarding Ruotolo's use of private-duty nurses at $125 per hour, 12 hours-a-
day, 7 days a week, Ruotolo claimed, incredibly, that healthcare providers at
Riverside Rehab and New York Presbyterian said that if Judith Brook has
enough money, private-duty nurses rather than home health aides should be
hired. When asked to name a physician who recommended private-duty
nurses, Ruotolo could not name a single one. In fact, no physician told Ruotolo
that Judith Brook needed nurses 12 hours-a-day, 7 days-a-week.

216.    When Ruotolo testified at the January 3, 2020 trial, he changed his story,
claiming that nurses rather than HHAs were indicated because Judith Brook
was colonized with *C. difficile*:

> Specifically during the month of June, during the month of June she had C
> Diff. ... The C Diff could transfer to the some of the hard surfaces of the
> home. The aides didn't necessarily have that type of training to stop it,
> clean it up--the RN did. That was also one, another reason why the RNs
> were put in place because she had C Diff. (Tr. 33)

217.    Ruotolo's testimony was false. "[M]aintain[ing] a clean environment" is
within the scope-of-practice of HHAs according to the New York State
Department of Health ("DOH") Division of Home and Community Based

Services "Scope of Tasks"/ "Matrix of Permissible and Non-Permissible Activities Home Health Aide (HHA) Services", page 29.[5]

218.    Ruotolo's testimony regarding nurses and HHAs demonstrates he has no idea what is taught in nursing-school or in HHA-training, and has little understanding of what private-duty nurses do. In twenty years of practice as a surgeon, Dr. Adam Brook has never heard of a physician ordering a home-nurse, rather than an HHA, because the patient had been colonized with *C. difficile*.

219.    Allegiant's provision of unneeded private-duty nurses at $125 per hour, where Allegiant knew or should have known that private-duty nurses were not needed, constitutes unjust enrichment and the damages for overcharges and fraudulent billing far exceed $75,000.

**The phony medication controversy**

220.    On Saturday, June 29, 2019, at 4:56 PM, defendant Allegiant Homecare Vice President Ann Reen emailed Dr. Adam Brook and guardian Ruotolo:

> Dr. Brooks [*sic*].
>
> There seems to be some confusion about your mother's medication regime. Please email me and updated list so I can confirm with her PCP.

---

[5] http://www.leadingageny.org/linkservid/086226dd-f154-009a-541f4722d38b4641/showmeta/0/, accessed July 12, 2021

Thank you,

Ann Reen.

221.    Before Dr. Adam Brook had any time to respond, 42 minutes later, Ruotolo

emailed the court-evaluator and all parties and the Court on Saturday, June 29,

2019, at 5:38 PM:

Mr. Corn,

Please see an email to you client this afternoon, from the supervising RN.

I am informed the AIP is in pain and the RN is experiencing a lack of
cooperation on cross-petitioner's part.

Is there some reason that may be the case?

Please advise after you have had an opportunity to speak with your client.

Joseph Ruotolo

222.    In an email exchange with defendant Ann Reen, Dr. Adam Brook

responded to defendant Reen's claim that there were "discrepancies in

medication". *See* Brook-Reen June 30, 2019 12:27 AM-3:50 AM email chain. In

particular, Dr. Adam Brook's June 30, 2019, 12:27 AM email says:

If you have any questions about my mother's medications, please contact
Dr. Cynthia Lien. Dr. Lien's number is (212) 746-7000, and I expect she
will be available Monday. You are also welcome to call me on my cell phone
at (415) 516-0787.

223.    In several emails, Dr. Adam Brook repeatedly asked defendant Ann Reen

specifically what the "discrepancies in medication" that Reen claimed were.

Reen never stated what specific medications there were "medication discrepancies" for. Ms. Reen emailed Dr. Adam Brook, Dr. Brook's then attorney Harvey Corn, and guardian Ruotolo, at June 30, 2019 8:34 PM: "It seems as though the medication discrepancies have been worked out."

224.    But in that very same June 30, 2019 8:34 PM email defendant Ann Reen introduced several new manufactured controversies including: A. "your mothers condition is still unstable"; B. "AHC [Allegiant Homecare] will be ordering food weekly for your mother as HHAs [home health-aides] stated there was a time when food was minimal." But Judith Brook's condition was not "unstable", and there was never a time when food in the house was "minimal".

**The July 1, 2019 oral argument on guardian Ruotolo's request that Dr. Adam Brook's power-of-attorney be revoked**

225.    On July 1, 2019, without Judith Brook present, Judge O'Neill-Levy held a hearing on Ruotolo's request that the power-of-attorney Dr. Adam Brook held for his mother be revoked.

226.    Ruotolo falsely claimed to the Court, as a basis for voiding Dr. Adam Brook's power-of-attorney, that Dr. Adam Brook was responsible for Judith Brook's being delayed for 4 days from leaving New York Presbyterian, but this was a fake controversy that Ruotolo manufactured because Ruotolo did not

allow Judith Brook to come home on Friday at 6 PM, and Ruotolo did not allow Judith Brook to be discharged on Saturday or Sunday, as discussed *supra*.

227. Ruotolo claimed to the Court, as a basis for voiding Dr. Adam Brook's power-of-attorney, that Dr. Adam Brook was responsible for Judith Brook refusing to go to New York Presbyterian Hospital when she developed diarrhea, but Judith Brook went to her geriatrician Dr. Cynthia Lien's office, and she did not need to go to the Hospital at that time.

228. Ruotolo falsely claimed to the Court, as a basis for voiding Dr. Adam Brook's power-of-attorney, that there was only ice cream and soda in the apartment, but this was untrue and concededly not personally witnessed by Ruotolo.

229. Ruotolo claimed to the Court, as a basis for voiding Dr. Adam Brook's power-of-attorney, that Dr. Adam Brook was responsible for Judith Brook's discharge papers being "missing" as a nurse allegedly could not find them, but Dr. Adam Brook never refused to hand over any hospital discharge papers in his possession, as discussed *supra*.

**The manufactured controversies in July 2019**

230. On July 1, 2019, 5:14 PM, defendant Shainbrown emailed the court-evaluator and all parties:

On another front, could you please ask your client to refrain from making unfounded allegations against myself, my client, as well as Ms. Crowley

and Mr. Ruotolo. I understand Adam is constantly telling his mother Howard is trying to take her money and put her in a nursing home, etc., and that's just not the case.

231.    Mr. Shainbrown's email was without foundation and another out-of-court false statement intended to help his client procure the guardianship of Judith Brook by fraud upon the Court.

232.    On July 6, 2019, 3:23 PM, defendant Ruotolo emailed the court-evaluator and all parties with more hearsay:

In regards to your mother, I received this communication from the home care agency:

*"I am told by the RN that Judith is lethargic in the morning and playing in feces daily. I believe her staying up until 1a is not helping her morning confusion. Could you possibly speak with Liz and ask her to leave clients home at a decent hour. This would help with her recovery."*

233.    This was a continuation of Ruotolo's phony narrative that Judith Brook purportedly had advanced dementia and therefore a guardian—namely Ruotolo himself—should be appointed.

234.    By email dated July 6, 2019, 3:32 PM, Dr. Adam Brook responded:

I have been present for much of the time in the apartment. My mother is not "lethargic". "Lethargic" is a medical term, and I am qualified to say that my mother is not lethargic. Being sleepy at times is not the same as being lethargic.

Nor is my mother confused.

Nor is my mother "playing in feces daily".

These false statements need to stop immediately. Please identify by name the individual who is making these false statements. (Exhibit 36)

235.   On July 6, 2019, 12:40 PM, Dr. Adam Brook sent a second email to Ruotolo:

As a follow up to my last email, kindly advise me of the name of the person who told you that my mother is "lethargic", "confused", and "playing in feces". I am sure that you would agree that it is important that we learn how these false statements originated.

236.   But Ruotolo did not identify the individual who was making these false statements.

**The Margaret Crowley July 10, 2019 court evaluator report**

237.   Margaret Crowley died on August 3, 2020, and for that reason she is not a defendant in the case at bar.

238.   Crowley produced a court-evaluator's report filled with lies and incorrect statements. Whenever it came time for Crowley to be cross-examined on her court-evaluator report, she would claim to be too sick to be examined.

239.   The lies in Crowley's report are material because, as discussed *infra*, the successor court-evaluator Ira Salzman stated he relied on Crowley's report in drafting his first court-evaluator report even though Crowley had never been

examined on her court-evaluator report and even though Salzman never interviewed Crowley or independently verified her report.

240.    The misrepresentations in Crowley's court-evaluator report included at least the following:

241.    Page 2 ¶6 of Crowley's court-evaluator report stated incorrectly that the order to show cause had been served on Dr. Judith Brook, but the order to show cause was neither served on Dr. Judith Brook nor personally delivered to Dr. Judith Brook as NYMHL §81.07 requires.

242.    Crowley's court-evaluator report ¶15, parroting Muser's petition and without any investigation of the facts by Crowley, incorrectly claimed that the hereditary hemorrhagic telangiectasia affected Judith Brook's lungs, brain, spinal cord, and liver, but it did not.

243.    Crowley's court-evaluator report, parroting Muser's petition and without any investigation of the facts by Crowley, stated incorrectly at ¶15 that Judith Brook "stopped going to work on a regular basis" in "June of 2018", but in fact, as is documented by Judith Brook's secretary Linda Capobianco's December 7, 2018 email to Adam Brook, Judith Brook continued going to work through the end of September 2018.

244.    Crowley's report was filled with outrageous claims that are not credible and inconsistent with Judith Brook's later testimony in court. For example, Crowley's report, ¶20, asserted that Judith Brook said: "I have been working 17-18 hours a day. I

am a surgeon—like my son, a cardiothoracic surgeon." It is not credible that Judith Brook would have made such a statement.

245.   In fact, on July 3, 2019, when Judith Brook was in the emergency room with an episode of dyspnea, she was examined by New York Presbyterian emergency room attending physician Dr. Tanveer Makker. Dr. Makker told Dr. Adam Brook that Dr. Judith Brook had "decisional capacity", and was fully competent to make decisions on her own regarding her own life.

246.   Judith Brook's court-appointed attorney Diana Rosenthal was not with Judith Brook when Margaret Crowley interviewed her, and without an attorney present Judith Brook was defenseless against Crowley's manipulations, and, more importantly, without an attorney present, there was no witness to Crowley's interview of Judith Brook who could point out the misrepresentations in Crowley's report. Diana Rosenthal's failure to be present during Crowley's interview of Judith Brook, where Judith Brook's civil and constitutional rights were at stake, constituted legal malpractice.

247.   Crowley also lied by claiming Judith Brook made statements that Judith Brook never made including: at page 7 ¶23, that Judith Brook said she has 6 grandchildren and the rest were all boys; and page 7 ¶23, "When your undersigned stated ADAM BROOK was her son, she said, "I don't know. I am tired."" This was all part of the conspiracy to have her colleague Ruotolo made permanent guardian of Judith Brook. The statements that Crowley said Judith Brook said, but which Judith Brook in fact never said, are statements that someone with advanced dementia would say. It is clear

from the transcripts of Judith Brook in open court; from the testimony of Adam

Brook, Nicole Hazard, and others; and from audio recordings of Judith Brook that

Judith Brook did not have advanced dementia.

248.    Crowley also lied when she claimed that Riverside Rehab social worker Tara

Diamond said that "Adam Brook, MD did not feel his mother needed an aide 24/7"

on May 24, 2019 at approximately 2 PM. As demonstrated by Dr. Adam Brook's

contemporaneous notes of his interview of Ms. Diamond four hours later at 6:11 PM

on May 24, 2019, Tara Diamond never told Crowley that Dr. Adam Brook said he did

not feel his mother needed an aide "24/7".

**Crowley Reports Uncorroborated Hearsay from Muser, an interested witness**

249.    According to Crowley's report, Howard Muser told Ms. Crowley that Judith

Brook "ha[s] no other brothers and sisters". (Crowley court-evaluator report page 7,

¶26) In fact, Judith Brook had a sister-in-law, Joanne Lopez.

250.    According to Ms. Crowley's report, Howard Muser told Ms. Crowley that

"[a]fter the death of his brother-in-law, David Brook, MD, Judith Brook asked him to

help her with her finances". But this was untrue. Judith Brook was in the hospital at

the time of her husband's death and in a hospital or rehab from then until the time

when the petition was filed, when Howard Muser claims (falsely) that she asked him

for help with her finances. (Crowley court-evaluator report, page 8 ¶27)

251.    According to Crowley's court-evaluator report, page 8, ¶27, Howard Muser told

Crowley that "Judith Brook's HHT illness has progressed and she has no dignity at

this time."

252.    According to Crowley's court-evaluator report, page 8, ¶28, Howard Muser told

Crowley that "[Adam Brook] has failed to get JUDITH BROOK the care that she

needs."

253.    According to Crowley's court-evaluator report, page 8, ¶28, Howard Muser

made the following outrageous, malicious, and false statement to Margaret Crowley:

> ADAM BROOK, MD, is not mentally stable to help his mother. ADAM
> BROOK, MD, is totally dependent on his mother, and he has failed to get
> JUDITH BROOK the care that she needs. ADAM BROOK, MD, is
> preoccupied with his nine-year pro se litigation against a hospital that he
> used to work at. ADAM BROOK, MD, has spent over one million dollars
> of his parent's money to fund the litigation and continues to get money on a
> monthly basis. Yet ADAM BROOK's mother JUDITH BROOK has no
> health-care assistance at this time. PETITIONER begs the Court to
> appoint him guardian or co-guardian of the personal and property of
> JUDITH BROOK.

254.    In fact, Dr. Adam Brook had done an excellent job managing his mother's

healthcare.

255.    In fact, Dr. Adam Brook was not "totally dependent on his mother", but had a

six-figure salary.

256.    In fact, Judith Brook was in a rehabilitation facility where she was cared for

by physicians, nurses, and nurses-aides. The statement that "ADAM

BROOK's mother JUDITH BROOK has no health-care assistance at this time" was egregiously false.

257.    In fact, both of Adam Brook's parents, David Brook and Judith Brook, had funded Dr. Adam Brook's litigation against Peconic voluntarily over the course of a decade, as proved in the Article 81 case and so noted on the record by Judge O'Neill-Levy.

258.    Muser and his son-in-law/attorney Shainbrown's unsworn false and hearsay statements made out-of-court to court-evaluator Crowley were part of Muser, Shainbrown, and Huth's attempt to create a false record in furtherance of the conspiracy and were impertinent and so needlessly defamatory as to warrant the inference of express malice. Muser and his son-in-law/attorney Shainbrown made these statements for their own nefarious purposes.

259.    Crowley also interviewed Dr. Adam Brook, who she referred to in her report incorrectly as "DAVID BROOK, MD". Crowley, in her efforts in furtherance of the conspiracy with the Court and co-conspirators to have her colleague Joseph Ruotolo appointed to the lucrative position of Judith Brook's guardian, falsely claimed that Dr. Adam Brook had said that "[h]e does not feel his mother has needed an aid[e]". (Crowley court-evaluator report page 9, ¶29)

260.    Crowley's court-evaluator report claimed falsely that "Adam Brook has been far from candid with the Court concerning his parent's finances." (Crowley court-

evaluator report page 9, ¶30) The basis for this outrageous claim was the observation by Crowley—who was not a hand-writing expert—that "[t]he same hand writing [was used] going as far back as 2016 on the checks of both JUDITH BROOK and David Brook, MD".

261.    Crowley actually claimed in her report, at page 9 ¶31: "The undersigned provided the Court and counsel with copies of cashed checks [from 2016] which your undersigned court evaluator suggests are being written by Adam Brook MD".

262.    No 2016 checks from the David/Judith Brook account were written by Adam Brook.

263.    Checks on a Joint account in the name of both Judith Brook and Adam Brook were written in 2019 for Judith Brook's benefit not Adam Brook's benefit. Adam Brook had his own accounts.

264.    These checks were not a gift from Judith Brook to Adam Brook because the checks were written for Judith Brook's benefit.

265.    Crowley urged the Court to void Adam Brook's power-of-attorney and healthcare-proxy because "there is a conflict of interest with ADAM BROOK, MD, the cross-petitioner, due to the amount of money he takes on a monthly basis to fund his lawsuit and lifestyle, as well as the joint account at First Republic Bank." In fact, as hereinabove alleged and later proved in the Article 81 case, Judith Brook had voluntarily given money to Adam Brook for years to help him fight the lawsuit to regain his career.

266.    The amount of money Judith Brook was giving Adam Brook was $144,000
a year, simply not an amount of money that would jeopardize Judith Brook's
nearly $8,000,000 in assets. But most importantly, this was Judith Brook's
money, not Howard Muser's money, not the money of the attorneys of the
Elder Law bar who are alleged herein as co-conspirators to falsely find Judith
"incapacitated" to open the door to their claims for compensation. As a free
citizen of a free country, Judith Brook should have been allowed to do with her
money as she pleased. But the co-conspirator defendants all had the same
motive to do whatever was necessary with the Court to falsely have Judith
declared "incapacitated" so that they could file claims for compensation
against her estate. This was the reason that the defendants falsely claimed that
Adam was improperly taking funds from Judith when in fact Judith voluntarily
chose to provide financial support to her sole surviving child to restore (by
means of a lawsuit) his hard-earned career that was taken from him by
PBMC's fraud. Judge O'Neill-Levy ultimately found, based on substantial
documentary and witness testimony, that David and Judith Brook did
voluntarily support Adam in his legal claims. But pursuant to the conspiracy to
reward Ruotolo (and other claimants), Judge O'Neill-Levy nevertheless ruled
against Adam and Judith, without clear and convincing evidence to prove
Judith was incapacitated.

267.    Indeed, guardian Ruotolo requested the Guardianship court award him
payment of $318,129.81 from Judith's assets for a temporary guardianship

where he was given complete control over Judith Brook's person and property for only 71 days until his actions and the actions of other defendants resulted in Judith's premature death and substantial damage to her assets and to her Estate plan. Along with other the co-conspirator defendants, a total of ten attorneys requested the Guardianship court award payment to them of a total $873,774 for this disastrous guardianship. Crowley's report also did not offer Nicole Hazard as a possible guardian in the event Dr. Adam Brook would be deemed ineligible to serve, even though it has long been the law in this State, under both Article 81 of the Mental Hygiene Law and its precursors, that strangers will not be appointed guardian of the person or property of the "incapacitated person", unless it is impossible to find within the family circle, or their nominees, one who is qualified to serve.

**In a month and a half, the guardianship proceeding cost Adam Brook $80,000 in legal fees, and Adam Brook had little choice but to proceed *pro se***

268.    By middle July 2019, with still no hearing of the guardianship matter, Dr. Adam Brook had a bill from his attorney Harvey Corn in excess of $80,000 for the guardianship proceeding. It was clear to Adam Brook that in several more months of these proceedings he was going to run out of money, and for that reason he had to ask his then counsel Harvey Corn to withdraw as counsel on July 17, 2019. Adam Brook faced no choice but to proceed with this litigation *pro se*, where his mother's life was at stake, against a group of

individuals whose sole motive was to have her declared incapacitated by any means necessary in order for them to make claims for their "services" against the $8,000,000 in assets Adam's parents had accumulated through two lifetimes of hard work. These defendants did not care for Judith Brook's welfare or the true fact that she was competent, but viewed her as a walking piggybank.

269.    Once Dr. Adam Brook was *pro se*, Joseph Ruotolo considered Adam Brook easy prey for Ruotolo's schemes to claim Adam Brook had breached his fiduciary duty to his own mother, so that Ruotolo could provide Judge O'Neill-Levy with a basis to award Ruotolo the lucrative guardianship of Judith Brook. Once Dr. Adam Brook was *pro se*, Ruotolo knew that he could lie with impunity to the court: Ruotolo knew, from having been an appointee of Judge O'Neill-Levy 21 times in the prior two calendar-years (2018–2019), that Judge O'Neill-Levy would believe anything that Ruotolo would say and would discount anything that a *pro se* litigant would say.

**On Friday, July 19, 2019, Ruotolo manufactures a controversy by insisting that Judith Brook be placed in an ultra-luxury suite in New York Presbyterian Hospital, even though this placed Judith Brook far away from her medical team**

270.    On July 18, 2019, Dr. Adam Brook emailed temporary guardian Joe Ruotolo July 18, 2019, at 1:35 PM:

> I took my mother to the Presbyterian ED this morning because she had a
> brief episode of an irregular rhythm along with an episode of nausea.

271.    Joe Ruotolo responded to Dr. Adam Brook by email on July 18, 2019, at

4:03 PM:

> Thank you for the update. I hope she is feeling better.

272.    Unfortunately, the emergency room physicians gave Judith Brook too

much narcotic, and she was very drowsy as a result.

273.    On July 19, 2020, at 1:56 PM, while Adam Brook was at the Northport VA

Hospital treating cancer patients, Ruotolo emailed Dr. Adam Brook:

> I just finished visiting with Judith Brook, at the ED Weill Cornel. I also met
> with her doctors. She is admitted, and waiting on a room, and she has been
> in the ED for over 24 hours.
>
> After discussing with [sic] her options, she has chosen a private room, at
> Weill Cornel. Private rooms at Weill Cornel are private pay.
>
> Please call this afternoon Patient Services Administration, at 646-426-6871
> or 212-746-3813 and provide payment.  Payment is required upfront before
> getting the room.

274.    In furtherance of the conspiracy, Ruotolo sent this email not just to

Dr. Adam Brook to request pre-payment, but to all parties, the court-evaluator,

and the Court, revealing that his intention was not for Judith Brook's welfare,

but rather to instigate a controversy with Dr. Adam Brook, so that Ruotolo

could then cite the controversy to the Court to void Adam Brook's power-of-

attorney and appoint Ruotolo as Judith Brook's guardian.

275.    But private rooms for patients such as Judith Brook, who had a history of *Clostridium difficile* colonization, are actually not private pay at New York Presbyterian Weill-Cornell Hospital, but given without charge and paid for by insurance. Only private rooms on 14 Greenberg, the ultra-luxury floor, are private pay. Those rooms on the ultra-luxury floor have marble floors and fine china, but have significant disadvantages for many patients.

276.    14 Greenberg is, as the name suggests, located on the 14th floor. 14 Greenberg was far away from where Judith Brook's medical team ("the Medicine Blue team") was located, 5 Central. As Dr. Adam Brook, a Board-certified cardiothoracic surgeon with twenty years-experience knew, this has two problems associated with it.

277.    First, placing Judith Brook on 14 Greenberg would mean that Judith Brook would be far away from her medical team. In the event of an emergency, it would take Judith Brook's medical team, located on 5 Central, a longer time to get to 14 Greenberg. A delay in Judith Brook's medical team getting to Judith Brook in the event of an emergency would be dangerous.

278.    Second, by placing Judith Brook far away from her medical team, it meant that members of her medical team did not visit her, since it takes 15 minutes to walk to the other side of the hospital and take the elevator up to the 14th Floor. Less contact with her medical team is a very serious problem for an ill elderly patient. Therefore, a move to 14 Greenberg as proposed by Ruotolo was unnecessary and in fact would endanger Judith's care.

279.    The ultra-luxury room also cost $2200 a night above and beyond what Judith Brook's health insurance paid. This is why Ruotolo selected the ultra-luxury room: he expected Adam would object to this inordinate expense, but did not know of the healthcare risks it would entail, and he wanted to manufacture a controversy whereby Dr. Adam Brook would refuse to pay the $2200 per night for the ultra-luxury room so that Ruotolo could go to Judge O'Neill-Levy and say Dr. Adam Brook's power-of-attorney and healthcare-proxy should be voided because Dr. Adam Brook was purportedly refusing to pay for his mother's healthcare needs. Then, after Dr. Adam Brook's power-of-attorney and healthcare proxy were voided, Judge O'Neill-Levy could reward Ruotolo with the lucrative guardianship of Judith Brook.

280.    But Dr. Adam Brook, a Board-Certified cardiothoracic surgeon, knew that the issue of a private room was moot, because Judith Brook would be assigned a private room anyway because she had been infected the previous month with *Clostridium difficile*. Of course, such a private room would be on the regular hospital floor, and hence would almost certainly be on or near 5 Central, where Judith Brook's medical team was based (hospitals usually place patients close to where their medical team is based).

281.    Accordingly, four minutes later, while still at work, Dr. Adam Brook emailed Joe Ruotolo from his iPhone on July 19, 2019 at 2:02 PM:

    Mr. Ruotolo:

My mother is entitled to a private room without private pay because she recently had C. difficile colitis. Paying for a private room in such circumstances is just paying thousands of dollars for no reason. So no need to pay for a private room: it will be provided anyway.

Sincerely,

Adam Brook, MD, PhD

282.    Dr. Brook did not copy all parties, the court-evaluator, and the Court on the email because he was seeking in good faith to resolve the pretextual issue raised by Ruotolo.

283.    Not to be so easily dissuaded from his scheme to manufacture a controversy to justify the voiding of the power-of-attorney and healthcare-proxy Adam Brook held for his mother, at 2: 17 PM, exactly 15 minutes after Ruotolo's first email, Ruotolo continued the email chain:

It is true she will get a private room because of the C. diff, but she stated to me she wants the comfort of the private room on the 14th Fl., once it was explained to her.

So there is no misunderstandings, the room is to be paid from her funds not from your own funds.

She has been in the ED and hospital 2 times in the last week alone, and a little more care and attention on the 14th Floor will provide her with some much needed relief.

Thank you for your anticipated cooperation. And please inform the undersigned and all parties and the Court-copied above, when payment is made, this afternoon.

284.    Ruotolo egregiously lied about what Judith Brook said. During this particular hospitalization, Judith Brook was significantly lethargic, as observed in person by Dr. Adam Brook, because New York Presbyterian staff had given Judith Brook too much narcotic. Moreover, the rooms on the ultra-luxury floor are not "more comfortable" and patients on 14 Greenberg do not receive "more care and attention", they just have fancier fixtures. And in the fifty years that Adam Brook knew his mother she was not one to care about fancy fixtures. Ruotolo's conduct was transparently manipulative.

285.    Ruotolo essentially stated explicitly that Ruotolo was so brazen in manufacturing this controversy because Adam Brook had had Harvey Corn withdraw as counsel only two days previously. Ruotolo's next email to Dr. Adam Brook, all parties, the court-evaluator, and the Court, at 2:33 PM, four minutes later said:

> Dr. Brook,
>
> I think are [*sic:* our] emails are crossing.
>
> Please note, *since your [sic] are now representing yourself in this matter, there are no ex parts [sic] communications between us.* Counsel and the Court are to be copied on all our communications.
>
> Regards,
>
> Joseph Ruotolo (Emphasis added.)

286. 18 minutes later, at 2:51 PM, Ruotolo further emailed Dr. Adam Brook, all

parties, the court-evaluator, and the Court, to complete his manufactured plan,

in furtherance of the conspiracy, to "expand" his temporary powers:

> Please advise forthwith if you are complying with your mother's request to
> telephone Admitting to pay, from her funds, the room she requested.
>
> *If this is something you are not willing to do, then I will request the Court expand*
> *my temporary powers to include some property needs in order to comply with my*
> *ward's [Dr. Judith Brook's] request.* (Emphasis added.)

287. 28 minutes later, at 3:19 PM, Ruotolo emailed the Court (via the Court's

law clerk Premila Reddy), all parties, the court-evaluator, and Dr. Brook:

> Ms. Reddy,
>
> I have received papers that Adam Brook discharged his second attorney,
> and *he is now pro se in this matter.* He is copied in this correspondence.
>
> *I respectfully request the Court expand the temporary guardian's powers to*
> *include marshaling the AIP's assets.* The reason for this request is that *Adam*
> *Brook, for some reason, will not disburse my ward's funds for her benefit,* as the
> Court ordered at our last appearance. I have not asked Adam Brook to
> disburse his own funds. *And if the Court recalls, the Court Evaluator testified*
> *the AIP has near $8,000,000.*
>
> Dr. Judith Brook has been admitted to Weill Cornel twice in the last week,
> and is currently in the ED waiting on the room she requested. She
> specifically requested a private room on the 14th Fl of the hospital. Though
> she will receive a private room on a lower floor because she has C diff, the
> 14th Fl will provide Judith Brook with a much needed respite, during a
> very trying time for her. I explained the costs and benefits to Judith Brook
> as to the slightly more expensive private room and benefits and she still
> explicitly stated, to the undersigned, that she wants to pay for the room.

> I am in the process of disbursing my own funds to pay for the room, and seek payment from my ward's funds upon expansion of my powers.
>
> Thank you.
>
> Joseph Ruotolo (Emphasis added.)

288.   At 3:22 PM, without consulting with her client Judith Brook and against Judith Brook's wishes, Judith Brook's court-appointed attorney Diana Rosenthal emailed the Court demonstrating her further participation in the conspiracy:

> I have no objection to Mr. Ruotolo's request.

289.   This represented yet another example of Diana Rosenthal failing to advocate for her client's wishes, and making decisions on her client's behalf affecting her client's civil and Constitutional rights—including Judith Brook's right to choose her son as her power-of-attorney and healthcare-proxy— without discussing the matter with client Judith Brook or even consideration of Judith Brook's wishes. What Judith Brook wanted did not matter to Diana Rosenthal and MHLS because they were furthering the conspiracy's goal to have Adam's powers revoked and Judith declared incapacitated.

290.   Judith Brook was then moved to the ultra-luxury floor. As stated, this was done over Dr. Judith Brook's son and chosen healthcare-proxy Dr. Adam Brook's objection, because it put Judith Brook on 14 Greenberg, far away from her treating medical team, which was based on 5 Central.

291.    As things transpired, by the evening the narcotic Judith Brook had been
given in the emergency room wore off, Judith Brook improved
symptomatically, and Judith Brook's New York Presbyterian physicians were
ready to discharge Judith Brook on July 20. Dr. Adam Brook was then
informed by New York Presbyterian social worker Seth Herman that Joseph
Ruotolo had told New York Presbyterian that he did not give permission for
Judith Brook to be discharged home.

292.    On July 20, 2019, at 3:52 PM, Dr. Adam Brook emailed Ruotolo:

> I have just learned from discharge social worker Seth Herman that you
> have blocked my mother's discharge home from New York Presbyterian
> Cornell this evening.

> What basis, if any, was there for your decision to block my mother's
> discharge when my mother's medical team made clear their plan was to
> discharge my mother this evening?

293.    Dr. Adam Brook subsequently spoke with New York Presbyterian
physician assistant Emily Arduino who was caring for Judith Brook.

294.    Ms. Arduino told Dr. Adam Brook that after a conversation between
Mr. Ruotolo and the resident physician Dr. Pagliuca, it was determined that if a
key to Judith Brook's apartment could be located before 6 PM, she could be
discharged, but that she could not be discharged after 6 PM "because it was a
hot night". No one contacted Dr. Adam Brook, a Board-Certified
cardiothoracic surgeon, to discuss the matter. Judith Brook remained in
hospital unnecessarily another night, against her wishes to go home. Needless

to say, a charge of $2200 (above what insurance pays) was billed to Judith Brook.

295.    Dr. Brook documented what had happened in a July 21, 2019 7:02 PM email to Mr. Ruotolo that Dr. Brook sent in response to Mr. Ruotolo's July 21, 2019 6:31 PM email to the Court, the court-evaluators, and all parties.

**Allegiant Homecare, Inc. takes advantage of Judith Brook's hospitalization by assigning a private nurse for her, at $125 per hour, rather than a home health aide at Allegiant's inflated rate of $32 per hour, even though there was no need whatsoever for a private nurse in the Hospital and the private nurse assigned, Nickole Mitchell, interfered with the New York Presbyterian nursing staff**

296.    When Judith Brook was in the hospital, a home health aide to assist her might be beneficial, but there was no need for a private nurse since New York Presbyterian has excellent nurses to provide nursing care.

297.    On July 19, 2019, at 9:34 PM, Dr. Adam Brook emailed Ann Reen, R.N., Allegiant Homecare Vice President:

> I was shocked to learn that Allegiant had assigned a registered nurse to look over my mother *while she was in the New York Presbyterian-Cornell Emergency Room.* A home health aide to watch my mother is reasonable, but there is no role from a private nurse for my mother while she is in the hospital.
>
> Moreover, I was informed, in words and substance, by Orin Fraser and Latoya Davis of Cornell Patient Services Administration that the Allegiant

Nurse, Nicole, was interfering with the work of the Cornell nursing staff, and Cornell Patient Services staff had to tell Nicole to stop interfering with the Cornell nurses.

The Allegiant nurse Nicole told me that the Cornell nurse was in my mother's ER room "for only 4 minutes today". The Cornell nurse Allison told me that that was not true, and that she (Cornell nurse Allison) had been in my mother's ER room multiple times during the course of the day. I believe the Cornell nurse Allison.

I do not want Allegiant to assign an R.N. to care for my mother when she is in the hospital; I have no objection to a home health aide. Assigning an R.N. while my mother is in the hospital risks harming my mother. (Emphasis in original.)

298.    Allegiant's assignment of a private nurse, when only a home health aide was needed (since Judith Brook already had a Cornell nurse caring for her), thereby allowing Allegiant to bill at 4 times the rate, was another example of Allegiant's deliberate over staffing / double staffing and overbilling Judith throughout the time Ruotolo chose Allegiant to provide healthcare to Judith. All of these overbillings constitute billing fraud, and unjust enrichment in an amount to be determined at trial.

**In mid-August 2019, Allegiant nurse Nickole Mitchell does not take Judith Brook to the bathroom, causing a urinary tract infection for which Judith Brook needed to be hospitalized**

299.    On August 15, 2019, Dr. Adam Brook discovered that his mother was sitting in her diaper, which had soaked through to the sofa in the living room of her apartment.

300. According to Judith Brook and Judith Brook's friend Liz Rubenstone, the Allegiant nurse Nickole Mitchell assigned to Judith Brook did not take Judith Brook to the bathroom.

301. Because she had to sit in her urine, Judith Brook developed a urinary tract infection for which she required hospitalization and treatment with intravenous antibiotics.

302. The Allegiant nurse Nickole Mitchell's failure to take Judith Brook to the bathroom when it was medically necessary and appropriate was another example of Allegiant's and this nurse's medical malpractice for which damages should be assessed at trial.

303. On August 18, 2019, 2:43 PM, Dr. Adam Brook emailed Allegiant Vice President Ann Reen, R.N.:

> I have documented to you the multiple errors by nurse Nicole including failure to administer medications and erroneous charting. In the latest incident, I believe she is responsible for my mother's hospitalization for failure to properly deal with her urinary needs and actually leaving her in an unsanitary condition, which caused the urinary tract infection which required an admission to New York Presbyterian Hospital. Nurse Nicole must be removed from the case, and I will be communicating with Mr. Joseph Ruotolo about the proper level of staffing.

304. On August 19, 2019, at 4:57 PM, Dr. Adam Brook emailed Ruotolo, the court-evaluator, the Court, and all parties:

> The Allegiant Home Care nurse Nicole needs to be removed and never involved with my mother's care again. I came home Thursday to find the

Allegiant Home Care nurse Nicole had left my mother drenched in so much urine that it had soaked through her diapers to the couch. Because my mother was not taken to the bathroom by the Allegiant Home Care nurse Nicole, my mother developed a urinary tract infection, for which she is currently hospitalized.

I will be filing a report with the New York State Attorney General reporting this incident that occurred on August 16, 2019 where I found that my mother had been left by an Allegiant Home Care nurse with urine soaked through her diaper and wetting the couch.

This is not the first problem we have had with the Allegiant Home Care nurse Nicole: she interfered with New York Presbyterian medical staff in the Emergency Department, she reportedly left a hypodermic needle and syringe filled with medication in our apartment, and she charted or administered medications improperly, as I have documented.

It has come to my attention that one of the home health aides has filed a written complaint against Allegiant Home Care nurse Nicole, but Ms. Ann Reen has stated that Allegiant Home Care nurse Nicole should be kept on because Ms. Reen knows Allegiant nurse Nicole's parents.

Please provide me with an explanation for why you continue to insist that Allegiant Home Care be permitted to participate in my mother's care.

There is absolutely no indication for my mother to have a private duty nurse, nor have you stated an indication. My mother needs a home health aide, not a private duty nurse. In light of the repeated medication errors committed by Allegiant nurses, I need be giving medications to my mother personally.

If you insist that my mother have a private duty nurse assigned rather than a home health aide, please provide an explanation for your decision contrary to my decision, including an explanation as to why you believe redundant care is indicated, particularly given that I am a Board-Certified Cardiothoracic Surgeon.

In response to this email and others from Adam, Ruotolo was put on notice that his chosen agency was acting improperly but Ruotolo failed to take any action to halt Allegiant's malpractice and overbilling.

**The Friday, August 23, 2019 manufactured payment controversy**

305.    The hearing on Judith Brook's guardianship had been scheduled for September 6, 2019. Two weeks before that hearing, on Friday, August 23, 2019, 11:22 AM, while Dr. Adam Brook was at work treating cancer patients, out of the blue, and strategically done on a summer Friday, Ruotolo emailed Dr. Adam Brook and copied the Court, the court-evaluator, and all parties to create yet another false controversy, and attempt to obtain direct access for Allegiant to Judith's bank accounts:

> Mr. Brook,
>
> This matter is before the Court on September 6, 2019. As you are aware, I have been ordered to arrange for home care services for Dr. Judith Brook, and you have been ordered to disburse your mother's funds for said services, which have been in place since May, 2019. Per the home care agency, *service will discontinue due to a two-month outstanding invoice* owed for services to your mother. Either your mother's credit provided by you is no longer valid and/or has been stopped from being charge.
>
> <u>It is imperative that you correct this error today, before 1 p.m.,</u> for the home care services to remain in place over the weekend. I have attached the Payment Authorization and Guarantee that you previously completed.
>
> Please provide to the undersigned Dr. Judith Brook's working credit card/bank routing number and checking account number and/or debit card forthwith, which I will forward to the home care agency. (Emphasis in the original.)

306.   But the fact was that Allegiant Homecare had failed to provide Dr. Adam Brook with invoices. Nor had Allegiant provided Dr. Adam Brook with notice that services for Judith Brook would be discontinued as claimed by Ruotolo. Indeed, Allegiant suddenly discontinuing services without notice and without cause would have constituted malpractice by Allegiant. Allegiant never provided invoices to Dr. Adam Brook (which Dr. Adam Brook would have paid had Allegiant sent them to him). Moreover, Dr. Adam Brook had provided Allegiant with an unlimited credit card authorization. As is documented by the credit card statements, Allegiant failed to bill Judith Brook's credit card in June or July 2019. Allegiant did in fact successfully bill Judith Brook's credit card on August 16, 2019 for charges of $1,794; $10,000; and $7,260. (page 17)

307.   That Ruotolo gave Dr. Adam Brook 98 minutes to provide Ruotolo with "Dr. Judith Brook's working credit card/bank routing number and checking account number and/or debit card", without indicating how much was owed, is strong evidence that Ruotolo and Allegiant were furthering their scheme and the object of the conspiracy with the Court and co-conspirators, to manufacture grounds to void Dr. Adam Brook's power-of-attorney and healthcare-proxy.

308.   Nine minutes later, on August 23, 2019, 11:32 AM, Dr. Adam Brook responded to Ruotolo and copied the Court, the court-evaluator, and all parties, to put them on notice of the unreasonableness of Ruotolo's request:

   I have received no invoice that is 2 months outstanding

> I am not going to address a problem that has been outstanding you claim
> for 2 months while I am at work on 90 minutes notice.
>
> This stinks of manipulative behavior intended to steal my mother's assets.

309.    Fifteen minutes later, at 11:47 AM, Ruotolo again emailed Judge O'Neill-

Levy's Law Clerk Premila Reddy, the court-evaluator, and all parties and again

urged that his powers be "expanded" based on this manufactured controversy:

> Ms. Reddy,
>
> As can be seen from Adam Brook's response below, the issue of payment-
> which he has been court-ordered to make, will not be addressed before
> 1 p.m., today. My understanding, from the court evaluator's report, is that
> the AIP has sufficient assets to pay for her care. Dr. Judith Brook's services
> will discontinue without payment by cross petitioner. I apology [*sic*] for the
> short notice, but time-is-of-the-essence. Therefore, I respectfully request
> an expansion of my powers to include the ability to marshal Dr. Judith's
> assets to pay for her ongoing home care services.
>
> Respectfully submitted,
>
> Joseph Ruotolo

310.    Two minutes later, August 23, 2019, 11:49 AM, defendant Diana Rosenthal

emailed the Court, the court-evaluator, and all parties, again without

conferring with her client but manifestly in support of Ruotolo and the

conspiracy:

> MHLS [Mental Hygiene Legal Service] has no objection to Mr. Ruotolo's
> application.

311.    Ms. Rosenthal stated MHLS's "no objection" to Ruotolo's improper

request, despite Judith Brook's explicit statement that she did not want a

guardian, despite the fact that Rosenthal had not discussed appointing Ruotolo

as guardian with her client Judith Brook, and despite the fact that Rosenthal

had not investigated the claim of "arrears" at all, nor discussed the matter

with Dr. Adam Brook or Judith Brook to find out the facts of the matter.

Ms. Rosenthal stated MHLS's lack of objection to Ruotolo's request even

though she had been copied less than an hour earlier on Adam Brook's email

stating "I have received no invoice that is 2 months outstanding".

Ms. Rosenthal did not look into the facts, contact Dr. Adam Brook or accord

him any opportunity to demonstrate that "arrears", if any, were due to

Allegiant failing to provide invoices and failing to bill Dr. Judith Brook's credit

card in amounts below the credit limit. Ms. Rosenthal's failure to diligently

advocate for her client Judith Brook's clearly articulated wishes constituted

further legal malpractice.

312.   Five hours later, August 23, 2019, 5:11 PM, Ruotolo emailed the Court, the

court-evaluator, and all parties:

> Below is the most recent attempt, by the home care agency, to satisfy a
> portion of Judith Brook's outstanding arrears: today at 5:02 p.m. Cross-
> petitioner is unable to comply with the Court's order.

> I believe it would be detrimental to the health of Dr. Judith Brook to be
> without the home care services currently in place.

313.   Attached was a credit card sale receipt with a charge for $3065 and a

"declined" message.

314.   Allegiant, rather than send invoices to Dr. Adam Brook, attempted on
       August 23, 2019 suddenly to bill Dr. Judith Brook's credit card directly for
       multiple charges totaling $348,957.50 using the unlimited credit card
       authorization that Adam Brook had signed on June 6, 2019 after Ruotolo
       complained to the Court that a credit card authorization with a $20,000 limit
       was unacceptable. $348,957.50 was manifestly in excess of the limit on Judith
       Brook's credit card, and that is why the credit card charges were declined.
       Moreover, Allegiant had not provided invoices to Adam Brook showing such
       an amount owed.

315.   Furthermore, Ruotolo's statement that this was "the most recent attempt,
       by the home care agency, to satisfy a portion of Judith Brook's outstanding
       arrears" implied that there were "arrears" and that the home care agency had
       made previous unsuccessful attempts to collect payment from Dr. Adam Brook
       that Dr. Adam Brook was refusing to pay. But in fact, Allegiant failed to
       provide Dr. Adam Brook with invoices, and *Allegiant had not notified Dr. Adam
       Brook of any previous unsuccessful attempts to bill Judith Brook's credit card.*
       Accordingly, Ruotolo's implication that Dr. Adam Brook was refusing to make
       payments was false and made with knowledge of its falsity or reckless disregard
       for its truth or falsity, and succeeded in providing false evidence to the Court
       in furtherance of the conspiracy to make it appear that Dr. Adam Brook was
       failing to make payments for homecare services which purportedly would lead

to Judith Brook being placed in the dangerous situation of not having homecare.

316.   Ruotolo knew that Dr. Adam Brook had provided an unlimited credit card authorization on Judith Brook's credit card. On June 27, 2019 12:57 PM Adam Brook emailed his then attorney Harvey Corn the unlimited credit card authorization for Allegiant Homecare that Adam Brook had successfully faxed to Allegiant on June 6, 2019 at 10:14 AM. On June 27, 2019 1:13 PM, Mr. Corn forwarded this email and the attached unlimited credit card authorization to Mr. Ruotolo. It must be emphasized that Adam Brook is in possession of proof that the unlimited credit card authorization was successfully faxed to Allegiant on June 6, 2019 at 10:14 AM.

317.   On August 23, 2019, at 4:34 PM, Joe Ruotolo emailed the Court and all parties:

> So, all parties and cross-petitioner are aware, invoices for the AIP's home care service are mailed every two weeks to the Brooks' residence.

> I am informed the home care agency attempted to receive payments authorizations for weeks: recently, this past Friday, for appx $19,000; and today, at 12:39 p.m. for $3,065 - all denied, as they were in July and August. As a courtesy, the agency did not press Adam Brook for payment until it approached this week's balance. Attached hereto, is the most recent credit card denial to assist the AIP's son. It is anticipated, cross-petitioner and "Deanna," of card member services, will process all outstanding payments today.

> As to Mr. Shainbrown's question regarding home care services, they are still in place.

318.    But, in fact, Judith Brook's Fidelity credit card statement contains charges

for $1,794, $10,000, and $7,260 on August 16, 2019, a total of $19,054 that

was *successfully* billed to Judith Brook's credit card. (page 17) In claiming that

the payments were "all denied", Ruotolo lied to the Court in order to justify

the voiding of Judith Brook's power-of-attorney and healthcare proxy and his

appointment as Judith Brook's guardian.

319.    On August 23, 2019, at 7:00 PM, Dr. Adam Brook emailed the Court, the

court-evaluator, and all parties:

> I am writing in response to your August 23, 2019 1:11 PM email requesting:
> "Please update the court once you have looked into the credit card
> authorization issue."

> I spoke with Deanna from Cardmember Services a few hours ago, and
> Deanna told me that Allegiant attempted to bill my mother's credit card
> this morning for charges of $45,793; $10,000; $5,000; $92,000; $92,000;
> $3,000; and $3,000.

> This works out to a grand total of $250,793 dollars for less than 3 months
> of work.

> The reason why the charges are so high is Allegiant charges 125 dollars an
> hour for private duty nursing, even though I have repeatedly informed
> Court-appointed Interim Guardian Joseph Ruotolo and the head of the
> Allegiant Home Care agency Ann Reen that there is absolutely no medical
> indication for a private duty nurse (as opposed to a home health aide,
> which costs 20 dollars an hour if hired privately). Remember, I am a Board-
> Certified Cardiothoracic Surgeon with 20 years of clinical experience.

> Nobody, not even Donald Trump, has a 30 day credit card limit of 250,000
> dollars.

Mr. Ruotolo has stated in his 4:34 email today that: "I am informed the home care agency attempted to receive payments authorizations for weeks: recently, this past Friday, for appx $19,000; and today, at 12:39 p.m. for $3,065 - all denied, as they were in July and August. As a courtesy, the agency did not press Adam Brook for payment until it approached this week's balance. Attached hereto, is the most recent credit card denial to assist the AIP's son." Mr. Ruotolo's statement is materially false and misleading.

Today is the first time I have been notified that a credit card authorization has been rejected.

Indeed, the first invoice received from Allegiant was the July 31, 2019 and August 8 invoices (held together by a paper clip), addressed to Judith Brook, and postmarked August 13, 2019, for charges of 7,853 dollars and 12,996 dollars.

Allegiant should have been sending invoices regularly and billing the credit card regularly. Why was this not done before?

Furthermore, by email today at 6:12 AM I wrote to Ms. Reen and Mr. Ruotolo: "It has come to my attention that one of the Allegiant home health aides, Ms. Mojica, filed a complaint against one of the Allegiant nurses regarding the care my mother Dr. Judith Brook received. Please send me a copy of this complaint. Please also explain to me why I was not notified that this complaint had been filed and why Allegiant continued to send the same nurse back to provide care to my mother. Thank you in advance for your anticipated cooperation."

I have previously complained about this nurse Nicole. Yet I find that today Allegiant has assigned Nicole to be my mother's nurse.

My mother again now has stated that she does not want any private-duty nurse, and that she wants a home health aide. The irony of all this is that my mother is completely competent.

Pursuant to Deanna of Cardmember Services' instructions, my mother will call Cardmember Services and request an increase in the credit card limit.

Should Allegiant refuse to provide further care for my mother, I can arrange for home health aide coverage 24-7 with another agency on relatively short notice.

320. The invoices that Allegiant mailed on August 13, 2019 contained an invoice dated July 31, 2019 with terms of "9 days" meaning the invoice was "overdue" before Allegiant even mailed the invoice. (pages 1-4) This was manifestly manipulating the record to create false claims of overdue invoices.

321. In fact, Allegiant attempted to bill Judith Brook's credit card $348,057.50 on August 23, 2019 (at the time on August 23, 2019 that Dr. Adam Brook had spoken with Deanna of Cardmember Service, Deanna had told him that $250,793 had attempted to have been billed on the credit card, but, in a subsequent discussion on August 29, 2019, Matthew of Cardmember Service told Dr. Adam Brook that $347,057.50 had been charged (as Allegiant made additional charges on August 23, 2019 after Adam Brook's telephone call with Deanna)), without warning to Dr. Adam Brook that Allegiant would be doing so and without providing Dr. Adam Brook with invoices justifying those charges.

322. On August 29, 2019, Adam Brook and Judith Brook called Fidelity cardmember service, and spoke with Matthew from Fidelity cardmember service, and Dr. Adam Brook made an audio recording of that telephone call. A transcription of the audio recording provides:

Adam Brook: Hi, I'm sorry, I didn't catch your name.

Matthew: My name is Matthew.

Adam Brook: Hi Matthew, this is Dr. Adam Brook calling, and I'm here with my mother Dr. Judith Brook, and so we're calling about her Fidelity credit card ending in 8135.

Matthew: Yes, I did get that current info from the automated phone system. I would just need to speak to the applicant to verify them before we could continue.

Adam Brook: OK, yeah, no, she's right here. Hi Mom.

Judith Brook: Hi. How are you sir?

Matthew: Excellent. Can I have you state your full name for the sake of our recording?

Judith Brook: Dr. Judith Suzanne Brook. B-R-O-O-K.

Matthew: Splendid. And could I have you verify the zip code we have on file for you followed by your date of birth?

Adam Brook: The zip code.

Judith Brook: My zip code is 1-0-0-2-5.

Matthew: May I have your date of birth?

Judith Brook: My what?

Adam Brook: Date of birth.

Judith Brook: Oh. 12, 31, 39.

Matthew: And do I have your consent to speak to Adam about this account?

Judith Brook: Yes, you do.

Matthew: Thank you. And how can I help you two wonderful people today?

Adam Brook: So, I believe on August 23rd, 2019, Allegiant Homecare attempted to charge the credit card, and I wanted to know the time and the amount of all the charges that occurred on August 23rd, 2019.

Matthew: OK. So just to clarify it looks like all of the attempts they made on throughout the multiple days they were charging you, none of those went through, so you haven't --

Adam Brook: I understand that but what I need to know is the amount and the time at which they tried to make the charges. If you have that information.

Matthew: Yes, sir I do. There's quite a few of them do you have a pen and paper.

Adam Brook: Yeah, I got a pen and paper in hand.

Matthew: OK, so starting with the ones that are most recent I have. August 28th.

Adam Brook: No, no, no, I just want August 23rd, 2019, that's it.

Matthew: OK, my mistake. So August 23rd, 4:02 PM Central. 3,065 dollars.

Adam Brook: OK.

Matthew: 3:22 PM. 3,065 dollars.

Adam Brook: OK.

Matthew: 3:31 PM. 92,301 dollars and 50 cents.

Adam Brook: OK.

Matthew: 2:12 PM. 3,065 dollars.

Adam Brook: OK.

Matthew: 2:11 PM. 92,301 dollars, 50 cents.

Adam Brook: OK.

Matthew: 1:08 PM. 3,065 dollars.

Adam Brook: OK.

Matthew: 1:05 PM. 92,301 and 50 cents.

Adam Brook: OK.

Matthew: 9:45 AM. 5,000 even.

Adam Brook: OK.

Matthew: Also 9:45 AM. 10,000 even.

Adam Brook: OK.

Matthew: And 944. 45,793 dollars.

Adam Brook: OK. Were those all the charges on August 23, 2019?

Matthew: Yes sir.

Adam Brook: Thank you for your time. I appreciate your help. I hope you have a great day. Bye-bye.

Matthew: You too sir.

323.    This conversation demonstrated Judith's competence and clear state of mind on August 28, 2019.

324.    But as importantly, this transcript proves that Allegiant Homecare suddenly billed Dr. Judith Brook's credit card $348,957.50 in a single day. This was manifestly unreasonable and done solely to create a misleading record of "rejection."

325.    Thus, Allegiant had attempted to place on Dr. Judith Brook's credit card on August 23, 2019:

402 PM $3,065.

322 PM $3,065.

331 PM $92,301.50

212 PM $3,065.

211 PM $92,301.50

108 PM $3,065.

105 PM $92,301.50

945 AM $5,000.

945 AM $10,000.

944 AM $44,793.

326.    The sum total of these attempted charges is $348,957.50.

327.    Indeed, Judge O'Neill-Levy said at the December 9, 2020 hearing:

I was part of this case, I lived the panics, I lived the conference calls on Friday afternoon when home care wasn't going to come, and the availability to get everyone together and how we were going to ensure that Ms. Brook was cared for over the weekend. (Tr.44)

328.    From the foregoing facts, this is a summary of the way that Ruotolo, Allegiant Vice President Ann Reen, and Allegiant Home Care engineered a pretextual controversy in furtherance of the conspiracy: 1. Ruotolo insisted on an unlimited credit card authorization for payment of Allegiant's homecare services; 2. Ruotolo insisted on unneeded private duty nurses for Judith Brook at $125 per hour (as opposed to home health aides at Allegiant's inflated rate of $32 per hour) in order to quickly run up a hundred-thousand-dollar bill; 3.

Allegiant failed to provide Dr. Adam Brook with invoices; 4. In June, July, and the first half of August 2019, Allegiant failed to use the unlimited credit card authorization that Adam Brook had provided; 5. Allegiant without warning suddenly attempted to bill Judith Brook for $348,957.50 on Friday, August 23, 2019, knowing this huge sum would be rejected. Then, when the charges would not go through since they were over the credit limit, instead of Allegiant contacting Dr. Adam Brook, providing copies of alleged invoices and asking for an alternate form of payment, Allegiant notified Ruotolo, and Ruotolo went running to Judge O'Neill-Levy falsely claiming that Dr. Adam Brook was refusing to pay for homecare services for Judith Brook and claiming that "time-is-of-the-essence" and that unless Judge O'Neill-Levy immediately voided the power-of-attorney and healthcare-proxy Dr. Adam Brook held for his mother and expanded Joseph Ruotolo's power as guardian to include marshaling Judith Brook's assets, Judith Brook would be left without healthcare services due to claimed nonpayment of Allegiant's bills.

**Joseph Ruotolo's August 26, 2019 order to show cause and temporary restraining order**

329.    Ruotolo wasted no time to use these manufactured controversies to attempt to expand his powers and immediately drafted an order to show cause to expand his powers to make himself guardian of Judith Brook's person and property. This is documented by the time charges which he later submitted to the Court to bill Judith Brook on August 24, 2019, August 25, 2019, and

August 26, 2019 for $1187.50, $1330, and $475, respectively, for preparing and
serving an order to show cause. (page 15)

330.    On August 26, 2019, Joseph Ruotolo filed an *ex parte* order to show cause
restraining Dr. Adam Brook from withdrawing Judith Brook's funds and
requesting expansion of his powers to include "marshalling" Judith Brook's
assets. Ruotolo accompanied the order to show cause with an August 25, 2019
"Affirmation in Support of Notification" and an August 25, 2019 "Affirmation
in Support of Order to Show Cause with Temporary Restraining Order".

331.    Ruotolo made several very serious materially false and misleading
allegations in these August 25, 2019 affirmations, including:

332.    Ruotolo's August 25, 2019 "Affirmation in Support of Notification", at ¶4,
Ruotolo claimed: "Adam Brook has not disbursed JUDITH BROOK'S funds
for the home care services currently in place since July, 2019. Those service
total approximately $100,000, and may terminate if not paid immediately."

333.    To the contrary, as hereinabove alleged, on June 6, 2019 Dr. Adam Brook
had faxed an unlimited credit card authorization on Judith Brook's Fidelity
VISA credit card to Ruotolo's chosen homecare agency, Allegiant Homecare,
with the expectation that Allegiant would bill Judith Brook's credit card
regularly. Second, review of Judith Brook's Fidelity VISA credit card
statements indicate that Allegiant *did not bill Judith Brook's credit card in
June 2019 or July 2019,* and that Allegiant successfully billed Judith Brook's

credit card for $19,054 on August 16, 2019. Third, Allegiant failed to provide invoices to Dr. Adam Brook, so Dr. Adam Brook did not know that Allegiant had run up such a large bill in 3 months-time. Fourth, after not billing Judith Brook's credit card for three months, on August 23, 2019 two weeks before the scheduled September 6, 2019 hearing date to determine whether the power-of-attorney and healthcare-proxy Dr. Adam Brook held for his mother would be voided, Allegiant suddenly attempted to bill Judith Brook's credit card for $348,957.50 for less than 3 months of work. Fifth, when, unsurprisingly the credit card company did not process the transaction because $348,957.50 was over the credit card's limit, Allegiant did not inform Dr. Adam Brook or provide invoices so that he could arrange an alternate method of payment, but informed Joseph Ruotolo. Sixth, when Joseph Ruotolo learned that the charge for $348,957.50 did not go through, Joseph Ruotolo did not inform Dr. Adam Brook privately so that Dr. Adam Brook could obtain the Allegiant invoices, review the charges, and arrange payment for what was owed; instead Ruotolo went directly to the Court requesting again that the Court expand his powers to include "marshalling" Judith Brook's assets, and voiding Dr. Adam Brook's power-of-attorney and healthcare-proxy, followed by Joseph Ruotolo's August 26, 2019 submission of an order to show cause to void Dr. Adam Brook's power-of-attorney and healthcare-proxy.

334.     As already alleged, Ruotolo and Ann Reen insisted on using private duty nurses at $125 per hour instead of home health aides at Allegiant's (inflated)

rate of $32 per hour. By insisting on using private duty nurses, not only was Joseph Ruotolo able to reward Ann Reen, Vice President of Allegiant Homecare, Ruotolo and Ann Reen were able to run up a $100,000 bill in 3 months-time, thereby enabling this scheme in furtherance of the conspiracy whereby they could claim that Dr. Adam Brook had purportedly allowed a $100,000 bill to run up, purportedly threatening the discontinuation of homecare services for Dr. Judith Brook.

335.    Ruotolo's August 25, 2019 "Affirmation in Support of Order to Show Cause with Temporary Restraining Order", ¶4, says: "I made numerous attempts to have Adam Brook effectuate a proper payment authorization for the AIP's home care services. With some delay, a payment authorization-with payment limited to twenty thousand dollars, was signed by Adam Brook, as Power-of-Attorney, which also included a signature by the AIP on the same document (attached hereto as "Exhibit B")." This statement is intentionally misleading. Ruotolo emailed an uncompleted Allegiant payment authorization form to Harvey Corn on Saturday, June 1, 2019 at 12:59 PM (so that Harvey Corn could provide it to Dr. Adam Brook for completion). A payment authorization form with a $20,000 cap was successfully faxed to Allegiant on June 5, 2019 at 2:36 PM. After Ruotolo informed Dr. Adam Brook (via Adam's attorney Harvey Corn) that a payment authorization form with a $20,000 cap was considered unacceptable, Dr. Adam Brook successfully faxed a payment authorization form with no cap to Allegiant on June 6, 2019 at 10:14 AM.

336.   Ruotolo intentionally misled the Court in his August 26, 2019 "Affirmation in Support of Order to Show Cause with Temporary Restraining Order" by including the June 5, 2019 credit card authorization form with a $20,000 cap as an exhibit to his affirmation, when in fact Dr. Adam Brook faxed a credit card authorization form with an unlimited cap to Allegiant on June 6, 2019 that superseded the June 5 credit card authorization, and the June 6 fax was received by Allegiant only 2 business days after Ruotolo had faxed the uncompleted form to Dr. Adam Brook's then attorney Harvey Corn. The Court credited this Ruotolo claim because doing so furthered the Court's goal with the co-conspirators to support grounds to remove Adam's powers.

337.   Likewise, Ruotolo's claim that he made "numerous attempts" to obtain a payment authorization form with an unlimited cap was intentionally misleading. A review of Ruotolo's timesheet reveals Ruotolo made the following efforts in June 2019 to obtain a payment authorization: 1. An initial June 3, 2019 telephone call; 2. A June 4, 2019 telephone call; and 3. A June 5, 2019 telephone call in which Mr. Ruotolo told Harvey Corn that the payment authorization with a $20,000 cap was unacceptable. (page 9)

338.   The reason why Dr. Adam Brook initially put a cap on the credit card authorization is that Dr. Adam Brook wanted to be notified before any massive charges were made on Judith Brook's credit card, which, as it transpired, is exactly what happened when Ruotolo's chosen homecare agency Allegiant

Homecare suddenly attempted to bill a total of $348,957.50 to Judith Brook's credit card on August 23, 2019.

339.    Ruotolo's August 26, 2019 "Affirmation in Support of Order to Show Cause with Temporary Restraining Order", ¶6, says: "Adam Brook has not made, nor allowed, a home care service payment, since the end of June, 2019. The current arrears, from my understanding, hover around $100,000." But this statement is false and intentionally misleading. First, Allegiant successfully billed Judith Brook's credit card for $19,054 on August 16, 2019. Second, Allegiant failed to provide Dr. Adam Brook with invoices, and it is absurd to expect that Dr. Adam Brook would make a payment when he was never notified that a bill was due or what amount was due. Third, the high bill of $100,000 was directly the result of Ruotolo and Allegiant's scheme to run up a high bill by using private-duty nurses at $125 per hour, 12 hours-a-day, 7 days-a-week, when only home health aides were needed (for which Allegiant billed Judith Brook at the inflated rate of $32 per hour).

340.    Ruotolo's August 26, 2019 "Affirmation in Support of Order to Show Cause with Temporary Restraining Order", ¶11 asserts:

> But more egregious, Adam Brook stopped complying with this Court's Order to pay for JUDITH BROOK'S care almost as soon as the courtroom doors closed, after his requested July 1, 2019 conference. Again, in his email to all parties-August 23, 2019 (Exhibit D), Adam Brook acknowledged the receipt of home care service invoices mailed to his home, in July, 2019. But instead of making payment as agent for JUDITH BROOK, he willingly ignored the arrears, fixated on a paper clip fastener

that bound the invoice(s) mailed to his home, and tallied home care services to an amount that only exists in his mind.

341.    But, contrary to Ruotolo's August 26, 2019 affirmation, Dr. Adam Brook's August 23, 2019 email did not "acknowledge[] the receipt of home care service invoices *mailed to his home, in July, 2019*". (Emphasis added.) Dr. Adam Brook's August 23, 2019 email says: "[T]he first invoice received from Allegiant was the July 31, 2019 and August 8 invoices (held together by a paper clip), addressed to Judith Brook, and *postmarked August 13, 2019*, for charges of 7,853 dollars and 12,996 dollars." (Emphasis added.)

342.    Contrary to Ruotolo's affirmation, Dr. Adam Brook did not "willingly ignore[] the arrears", Dr. Adam Brook never received the invoices (other than the two invoices sent in an envelope postmarked August 13, 2019) because Allegiant did not send them, and in any event Allegiant had an unlimited authorization on Dr. Judith Brook's credit card. If Allegiant billed more than the credit limit because Allegiant billed over $350,000 in a single day on Judith Brook's credit card, Allegiant should have notified Dr. Adam Brook directly and Dr. Adam Brook would have resolved any problem of money being due.

343.    Ruotolo's August 26, 2019 affirmation, ¶12, falsely threatened:

It is unknown if the home care services, for Judith Brook, will remain in place without payment. But given that this matter may take several dates to conclude, JUDITH BROOK'S health—already compromised, risks further deterioration without the continuation of proper home care services.

344.    Ruotolo was deceitfully manufacturing a "panic", that unless Dr. Adam
Brook's power-of-attorney and healthcare-proxy were voided, Dr. Adam Brook
would not pay for homecare services for Judith Brook, and Judith Brook would
be left in the dangerous situation of being without homecare services.

345.    Importantly, Ruotolo's manufactured controversies were successful,
because this phony "panic" was then cited by the Court as a major factor on
January 3, 2020 for Judge O'Neill-Levy to void Dr. Adam Brook's power-of-
attorney and healthcare-proxy and expand the appointment of Joseph Ruotolo
to the lucrative position of being Dr. Judith Brook's guardian of person and
property. In an attempt to justify her actions, J. O'Neill-Levy made the
following statement at a December 9, 2020 hearing conference:

> So that piece falls so far from fraud and corruption, but I take those
> allegations seriously and that is what I tried, I think the argument was that
> home care was paid and the allegation that home care was not paid, but
> again, I was part of this case, I lived the panics, I lived the conference calls
> on Friday afternoon when home care wasn't going to come, and the
> availability to get everyone together and how we were going to ensure that
> Ms. Brook was cared for over the weekend. (December 9, 2019 hearing,
> Tr.44)

346.    But, as demonstrated *supra*, this was a manufactured crisis, manufactured
by Allegiant not billing Judith Brook's credit card in June or July 2019 despite
having an unlimited credit card authorization, by Allegiant not providing
Dr. Adam Brook with timely invoices, by Allegiant billing Judith Brook's credit

card $348,957.50 on one day, August 23, 2019 and then, rather than informing Dr. Adam Brook that the charges did not go through on the credit card because the charges were over the credit limit, Allegiant and Ruotolo going directly to the Court with the claim that Judith Brook's homecare services were purportedly going to be terminated because Dr. Adam Brook was refusing to pay for homecare services.

347. On August 29, 2019, at 4:49 PM, Dr. Adam Brook emailed Allegiant Vice President Ann Reen:

> This is to advise Allegiant Home Care that the credit card limit on my mother's credit card has been increased to 25,000 dollars.
>
> It is my understanding that Allegiant Home Care has already billed the credit card approximately 10,000 dollars.
>
> Please email me any outstanding Allegiant Home Care invoices, including an itemization of the charges, so that I can arrange for direct payment.
>
> Please also advise why Allegiant Home Care was not billing my mother's credit card on a weekly basis.

348. Neither Ms. Reen, nor any other representative of Allegiant Home Care, responded.

349. The reason why the credit card limit was not higher than $25,000 on August 29, 2019 was that the credit card company declined to raise the limit to higher than $25,000. It was Dr. Adam Brook's expectation that Allegiant would bill the credit card $25,000, and then Dr. Adam Brook would replenish the credit card balance, and in this fashion within a matter of days the balance

would be paid off. But Joseph Ruotolo, Ann Reen, and Allegiant Homecare wanted to orchestrate their manufactured crisis so that Joseph Ruotolo would be granted the lucrative guardianship of Judith Brook.

350.    As evidence that a private duty nurse was not needed, and that Allegiant and Ruotolo's insistence on a private duty nurse was not for Judith Brook's benefit but intended to compel Judith Brook to pay $125 per hour rather than the $32 per hour that Allegiant charges for a home health aide, when Allegiant did not have a private duty nurse available, Allegiant simply sent a home health aide.

351.    For example, on Sunday, September 1, 2019, Allegiant Vice President Ann Reen sent Dr. Adam Brook the following email:

> Adam,
>
> A home health aide will be caring for Judith Brook today.  You will be responsible for administering all of Judith's medications today, Sunday, 9-1-19
>
> Thank you in advance for you cooperation.
>
> Ann Reen

352.    In fact, Allegiant not only had trouble finding a private duty nurse on Sunday, September 1, 2019, they had trouble finding a home health aide on Sunday, September 1. The home health aide for Sunday, September 1, 2019, Mary Nketa, did not arrive until 10:19 AM. That Allegiant had no problem forgoing a private-duty nurse when the agency did not have a private-duty

nurse available is strong evidence that a private-duty nurse was not actually necessary, but was simply both a way to extract money from Judith Brook and to manufacture a phony controversy that would justify the voiding of Dr. Adam Brook's power-of-attorney and healthcare-proxy.

### The September 6 hearing and the October 18 trial date

353. On September 4, 2019, Dr. Adam Brook retained James Kaplan as his attorney. Mr. Kaplan charged a more affordable rate than Mr. Corn did.

354. The parties made appearances at the September 6, 2019 hearing date. Mr. Kaplan, being newly retained, requested an adjournment, which was granted. Ms. Crowley said she was ill, and did not appear.

355. However, at that hearing Judge O'Neill-Levy heard Judith Brook's in person request that Diana Rosenthal be replaced as counsel. Judge O'Neill-Levy said that Diana Rosenthal should remain as counsel for Judith Brook. Judith Brook complained that Diana Rosenthal was unavailable. The conclusion of this was that Diana Rosenthal remained as Judith Brook's counsel.

356. A trial was held on October 18, 2019. Ms. Crowley again said she was ill, and did not appear.

357. In addition to Adam Brook, Howard Muser, and Nicole Hazard testifying, Judith Brook testified. Judith Brook's testimony provides as follows:

THE COURT: Can you just let her answer the question before you start asking another question? Because she's --

[MR. KAPLAN] Q Who takes care of your finances and your health?

A My finances are taken care of by my son.

Q Okay.

A And what was the second question?

Q Who takes care of your health care needs, oversees them?

A My son.

Q Okay. Now, to the best of your knowledge, does your son hold a power of attorney for you?

A Yes. The problem is that he's being a cardiothoracic surgeon, he spends a lot of time at the hospital so I do get to see him a lot, but not as much as I'd like.

Q Well, now, Dr. Brook, you sat through this hearing and you know that a petition has been brought by your brother Howard Muser.

A He he's a pisser.

Q I'm sorry, could you elaborate?

A Is that a new term?

Q Yes.

A Oh, okay. My brother has -- I'm really distressed because of his behavior. He has a whole bunch of --a slew of, kids which is great. On the other hand - - -and a lovely wife. On the other hand -- and nice.

MS. ROSENTHAL: Dr. Brook, I think he just asked are you aware that he brought a petition.

So let's just answer yes or no.

Q Are you aware that he brought a petition to revoke Adam's power of attorney?

A Um, he should not have, because he doesn't know what the hell he's doing. And I don't want him involved at all in my family's life, period. He's finished.

Q Are you saying that you're opposing his petition to revoke Adam's power of attorney?

A Yes.

Q And as far as you're concerned, Adam should continue with the power of attorney?

A Absolutely.

Q And he should continue as your health care proxy?

A Yep. (October 18, 2019 hearing, Tr.164–165)

**On September 8, 2019, Shainbrown falsely and with intent to deceive claimed that Dr. Adam Brook sent a home health aide away**

358.    On September 8, 2019, Shainbrown falsely accused Dr. Adam Brook of sending a home health aide away and of leaving Judith Brook without homecare services, and further accused Dr. Adam Brook of making "crazy talk" that Dr. Brook would send the home health aides away. These accusations were false, malicious, made with reckless disregard for whether these statements were true or false, and were intended to induce the Court to believe that unless Dr. Adam Brook's power-of-attorney and healthcare-proxy were voided, Judith Brook would be left without homecare services. Shainbrown's false accusations were material, because Judge O'Neill-Levy

accepted them in furtherance of the conspiracy and stated from the bench that she "lived the panics" and that Judith Brook was at risk of not being cared for. But as shown, all of these so-called "panics" were phony and manufactured by Ruotolo, Allegiant, Shainbrown, and Huth.

**Margaret Crowley withdraws as court-evaluator, and Ira Salzman is appointed successor court-evaluator**

359.    In November 2019, Margaret Crowley asserted that she did not want to undergo cross-examination due to illness. Judge O'Neill-Levy's November 8, 2019 Order permitted Ms. Crowley to withdraw as court-evaluator and appointed Ira Salzman as successor court-evaluator.

**With James Kaplan now representing Dr. Adam Brook, Allegiant began sending invoices to Dr. Adam Brook, which Dr. Adam Brook paid promptly**

360.    At the September 6, 2019 hearing, the Court directed Ruotolo and James Kaplan to arrange a mechanism by which payments for homecare services to Allegiant Homecare would be made, and James Kaplan arranged for Ruotolo to promise that Allegiant would be providing Dr. Adam Brook with invoices.

361.    Significantly, on December 9, 2019, Ruotolo forwarded by email to James Kaplan (and copied successor court-evaluator Ira Salzman and court-appointed attorney for Judith Brook Diana Rosenthal) a spreadsheet from Allegiant Homecare *documenting that Dr. Adam Brook had made payments for*

*homecare services in timely fashion, had paid over $220,000 to Allegiant over a 6-month period for homecare services for his mother, and that the arrears, if any, were at most $428.*

**Successor court-evaluator Ira Salzman's requests for "timelines"**

362.     According to Ira Salzman's court-evaluator report, Mr. Salzman interviewed several individuals, including Howard Muser, Adam Brook, Nicole Hazard, and Judith Brook.

363.     In conjunction with creating his report, Mr. Salzman requested that petitioner and cross-petitioner provide him with timelines of events.

364.     Mr. Shainbrown drafted the petitioner's timeline and provided it to Mr. Salzman on December 23, 2019.

365.     Shainbrown's timeline (pages 41–43) was replete with false statements made with knowledge of their falsity or reckless disregard for their truth or falsity.

366.     For example, Shainbrown's timeline contained the entry for "8/2018 AIP [alleged incapacitated person] falls at home". But this claim was false.

367.     Judith Brook was still working as a full professor in September 2018. For example, according to Judith Brook's executive assistant Linda Capobianco's December 7, 2018 email, on September 28, 2018, Judith Brook "did the review

for the Appointments & Promotions Committee and dictated it to me over the phone".

368.    Shainbrown's timeline further asserted that on "10/2018 AIP falls while alone at home and fractures her back". This claim was also false. In fact, as already set forth, Judith Brook was cleaning out her husband David Brook's papers, in the presence of her housekeeper Joyce Lovelady, when she suddenly developed severe pain in her back. She did not fall. The pain was due to a spontaneous osteoporotic spinal fracture.

369.    Statements in Shainbrown's December 23, 2019 timeline that were materially false and made with knowledge of their falsity, or reckless disregard for their truth or falsity, and in furtherance of the conspiracy to induce the Court to issue an order declaring Judith Brook incapacitated, and voiding Dr. Adam Brook's power-of-attorney and healthcare-proxy, include at least the following:

369.1.    "1/2018 AIP [is] becoming increasingly frail. Petitioner and Petitioner's wife suggest to Adam (the adult son who lives with them) that he relinquish the master bedroom in the apartment Adam appropriated for himself, as the bathroom off of that room is much more accessible for elderly people. ... Adam refuses to give up "his" room."

369.2.    "8/2018 AIP falls at home"

369.3.    "8/28/2018 Petitioner speaks to Adam about the need for a home healthcare aid[e]. Adam again refuses due to finances."

369.4.    "10/2018 AIP falls while alone at home and fractures her back. … AIP asks Petitioner to speak to Adam about home healthcare aides; Adam refuses, saying the AIP "cannot afford it" and he would "not turn [his] apartment into a nursing home".

369.5.    "1/2019 An upset AIP telephones Petitioner stating Adam came to he [*sic*] hospital room with "a bunch of papers to sign and a notary". AIP did not know what she signed and asked Petitioner to speak with Adam. Adam refuses to discuss with Petitioner."

369.6.    "1/2019 … Upon AIP's potential discharge from the hospital, Petitioner again pleads with Adam to secure healthcare aides. Adam refuses, stating he will not turn his "house into a nursing home"."

369.7.    "1/2019 & 2/2019 … AIP expressed a desire for Adam to stop his lawsuit. AIP also expresses to Petitioner and Petitioner's wife she "needs help at home". Petitioner informs Adam, who hangs up the phone on Petitioner."

369.8.    "3/2019 (first week) Adam calls Petitioner's wife at appx 11:30pm stating AIP is stuck on the toilet and asking Petitioner's wife to drive 1&#43; hours to NYC to help, because Adam "did not feel comfortable"."

369.9.      "3/2019-4/2019 AIP lived in abject squalor at Riverside. ...
Petitioner spoke with Adam about moving the AIP to a better/more
comfortable facility. Adam refused due to the expense."

369.10.     "3/2019-4/2019 Social worker and nurses at Riverside recommend
24/78 [*sic*] care for the AIP, even while she was currently at the facility.
AIP's roommates had 24/7 care and oftentimes that aide would volunteer
to help Judy because Judy was in dire need of help and at a risk of an
additional fall. Petitioner speaks with Adam again about additional care."

369.11.     "4/2019 Adam states 24/7 care is unnecessary and too expensive
... Adam then forbids Petitioner and Petitioner's wife from visiting with
AIP."

369.12.     "5/2019 Shortly after petition filed but before instillation [*sic*] of
temporary guardian, AIP falls while at Riverside and injures her nose,
elbow, among other thing [*sic*]. ... Court immediately appoints a
temporary guardian."

369.13.     "6/26/2019 AIP discharged again from the hospital; Mr. Ruotolo
instructs Adam to prepare the apartment for the AIP's return. Upon
inspection of the apartment, Mr. Ruotolo finds that the necessary grab
bars have not been installed, Adam refuses to allow the AIP into the
master bedroom and bathroom, and the Adam has filled the refrigerator
with only ice cream and soda. When picking the AIP up from the hospital,

Adam does not arrive with shoes for the AIP. Petitioner pays out of pocket for necessary food and amenities to ensure the AIP's return home."

369.14.     "6/27/2019 Adam does not properly administer medications to the AIP; refuses to share the discharge orders with others."

369.15.     "7/22/2019 Adam brings the AIP back to the ER. After depositing her alone in the [*sic*], Mr. Ruotolo visits and explains to the AIP the possibility of a room on an upgraded floor. AIP indicates she wants that."

369.16.     "7/2019-9/2019 Frequent visits to the ER (Adam would bring the AIP multiple times per week) warrant questions from social workers and hospital staff as to why Adam was frequently bringing the AIP back."

370.     The foregoing unsworn out-of-court statements in Shainbrown's timeline were false, made with knowledge of their falsity, malicious, and were intended to have Judith Brook declared incapacitated and Adam Brook's power-of-attorney and healthcare-proxy voided. These false, malicious unsworn out-of-court statements in Shainbrown's timeline constitute deceit, collusion, and a successful attempt to provide support for the conspiracy's goals to the Court, the court-evaluator, and others.

371.     In addition, by falsely claiming that Adam Brook did not properly administer medications to the AIP, Mr. Shainbrown impugned Dr. Adam Brook's reputation in his professional capacity.

372.    Defendant Karl Huth and Huth, Reynolds, L.P. assisted, aided, and
abetted Shainbrown in his efforts to provide false or misleading information to
the Court and the court-evaluator.

**Successor court-evaluator Ira Salzman created false and malicious court-evaluator reports, intended to install and then to maintain his colleague Joseph Ruotolo in the lucrative position of Judith Brook's guardian. By creating false reports, by relying on double and triple hearsay, by simply assuming that allegations of wrongdoing were true without investigating them, and by interviewing Judith Brook when she was acutely ill in New York Presbyterian Hospital and immediately after she woke from sleep, Salzman breached his fiduciary duty to the Court and the parties. By further conspiring with Joseph Ruotolo on January 2, 2020 to rig the January 3, 2020 hearing, Salzman breached his fiduciary duty and furthered the conspiracy. Salzman furthered this wrongful conduct by his false testimony at the hearing and his urging the Court to deny Judith Brook and Adam Brook due process of law.**

373.    Ira Salzman created malicious and biased court-evaluator reports intended
to install, and then to maintain, Ruotolo in the lucrative position of guardian of
Judith Brook. The Court, in furtherance of the conspiracy, accepted the
Salzman report including double hearsay, improper reliance on the Crowley
report, and false statements by Ruotolo and others.

374.   Salzman had the same financial motive in finding Judith Brook incapacitated, in finding that Adam Brook had breached his fiduciary duty to his mother, and in finding that Ruotolo should be appointed guardian of Judith Brook's person and property. Under MHL Art. 81, the evaluator is paid by the AIP if judgment of incapacity is made. Likewise, Salzman had the same financial motive in finding that Judith Brook's daughter-in-law, Nicole Hazard, Esq., should not be Judith Brook's guardian, but that Ruotolo should be maintained as guardian of Judith Brook's property and person. Both Salzman and Ruotolo practice regularly in the same guardianship courts. Salzman has a history of representing petitioners in guardianship litigation, and being attorney for a petitioner can be very lucrative. Since Ruotolo by his own submissions stated he had been appointed to various positions in guardianship litigation over 300 times in the preceding decade, Salzman could well expect that he would encounter Ruotolo again in guardianship litigation, and, in particular, that Salzman might then be representing a petitioner and Ruotolo might be court-evaluator or the court-appointed attorney for an alleged incapacitated person. By presenting a report and giving testimony that would support the appointment of Ruotolo to the lucrative position of guardian of Judith Brook, Salzman could well expect that the next time he encountered Ruotolo in another case needing Ruotolo's support of Salzman's position, Ruotolo would do so.

375.     This explains the false but superlative language in Salzman's January 3,

2020 testimony in which Salzman praised Ruotolo and urged the Court to

appoint Ruotolo as guardian:

> SALZMAN: I think Mr. Ruotolo has been a superhero and I think he, and
> the Court should appoint a new independent Guardian here. Thank you.
>
> THE COURT: And?
>
> THE WITNESS: appoint an independent Guardian. I think Mr. Ruotolo
> would be a great choice.
>
> THE COURT: Thank you. (Tr.58)

376.     Ira Salzman included in his court-evaluator report his interview of Judith

Brook, and cast Judith Brook as having advanced dementia. He achieved this

result by interviewing her immediately after having woken from her sleep while

she was in the hospital with an acute episode of urosepsis. To the contrary,

Judith was highly lucid and articulate, as she demonstrated by her in-court

testimony that Muser should not have brought the proceeding and she wanted

Adam to continue caring for her. For example, Ira Salzman's court-evaluator

report, ¶67, says "Judith Brook recognizes her son", as if this were the limit of

her cognitive ability.

377.     Salzman reiterated this false picture of Judith Brook during his testimony

at the January 3, 2020 hearing.

378.     Salzman intentionally ignored Judith Brook's lucid in-court recorded

testimony on September 6, 2019 and October 18, 2019. Salzman admitted that

he interviewed Judith Brook in the Hospital when she was acutely ill, and admitted that he interviewed her immediately after she woke from sleep. (January 3, 2020 hearing, Tr. 49-51) It is widely known medical fact that elderly individuals are groggy for a significant period of time after wakening; the phenomenon is called "sleep inertia". This period of grogginess is even more prolonged in elderly individuals when they are acutely ill. Salzman, who held himself forth as an Elder Law attorney with 45 years of experience, knew or should have known this; his interviewing Judith Brook by waking her was thus either incompetence, an intentional attempt to find that she had advanced dementia, or both. Regardless, by conducting the interview of Judith Brook while she was acutely ill with urinary tract infection, atrial fibrillation, and some degree of acute low cardiac index, and by conducting the interview of Judith Brook immediately after she woke from sleep, Ira Salzman breached his fiduciary duty to conduct a fair evaluation of Judith Brook.

379.   Ira Salzman wrongfully incorporated Shainbrown's timeline of false statements into his report as "Exhibit D" without insisting that Mr. Muser undergo cross-examination on this timeline. Indeed, Salzman urged that the Court to decide the January 3, 2020 proceeding on January 3 and to deny Cross-petitioner's counsel Kaplan's request for an adjournment that would have given Cross-petitioner the opportunity to assemble evidence and witnesses to refute the new false allegations in the timeline and the Salzman report, which had been delivered to Mr. Kaplan 16 nighttime hours before the

hearing. Salzman also ignored the evidentiary standard of guardianship proceedings, including NYMHL §81.12, which requires all findings to be made by "clear and convincing evidence" and that "[t]he burden of proof shall be on the petitioner." In doing so, Mr. Salzman breached his fiduciary duty as a Court-appointed evaluator and furthered the conspiracy to find Judith Brook "incapacitated."

380.    Salzman's court evaluator report says, at ¶2: "In conducting my investigation I have relied on the report of the prior court evaluator." But the prior court evaluator Margaret Crowley had never undergone cross-examination on her report, nor did Salzman ever interview Margaret Crowley about her report or independently verify the reported statements.

381.    Salzman wrote in his report, at ¶118:

> [I]t appears from information that I have received from Mr. Ruotolo that home care bills have not been paid in a timely way even though he promised to do so (this is an issue best addressed by Mr. Ruotolo).

382.    As amply alleged above, the claim of untimely payments for homecare was manufactured by Ruotolo and Allegiant. By Salzman relying on Ruotolo's conclusory statement on the critical issue of whether homecare bills have been paid, and with Salzman never according Dr. Adam Brook any opportunity to rebut Ruotolo's false allegation, Salzman breached his fiduciary duty to perform an even minimally adequate investigation. This is particularly so because Salzman received the December 9, 2020 email that Ruotolo sent

documenting regular payments by Dr. Adam Brook to Allegiant Home Care of over $220,000 as of December 9, 2020, but Salzman failed to include in his report any analysis of how the payments were made against the charges.

383.    Significantly, Ruotolo had copied Ira Salzman on the email Ruotolo forwarded to James Kaplan to which was attached a spreadsheet from Allegiant Homecare *documenting that Dr. Adam Brook had made payments for homecare services in timely fashion, had paid over $220,000 to Allegiant over a 6-month period* for homecare services for his mother, and that the arrears, if any, were at most $428.

384.    Salzman included in his report a double hearsay voicemail of a third party; Ruotolo had emailed Salzman the voicemail of the third party. Salzman included a transcription that Salzman himself made of the voicemail. Salzman's report asserted that the voicemail was by a "Mary Amadillo", who in the voicemail claimed both that she was a care manager at New York Presbyterian Hospital and that Dr. Adam Brook was opposed to his mother receiving physical therapy. This was hearsay and untrue; Dr. Adam Brook was not opposed to his mother receiving physical therapy. On January 3, 2020, Judge Kelly O'Neill-Levy, in accepting the whole report into evidence, accepted the voicemail into evidence; and Salzman argued that Dr. Adam Brook's purported opposition to physical therapy was yet another reason for voiding Dr. Adam Brook's power-of-attorney and healthcare proxy. In a February 11, 2021 7:55 AM email Salzman later conceded that "Mary

Amadillo" "is not a person I ever met or spoke to", and that he actually did not know the identity the individual who had allegedly left the voicemail for Mr. Ruotolo. Thus, the voicemail was not only double hearsay, it was unauthenticated. Salzman breached his fiduciary duty as court-evaluator by failing to investigate who had left the voicemail and failing to make a reasonable assessment of the accuracy of the voicemail.

**On January 2, 2020, Ira Salzman telephoned Joe Ruotolo, and Salzman and Ruotolo rigged the hearing**

385.   Ruotolo's January 2 timesheet contains an entry, "TC [telephone call] from CE [court-evaluator] re hearing of 1/3/20". (page 19)

386.   Thus, *after* Salzman finished and photocopied his court-evaluator report on December 31, Salzman telephoned Ruotolo on January 2 and told Ruotolo that Ruotolo was going to be guardian. Salzman and Ruotolo also plotted-out how they were going to rig the January 3 hearing, as shown by Ruotolo's next time entries the same day.

387.   Four entries later on Ruotolo's timesheet (page 19), *still on January 2*, is the entry "Prepare proposed order for hearing of 1/3/20" (1.3 hours).

388.   Thus, Ruotolo knew in advance of the hearing from his private discussion with Salzman that Salzman was going to see to it that he (Ruotolo) was going to be appointed guardian on January 2, *before the January 3 hearing had even occurred.* Ruotolo would not have spent 1.3 hours preparing an Order *for which*

*he would be paid for preparing only if the Order was approved* unless Ruotolo knew in advance from his call that same day with Salzman that the Order would be approved. As documented by Ruotolo's timesheet, Ruotolo's preparation of the proposed Order *on January 2* to appoint himself with expanded powers over Judith's person and property was the direct result of his private phone-call with Salzman.

389.    Two entries later on Ruotolo's timesheet, still on January 2, is the entry "Rcd [Received] & reviewed CE's [Court-Evaluator's] report" (0.3 hours).

390.    Thus, only *after* Ruotolo prepared the Order appointing himself guardian did Ruotolo receive Salzman's court-evaluator report and spend 18 minutes reviewing it. The clear inference is that Salman had already told Ruotolo on the call how Salzman's report would support Ruotolo's further appointment.

391.    On December 31, 2:01 PM, Ira Salzman emailed his successor court-evaluator report to the Court. There was thereafter no reason for Salzman to communicate with Ruotolo except to plot with him as part of the conspiracy how Ruotolo would be appointed 3 days later at the scheduled hearing.

392.    Thus, it is clear that Salzman and Ruotolo conspired to rig the January 3, 2020 hearing so that Judith Brook would be declared incapacitated, Dr. Adam Brook would be found to have breached his fiduciary duty to his own mother, and Ruotolo would be appointed to the lucrative position of guardian of Judith

Brook, and all defendants in the conspiracy would be able to make large claims for compensation. And that is exactly what occurred.

393.    It is clear that Salzman told Ruotolo, or the two of them agreed during their telephone call, that Ruotolo was going to be given his expanded powers as guardian, so that Ruotolo could immediately draft that Order to submit, *even though the January 3, 2020 hearing had not yet occurred.*

394.    On January 3, 2020, at the conclusion of the trial hearing, Ruotolo handed up the Order he had prepared on January 2, 2020, and J. O'Neill-Levy signed it without hearing any oral argument from the parties on whether a guardian should be appointed.

395.    Salzman only emailed his lengthy court-evaluator report to the parties on January 2, 2020, at 4:14 PM. This gave Dr. Adam Brook and his attorney James Kaplan barely 16 nighttime hours to prepare to rebut the new allegations at the January 3, 2020, 9:30 AM trial date.

**Judge O'Neill-Levy proceeded with the January 3, 2020 trial even though Judith Brook was not present and neither Dr. Adam Brook nor his attorney James Kaplan had time to prepare and assemble evidence and witnesses to rebut the new allegations in Salzman's court-evaluator report and the new allegations in Ruotolo's January 3, 2020 testimony**

396.    Judith Brook was discharged from New York Presbyterian Hospital on January 2, 2020, and was not feeling well enough to attend court on January 3,

2020. However, she stated to Adam Brook she wished to attend. The AIP's

attendance at Article 81 hearings is expressly provided for in the statute.

NYMHL §81.11(c).

397.    Before he left for the courthouse, Dr. Adam Brook made an audio

recording of his mother on his iPhone. A transcription of the audio recording is

as follows:

> Adam Brook: Mom, do you want the hearing postponed so that you can be
> present?
>
> Judith Brook: Absolutely. (audio recording transcript)

398.    Even though Diana Rosenthal (Judith Brook's court-appointed attorney)

*had not discussed waiver of Judith Brook's appearance at the January 3, 2020 trial*

*with her client,* Diana Rosenthal without foundation and in breach of her

professional obligations to her client informed the Court (Judge O'Neill-Levy)

that Rosenthal was waiving Judith Brook's appearance at the January 3, 2020

trial. The transcript of the January 3 trial provides:

> THE COURT [J. O'NEILL-LEVY]: Ms. Rosenthal, you had sent an e-
> mail with regard to waiving your client's appearance to everyone, but I just
> want to say on the record that Dr. Judith Brook testified on the last Court
> appearance and that you are waiving her appearance today?
>
> [COURT-APPOINTED ATTORNEY FOR JUDITH BROOK]
> MS. ROSENTHAL: Yes, your Honor, I am.
>
> THE COURT: Thank you. So, the successor Court Evaluator report is
> being put into evidence now as Court Exhibit I.

[DR. ADAM BROOK'S ATTORNEY] MR. KAPLAN: My client tells me his mother did not want to waive her appearance this morning.

DR. A. BROOK: She never asked my mother.

THE COURT: So, can you -- you need to communicate just with your attorney, okay? Please don't call out.

DR. A. BROOK: I didn't call out. I raised my hand.

THE COURT: But I didn't call on you.

So, could this be marked as Court Exhibit I please?

399.    Diana Rosenthal's waiver of her client Judith Brook's appearance was legal malpractice. Rosenthal's role, under NYMHL §81.10 and its Law Revision Commission comments, was to advocate for Judith Brook's wishes, which by Judith Brook's explicit testimony in Court and by her direct conversations with Rosenthal was for herself not to be declared incapacitated and for her son Dr. Adam Brook to continue as her power-of-attorney and healthcare-proxy. By waiving Judith Brook's appearance, Diana Rosenthal (and her employer the New York State Mental Hygiene Legal Service) wrongfully failed to advocate for and actually defeated her client Judith Brook's wishes. Had Judith Brook been present, she would have articulately defended herself against charges of mental incapacity, would have defended her son Dr. Adam Brook's power-of-attorney and healthcare-proxy, and would have refuted many of the false allegations in Salzman's court-evaluator report and in Salzman and Ruotolo's testimony.

400.    It is significant the NYMHL §81.11(c) explicitly states that "[t]he hearing must be conducted in the presence of the person alleged to be incapacitated". Moreover, §81.11(c) explicitly contemplates the hearing may be held "where the person alleged to be incapacitated resides."

401.    But the legal wrong of conducting the hearing in the absence of the alleged incapacitated person, where the alleged incapacitated person wants to be present, is more serious than the violation of the §81.11(c) statute.

402.    Both the federal and New York State Constitutions guarantee the right to due process in a civil proceeding. A party's right to be present and to confront witnesses testifying against the party is thus fundamental to a fair, due process proceeding. Article I §6 of the New York State Constitution says: "In any trial in any court whatever the party accused shall be allowed to appear and defend in person and with counsel as in civil actions and shall be informed of the nature and cause of the accusation and be confronted with the witnesses against him or her."

403.    In a constitution for a free people, there can be no doubt that the meaning of "liberty" and due process must be broad indeed. Accordingly, the right to appear and the right to confrontation of witnesses is applicable to the Article 81 proceeding. Indeed, a finding of "incapacity" results in as serious, or more serious, diminution of personal liberty than a criminal conviction with a sentence of life imprisonment. Accordingly, the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution and New York State Article I §6

guarantees of the right to confront accusers are applicable to guardianship proceedings.

404.    In the guardianship proceeding, both Salzman's and Ruotolo's January 3 testimony was essentially that Judith Brook had advanced dementia. Had Judith Brook been present on January 3, she could have refuted many of Salzman's and Ruotolo's claims, and in particular the claim that Judith Brook had advanced dementia.

405.    Accordingly, Diana Rosenthal's (and MHLS's) waiver of Judith Brook's appearance at the January 3 trial, where Judith Brook said that she wanted the trial postponed so that she could be present, and where Diana Rosenthal never discussed waiver with Judith Brook (not even by telephone), seriously prejudiced Judith's case to have the Petition dismissed.

406.    At the beginning of the January 3, 2020 hearing, J. O'Neill-Levy solicited and received from attorney Rosenthal a groundless and unconstitutional waiver of Judith's presence, which was actually contrary to Judith's express wishes. Rosenthal's failure to ascertain her client's desires for that day, failure to protect her client's right and actually working against her client's wishes by an unauthorized waiver is legal malpractice for which she and co-defendants Wechsler and MHLS are liable as Judith's appointed attorneys, with damages to be determined at trial.

407.   Moreover,  since Diana Rosenthal's (and MHLS's) conduct was not merely negligent, but intentional and intended to defeat her client's wishes not to be declared incapacitated and for Dr. Adam Brook's power-of-attorney and healthcare-proxy not to be voided, and since the result of Diana Rosenthal's (and MHLS's) conduct was the stripping of all of Judith Brook's civil and Constitutional rights, Diana Rosenthal (and MHLS's) conduct constituted wrongful conduct, under color of law, and those actions deprived Judith Brook of her rights, privileges, and immunities secured by the U.S. Constitution and laws in violation of 42 U.S.C. §1983. In addition, since New York State Constitution Article I, including Article I §6, is unambiguous on this right, Diana Rosenthal and MHLS's wrongful waiver of Judith Brook's appearance against Judith Brook's wishes is actionable under the New York State Constitution.

408.   Later in that same hearing, while on the witness stand during his direct examination, Dr. Adam Brook tried to play the audio recording of his mother's statement that she wished to attend, but Judge O'Neill-Levy interrupted Dr. Adam Brook and prevented Dr. Adam Brook from playing the audio recording. The transcript of the January 3, 2020 hearing provides:

Q. Dr. Brook, have you read the Court Evaluator's report?

A. I have, and after reading the report and telling my mother Dr. Judith Brook it was full of false statements, my mother asked that she be allowed to be present today. She couldn't come today, but if I can play --

THE COURT: Just answer the question. All right.

I would ask that you just answer the question. (Tr.79)

409. Because court-appointed court-evaluator Ira Salzman did not release his court-evaluator's report to the parties until January 2, 2020 at 4:14 PM, Dr. Adam Brook and his attorney James Kaplan only had 16 nighttime hours to prepare, and did not have time to assemble documents and witnesses to rebut the new allegations in the Salzman report. Judge O'Neill-Levy nevertheless denied Mr. Kaplan's multiple requests for a reasonable adjournment to prepare. By these actions, Salzman and the court furthered the conspiracy to reach a pre-ordained result adverse to Judith and Adam.

410. Salzman's December 31, 2019 court evaluator report, ¶110, also had vague allegations that "Mr. Ruotolo has advised me that there have been continuing problems with the payment of these bills that has required continuing intervention. It is my understanding that Mr. Ruotolo will be testifying on this and other issues before this court." But without knowing what Ruotolo would actually testify, Adam Brook and James Kaplan not only had only 16 nighttime hours to prepare, they had actually no meaningful opportunity to rebut what Ruotolo would testify to.

411. James Kaplan requested an adjournment, and Judge O'Neill-Levy refused to grant James Kaplan's request for an adjournment. James Kaplan then stated his objection:

MR. KAPLAN: I will state my objection.

Your Honor, we first saw the Court Evaluator's report for the first time around 5 o'clock last night. I know Mr. Salzman has put a tremendous amount of time into this and other people here, and has tremendously tried to understand the issues in this complicated case, as I did some months ago.

However, I had assumed that this report would be largely based on the trial record. This case was tried on October 18th, as you recall, and there are numerous items in here which were not covered in the trial.

We are really not in a position at this moment to respond to it. In particular, I am concerned that his conclusions seems to be based on facts which are not in the prior record and which are not accurate, as far as I know, which we have never been, had been discussed with us.

There are two witnesses who are exhibits to his report that we have never seen. So, I think the appropriate thing at this point would be for us to perhaps have a discussion with Mr. Salzman and counsel and explain what our objections are so we can understand what the factual basis of or the actual facts that he purports to be making his report on.

Seems to me without that, it's really a lack of due process. We, I am not in a position to address all the items or even the critical items in his report, and I think it's a question of due process and failure to and interest of my client, to Mr. Salzman and the Court, we should put this off for a week or so.

We can perhaps have a further hearing on these issues so that they could be accurately addressed. The report, as it is, tries very hard to, but it doesn't contain factual hearings on the key issues.

It doesn't -- there are a number of issues which he purports to be relying on which, as far as, which I believe are completely untrue, and those issues should be resolved or at least there should be some attempt at resolving it before we hear his report, in my opinion. (Tr.5–6)

412.   Judge O'Neill-Levy then told the lawyers she wanted an off-the-record conference in her Chambers. After the off-the-record conference, Judge O'Neill-Levy made the following speech from the bench:

We just were having an off the record conference in which the Court asked Mr. Kaplan to specifically indicate to the Court which portions of the Court Evaluator's report he objected to, and the Court would consider redacting the areas he objected to.

His main objection is to the conclusion that Dr. Adam Brook did not cooperate with enabling his mother to have physical therapy. This issue had been circulated in e-mails and is not a surprise.

However, given that he believes that his client has a different version, he is free to recall his client, should he choose to on that issue, and ask his client questions with regard to what steps were taken and cooperation relative to getting his mother physical therapy.

So, given that that was the only item that was mentioned specifically, other than broad statements that this is not fair and he wants to insure that his client has his due process rights, other than indicating that this report is a violation of his client's due process, the only item that was specifically mentioned, given an opportunity, was the item relative to physical therapy and given that e-mails were circulated on this issue and that Mr. Salzman is

going to testify now with regard to his report, and you will have an opportunity to cross examine him and Mr. Ruotolo will also testify and he will have an opportunity to cross examine him. He can also recall his clients.

There is no need to redact the report with regard to this issue. (Tr.8–9)

413.   Mr. Kaplan then responded:

May I respond to that?

That certainly was the one issue that we discussed, but there may be others in the report that we didn't have time to go through. (Tr.9)

414.   To which J. O'Neill-Levy:

We did have time. We were sitting there. We did have time, and I asked multiple times in conference, what it is that -- *I was ready to hear your arguments on what it is. So you also, this is very, very expensive. We need to proceed now. Okay.* (Emphasis added.)

415.   The reason given of "expense" was never an issue in the nearly 7 months of proceedings. And expense or time for due process should never have been a factor with Judith's liberty and welfare at stake, and her $8 million dollar Estate at risk.

416.   In short, it was a manifest "rush to judgment" by the Guardianship judge that day to refuse a reasonable continuance to enable Mr. Kaplan to put together opposing evidence. Instead, the Court had before it  the lengthy court-evaluator's report which she could cite to support the common goal of

the conspiracy in entering her January 3 final Order, as drafted and handed up that day by Ruotolo, "finding that Judith Brook is an incapacitated person in need of an Article 81 guardian ... " ( January 3, 2020 Order). This paved the way for lucrative fees to be awarded in excess of $500,000 from Judith's Estate, an amount that the Court later ordered Ruotolo to hold expressly for that purpose. (May 28, 2020 Order) The fee applications submitted and pending vastly exceed that sum.

**Ruotolo repeatedly committed perjury, including falsely claiming that Dr. Adam Brook was not directing payments for homecare-services, in order to have the Court void Adam Brook's power-of-attorney and healthcare-proxy and appoint Ruotolo guardian**

417.     Ruotolo (as well as Salzman and Rosenthal who are listed recipients of Ruotolo's December 11, 2019 email) knew that payments were up to date with Allegiant, but Ruotolo and Salzman testified falsely in Court while under oath and falsely claimed that payments were not up to date in order to have Dr. Adam Brook's power-of-attorney and healthcare-proxy voided so that Ruotolo could obtain the lucrative guardianship of Judith Brook.

418.     The fact is, and would have been shown after an adjournment, that after Dr. Adam Brook retained James Kaplan as his attorney, Allegiant sent invoices in a disorganized fashion to Dr. Brook, and Dr. Brook paid all invoices promptly.

419.    Ruotolo's January 3, 2020 testimony provides:

> But, in between the time she was discharged and the end of June, there
> were issues with payment to the home care agency and the home care
> agency kept alerting me at that time, I was forwarding those e-mails to
> Mr. Corn, and then Mr. Corn forwarded them to his clients, and that's
> when the case, since Mr. Corn was discharged, and Mr. Kaplan has taken
> over the case for Dr. Brook, every e-mail I would get from the home care
> agency, which are multiple e-mails, multiple times a week, regarding the
> payments for services to Judith Brook, that they are not being paid. I would
> forward to Dr. Adam Brook's counsel and then I would presume they
> would forward it to Dr. Adam Brook.

> So, since the bill wasn't being paid in June, I think it was about 100
> something thousand dollars, I submitted the motion to Court to expand
> powers to the Property Guardian. (Tr.13)

420.    Ruotolo's testimony was false, made with knowledge of its falsity, but was
        readily accepted by the Court (Judge O'Neill-Levy) without an adjournment
        for rebuttal, in order to make a false record that Dr. Adam Brook had not made
        timely payments for homecare services for his mother, which would support
        the order removing his powers and "finding" Judith "incapacitated."

421.    At the January 3 hearing, Ruotolo testified that Dr. Adam Brook was not
        making payments for homecare services, which the court used to ask a leading
        question in support of her planned Order:

THE WITNESS [RUOTOLO]: ... There was one time, I think there was a bill for $16,000. Maybe in the last 60 days a check was received for 300, for $300. I think as of today's date, that the bills are still outstanding from November, mid November, so that would put almost two months that the bills have not been paid.

THE COURT: And that resulted in their potentially not providing home health care?

THE WITNESS: Correct, correct. I have used the agency on other matters and I sort of assured them eventually they would get paid. (Tr.14)

422.   Ruotolo further testified when examined by court-evaluator Salzman:

Q [SUCCESSOR COURT-EVALUATOR SALZMAN] There was ultimately a settlement entered into with regard to the payment of those bills; is that correct?

A [RUOTOLO] Yes.

Q What was the nature of that settlement?

A That a payment was going to be made that day certain sum. I think it might have been 50. The Cross Petitioner was going to review the invoices and make a subsequent payment the following week for the difference, but it dragged on for weeks and weeks.

Q Was there any agreement that how quickly bills would be paid thereafter?

A I believe once they received the invoices from the home care services, they would be reviewed and then paid.

Q Was there agreement they would be paid within two weeks?

A I believe so.

Q Did Dr. Adam Brook comply with that agreement?

A No.

DR. A. BROOK: I can't hear. Can people speak loudly?

THE COURT: The answer is no.

A He did not comply. I would relay all of the, as I previously stated, every time I received an e-mail from the home care agency I just forwarded it to Mr. Kaplan that the payments have not been received. We received checks for amounts that have nothing to do with the invoices. (Tr.26–27)

423.   The Court (Judge O'Neill-Levy) accepted Ruotolo's false testimony as truthful.

424.   Dr. Adam Brook has documentary evidence that he made timely payments of $235,316 for homecare services over a 7-month period:

   9/8/19 $50,000 check #5223 Citibank 9/19/19 statement

   8/16/19 $1794 credit card Elan Financial Services 8/19 statement

   8/16/19 $10,000 credit card Elan Financial Services 8/19 statement

   8/16/19 $7260 credit card Elan Financial Services 8/19 statement

   8/27/19 $4608 credit card Elan Financial Services 8/19 statement

   8/27/19 $3064 credit card Elan Financial Services 8/19 statement

   8/27/19 $3065 credit card Elan Financial Services 8/19 statement

8/27/19 $768 credit card Elan Financial Services 8/19 statement

9/12/19 $25,000 check #1064 First Republic 9/19 statement

9/19/19 $25,000 check #1066 First Republic 9/19 statement

10/5/19 $31,822.75 check #5073 First Republic 10/19 statement

10/22/19 $17,434 check #5075 First Republic 10/19 statement

11/8/19 $11,904 check #5085 First Republic 11/19 statement

11/22/19 $10,320 check #5088 First Republic 11/19 statement

12/5/19 $344.50 check #5097 First Republic 12/19 statement

12/10/19 $18,438.43 check #5099 First Republic 12/19 statement

1/7/20 $14,493.32 check #5109 First Republic check 1/7/20

425.    Forensic-accountant Dr. Eric Kreuter's November 10, 2020 affidavit,

made after the January 3, 2020 hearing in connection with Adam's opposition

to the fee requests, says:

> During his time as the guardian of Judith Brook, Dr. Brook was charged
> with ensuring timely payments to Allegiant, among many other
> responsibilities. Mr. Ruotolo has made claims that Dr. Brook had unpaid
> invoices owed to Allegiant through the middle of November. Upon review
> of outstanding invoices from Allegiant, communications from Allegiant to
> Dr. Brook, and payments made, it appears out of 39 invoices received
> ranging from the date of 8/13/2019 through 12/23/2019, there were only
> 12 invoices which were not paid within nine days (invoice terms are 9
> days) after being received. Additionally, of these 12 invoices, all payments
> occurred within one month upon receipt. Based on this fact pattern, it
> appears Mr. Ruotolo's claim is unsubstantiated and Dr. Brook made

substantial efforts to ensure that payments were made in a as timely manner as possible given the disorganized communications from Allegiant. (¶8)

426.    *Also*, payments made to Allegiant and supporting documentation, and 2019 Allegiant invoices. According to First Republic Bank, 5 business-days elapse between when an electronic payment is set-up and when the recipient receives payment. Allegiant sent all invoices to Dr. Adam Brook by email except the first two invoices which arrived in the same envelope by U.S.-mail postmarked August 13, 2019.

427.    Crucially, Dr. Adam Brook attempted to rebut Ruotolo's false and unexpected testimony. During the lunch break, Dr. Brook copied the list of payments he had made from his iPhone onto a yellow sheet of legal paper. Dr. Brook did not have with him the bank/credit card statements underlying this list of payments because, having received Ruotolo's December 9, 2019 email with the attached Allegiant spreadsheet *indicating that Ruotolo knew that Dr. Adam Brook had made payments to Allegiant Home Care of $221,710.68 as of December 9, 2019*, Dr. Brook did not expect Ruotolo to commit perjury to claim otherwise. Dr. Adam Brook's attorney James Kaplan already having been denied an adjournment, then offered this list of payments as an exhibit, but Judith Brook's court-appointed attorney Diana Rosenthal objected, again contrary to Judith's wishes, and Judge O'Neill-Levy sustained the objection. The transcript provides:

Q [MR. KAPLAN] I guess on page 26 it [Salzman's court-evaluator report] also says that home care bills have not been paid. We have discussed that.

THE COURT [ J. O'NEILL-LEVY]: We have discussed that.

Q [MR. KAPLAN] You brought up a possible Exhibit, which I would like to offer.

[COURT-APPOINTED ATTORNEY FOR JUDITH BROOK]
MS. ROSENTHAL: I object to this.

THE COURT: I will sustain that.

THE WITNESS [DR. ADAM BROOK]: It lists over $260,000 of payments in five months that have been made to Allegiant Home Care Agency, but apparently, I am not getting credit for that.

THE COURT: Let the record reflect Mr. Kaplan lifted up a yellow sheet of legal paper that his client had written out during the break, and so, counsel objected to admitting it into evidence and I will sustain that. ( January 3, 2020 hearing, Tr.111–112)

428.   Ruotolo's December 11, 2019 3:20 PM email, *on which court-evaluator Salzman and Rosenthal (court-appointed attorney for Judith Brook) were copied*, attached a spreadsheet from Allegiant of total-charges of $221,710.68, and a list of payments by me totaling $202,499.75. However, in this email Ruotolo conceded that Allegiant had in addition "received check no.: 5099— $18,438.43 & check No.: 5097—$344.50." Dr. Adam Brook's payments of

$18,438.43 and $344.50 were not included in the list of Adam Brook's payments on the Allegiant spreadsheet.

429.    Therefore, per Ruotolo's December 11, 2019 email, as of December 11 total payments to Allegiant were:

$202,499.75+$18,438.43+$344.50=$221,282.68

430.    Thus, if the Allegiant charges listed on the spreadsheet attached to Ruotolo's email were correct, Dr. Adam Brook's arrears to Allegiant as of December 11, 2019 were at most $428 ($221,710.68 billed minus $221,282.68 paid), compared with $221,282.68 Dr. Adam Brook already paid to Allegiant.

431.    Diana Rosenthal's objection to Adam's handwritten but accurate listing of $235,316 in payments as of January 3, 2020 that Mr. Kaplan proffered was a further occurrence of legal malpractice. Rosenthal's role, under NYMHL §81.10 and its Law Revision Commission comments, was to advocate for Judith Brook's wishes, which by Judith Brook's express testimony in Court was for her son Dr. Adam Brook to continue as her power-of-attorney and healthcare-proxy. By successfully suppressing crucial evidence that supported Adam Brook's diligence in payments and continuation of Dr. Adam Brook's power-of-attorney and healthcare-proxy, Diana Rosenthal (and her employer MHLS) wrongfully defeated her client Judith Brook's wishes. Diana Rosenthal's (and MHLS's) conduct constituted legal malpractice.

432.    As was the case with Rosenthal's wrongful waiver of Judith's right to appear at the final hearing, since Diana Rosenthal's (and MHLS) conduct was not merely negligent, but intentional and intended to defeat her client's wishes through suppression of evidence favorable to her client's wishes that Adam continue with his powers, and since the result of Diana Rosenthal's (and MHLS's) conduct was the stripping of all of Judith Brook's civil and Constitutional rights, Diana Rosenthal (and MHLS's) conduct constituted wrongful conduct, under color of law, that deprived Judith Brook of her rights, privileges, and immunities secured by the U.S. and Constitutions and laws. *See* 42 U.S.C. §1983. In addition, New York State Constitution Article I, including Article I §6, is unambiguous in protecting Judith's rights and due process, supporting a cause of action for constitutional tort. Constitutional tort secures the liberty interests guaranteed to individuals by the New York State Constitution. Diana Rosenthal's and MHLS's intentional and successful efforts, against their clients wishes, to have Judith Brook found incapacitated and to have Dr. Adam Brook's power-of-attorney and healthcare-proxy voided, are actionable under New York State Constitution.

433.    At the January 3, 2020 trial, Ruotolo further lied in claiming that multiple healthcare providers other than Ann Reen of Allegiant Homecare said that private-duty nurses, at $125 per hour, were required 12 hours-a-day. Ruotolo's testimony provides:

At that time she had RNs with her for, I believe it was 12 hours. One of the reasons that the RNs were put in place was that the health care providers at New York Presbyterian said she has the funds. It's definitely recommended she have RNs as well as some of the staff at Riverside. She was --

THE COURT: Staff at Riverside recommended?

THE WITNESS: The social worker and one of the doctors I had spoken to, because I had consulted with them, just not the agency, because the agency has a financial interest in supplying an RN, so I didn't want to rely on their opinion, so I consulted with the opinions of other providers. (January 3, 2020 hearing, Tr.15–16)

434.    But this was untrue. No healthcare providers other than those associated with Allegiant Homecare ever recommended that Judith Brook should have private-duty nurses 12 hours-a-day.

**On January 3, 2020, Judge O'Neill-Levy appointed Joseph Ruotolo temporary guardian of Judith Brook's property and person**

435.    At the conclusion of testimony on January 3, 2020, Ruotolo handed up to Judge O'Neill-Levy the Order that he had drafted the day before (January 2), "finding that Judith Brook is an incapacitated person in need of an Article 81 guardian, "vacating" Dr. Adam Brook's power-of-attorney and healthcare-proxy, and expanding Ruotolo's temporary powers to include being temporary guardian of the person and guardian of the property. Without hearing any argument, Judge O'Neill-Levy added two more short paragraphs at the end

further restricting Dr. Adam Brook, and signed the Order. Specifically, after being urged to do so by petitioner's counsel Huth and court evaluator Ira Salzman, Judge O'Neill-Levy added to the order that Adam Brook surrender Judith Brook's passport to Mr. Ruotolo immediately.

436.   This is significant because Judith Brook had repeatedly stated that if Judge O'Neill-Levy declared Judith Brook incapacitated, she wanted to leave the country.

437.   For example, Ira Salzman's court-evaluator report provides, regarding his interview with Judith Brook on December 29, 2019

> She then said to me, "My brother and I have been at odds with one another. He is involved in a lawsuit which he will probably win".
>
> I asked her what kind of lawsuit and she was not able to explain it to me.
>
> She then said, "If I lose the lawsuit, I am going to move out of the country, and I will probably go to Canada or Nova Scotia." (¶84–86)

438.   As another example, Adam Brook recorded a conversation he had with his mother on January 29, 2020, 8 days after Judith Brook sustained a rib fracture during CPR at Mary Manning Walsh Nursing Home. A transcription of that conversation provides:

> Judith Brook: Hello.
>
> Adam Brook: What were you just saying?
>
> Judith Brook: I said oh hi, this is Judy. I want to be with Adam, and wherever he decides to go is where I'm going to go.

439.    The other addition by the Court to its January 3, 2020 was a provision supporting continued payments to Adam Brook for his "pending lawsuit" "consistent with Judith Brook's practice" but inconsistently, the Court added new requirements and preconditions to the disbursement of such funds.

440.    The Court then made brief comments on the record in support of her decision and then called the next case on her docket.

441.    The January 3, 2020 hearing was a show-trial to reach a result predetermined by the co-conspirator defendants. Ruotolo's appointment was procured by the conspiracy and false evidence hereinabove alleged.

442.    Based on the record, the Guardianship judge, in conspiracy with the identified co-conspirator defendants committed the following Constitutional violations, lack of due process, and breach of evidentiary requirements in this proceeding up to January 3, 2020.

1.    Ignoring Judith's rational, competent testimony in court at the September 6 and October 18 hearings and finding against her explicit wishes;

2.    Allowing court-evaluator Crowley to resign because she was repeatedly purportedly "too ill" to undergo cross-examination on her report, but then allowing successor court-evaluator Salzman to rely on Crowley's report;

3. Denying Adam Brook and his attorney James Kaplan any time to gather evidence and prepare for the January 3 hearing, so that they could respond to new allegations in Salzman's lengthy successor court-evaluator report, which Salzman did not release to Kaplan until January 2, 4:14 PM. Salzman has previously engaged in such "Bum's rush" tactics. *See Black v. Wrigley*, No. 1: 17-cv-00101 (N.D. Ill. 2019);

4. Refusing to postpone the January 3 hearing so that Judith could be present, thereby denying Judith her statutory, common-law, and Constitutional-rights, including her due process right to be heard and to confrontation in a proceeding that resulted in complete deprivation of her civil-rights;

5. Refusing to allow Adam Brook to present evidence that he had made $235,316 in payments to Allegiant for homecare-services over a 7-month period;

6. Denying Judith legal-representation by an attorney who actually would meet and confer with Judith, and advocate for Judith's wishes not against them;

7. Allowing substantial admission of and reliance on hearsay and demonstrably false testimony and unsworn submissions by the co-conspirators;

8. Improperly shifting the burden-of-proof to Judith, instead of placing the burden-of-proof to show by clear-and-convincing evidence on petitioner

Muser, where it properly resided, *see Ha*, 174 A.D.3d 704, 705 (2nd Dept. 2019) ("'"The burden of proof shall be on the petitioner" (Mental Hygiene Law §81.12[a])'");

9.  Vacating Adam Brook's longstanding power-of-attorney and healthcare-proxy and finding incapacity of Judith without clear-and-convincing evidence, *see Chaim*, 26 Misc. 3d 837, 847 (Surrogate's Court, New York 2009) ("Article 81 requires proof by clear and convincing evidence (Mental Hygiene Law §81.12[a])"), and without stating the basis for vacating the power-of-attorney and healthcare-proxy.

443.   These procedural and substantive due-process violations were not accidental or harmless, but at the heart of the proceeding.

**After Joseph Ruotolo's appointment as Judith Brook's guardian, Joseph Ruotolo and others wrongfully caused Judith Brook's death. Joseph Ruotolo also engaged in machinations intended to justify the Court awarding him Judith Brook's money.**

444.   After his appointment as temporary guardian of Judith Brook's person and property, Ruotolo committed a series of actions and omissions that proximately caused Judith Brook's wrongful death and also breached his fiduciary duties to Judith.

445.   Prior to Judge O'Neill-Levy's appointment of Joe Ruotolo on January 3, 2020, Dr. Adam Brook had been administering his mother's medications.

446.    After January 3, Ruotolo paid (out of Judith Brook's assets) his favorite homecare-agency, Allegiant Home Care, to provide nurses to administer Judith Brook's medications.

447.    Allegiant assigned a series of firefighters, who were moonlighting as nurses to make some extra money, to administer Judith Brook's medications.

448.    On January 6, 2020, no one came to administer medications to Judith Brook.

449.    On January 6, 2020, at 9:45 PM, Dr. Adam Brook emailed Judge O'Neill-Levy's Law Clerk Premila Reddy:

> It has come to my attention that no one has given my mother her evening medications this evening, and no one has given my mother her Forteo injection this evening.

450.    Dr. Paula Rackoff, Judith Brook's rheumatologist, had prescribed Forteo injections to Judith Brook to lessen the chance of fractures of the spine and other bones due to osteoporosis.

451.    Ultimately, Dr. Adam Brook administered Judith Brook her medications and her Forteo injection notwithstanding that he was no longer healthcare-proxy, because he did not want his mother to become ill.

452.    Ruotolo's January 20, 2020 Affirmation of Legal Services, provides the following false narrative, at ¶10:

> I was notified on *January 6, 2020*, by Judith Brook's friend, Liz
> Rubenstone, that a home care aide was prevented by Adam Brook from
> administering evening medications to the IP [incapacitated person], on
> *January 3, 2020*--the same day all health care proxies were vacated .by
> court order.
>
> Eventually, Adam Brook permitted the medications to be given to JUDITH
> BROOK, at 11 :30 P.M., January 3, 2020. A notification, as to custodial
> interference, was made to the NYPD 24th Precinct, on January 11, 2020.
> (¶10. Emphasis added.)

453.   But Exhibit A of the very same document, Ruotolo's timesheet, has a
       January 7, 2020 entry (page 27):

> TC [Telephone call] to L. Rubenstone re IP's meds from *1/7/20*. A. Brook
> initially refused dispensing of night meds & removed medication to IP
> [incapacitated person]. (Emphasis added.)

454.   Upon information and belief, Ruotolo lied that Elizabeth Rubenstone told
       him that Dr. Adam Brook had interfered with medication administration to
       Judith Brook. The inconsistency of the dates as to when Dr. Adam Brook
       purportedly interfered with medication administration to his mother, and as to
       when Ruotolo was purportedly notified of interference with medication
       administration by Dr. Adam Brook, is evidence that Ruotolo fabricated the
       claim that Dr. Adam Brook interfered with medication administration to his
       mother.

455.   Exhibit A, Ruotolo's timesheet, has an entry for 1/11/20:

At NYPD 24th Precinct. Interviewed threat by Domestic Violence Police Officer Williams. Copy of Court Order left with officer. (page 9)

456.    Ruotolo's assertion that he filed the police report against Dr. Adam Brook on January 11, 2020 also is evidence that this story of purported interference by Dr. Adam Brook with his mother's medication was a fabrication by Ruotolo. Ruotolo fails to explain why, if Ruotolo was notified of Dr. Adam Brook interfering with his mother's medication on January 6 or January 7, he waited until January 11 to file a police report against Dr. Adam Brook.

457.    Before filing the police report against Adam Brook with the NYPD, Ruotolo (himself previously a police officer who had been punished by the NYPD for excessive use of force) failed to contact Dr. Adam Brook's attorney James Kaplan to see if there was any truth to this claimed story or even just to determine what Dr. Adam Brook's position was regarding this purported medication interference incident.

458.    Ruotolo's timesheet asserts that he spent 1.4 hours at the 24th Precinct, and he has requested that Judge O'Neill-Levy pay him $665 from the estate of Judith Brook for the "services" he provided to Judith Brook by filing a police report against her sole surviving child, who actually administered the prescribed medications when an Allegiant nurse failed to appear.

459.    In fact, Dr. Adam Brook reported to Judge O'Neill-Levy on January 6, 2020 that Dr. Adam Brook administered to Judith Brook her medications on

January 6 because no one from Allegiant came to administer them. In order to retaliate against Dr. Adam Brook for reporting that no one came to administer medications to Judith Brook, Ruotolo invented a false story that Dr. Adam Brook was interfering with administration of Judith Brook's medications, and Ruotolo filed a false police report falsely accusing Dr. Adam Brook of custodial interference.

460.    On January 12, 2020, Judith Brook became ill and needed to be taken by ambulance to NYP.

461.    Ruotolo routinely accused Adam Brook of harming Judith Brook whenever Ruotolo's own incompetence caused Judith Brook harm, so it is important to note that on January 12, 2020 Dr. Adam Brook was out of town.

462.    10 NYCRR §763.7 required Allegiant Home Care, a homecare-agency, to make and preserve medical records.

463.    On June 16, 2020, Allegiant produced Judith Brook's medical records in their possession, including medical records Allegiant created.

464.    Notably missing are Allegiant medical records from January 2020, including medication administration records for the period January 3–January 12, 2020, even though 10 NYCRR §763.7(c) requires that "[e]ach patient's clinical records shall be kept securely for not less than six years after discharge from the agency[.]"

465.    Upon information and belief, Judith Brook became ill because Allegiant
        Home Care nurses failed to administer medications properly to Judith Brook.

466.    Because Allegiant can't or won't produce medical records from this
        period, plaintiff is left prejudicially bereft of the best evidence to prove that
        Judith Brook's January 12, 2020 illness resulted from a medication-error by
        the firefighter-moonlighting-as-a-nurse on January 12.

467.    Judith Brook was hospitalized at New York Presbyterian Hospital
        ("NYP") on January 12 and discharged on January 17.

468.    On January 17, Ruotolo directed that Judith Brook not be allowed to go
        home but ordered her sent to the Mary Manning Walsh Nursing Home
        ("MMW") against her will. Ruotolo placing Judith Brook in MMW, and
        forcing Judith Brook to remain in MMW, violated NYMHL §81.22(a)(9) since
        Ruotolo had no court order to do so or change her residence.

469.    MMW staff told Adam Brook on repeated occasions that they were not
        permitted to provide Adam Brook with any information about his mother's
        medical care or medical condition because his mother's court-appointed
        guardian, Ruotolo, had given them instructions not to provide any information
        about his mother's medical care.

470.    MMW medical records, produced June 5, 2020, page 112, which is the
        January 17, 2020 3:57 PM NYP "Discharge -Reconciliation", provides:
        "metoprolol tartrate 25 mg oral tablet *1 tab(s)* orally every 12 hours" crossed

out; "metoprolol tartrate oral tablet 25 mg oral tablet *0.5 tabs* orally every 12 hours–Indication: Heart Disease"; and "Discontinued; Copy/Discontinue" followed by "metoprolol tartrate 25 mg oral tablet is continued and modified". (page 113. Emphasis added.)

471.    However, MMW medical records page 111, the January 17 4:08 PM NYP "DISCHARGE MEDICATION LIST", provides, under the heading "Stop taking these medications listed below", "metoprolol tartrate 25 mg oral tablet". (page 112)

472.    Thus, the NYP discharge medication reconciliation, which indicates that the dose of metoprolol is to be lowered but not discontinued, is inconsistent with the NYP discharge medication list, which indicates that metoprolol is to be discontinued.

473.    MMW physicians did not order metoprolol for Judith Brook during her stay at MMW that began January 17. Pages 202 to 206, MMW medical records Med Rec. P 201-205.

474.    As Dr. Adam Brook explained at the *July 1, 2019* court hearing, at which Ruotolo was present, metoprolol was a critical medication for Judith Brook to receive. (Tr. 9-11)

475.    But for Ruotolo acting as temporary-guardian telling MMW staff not to discuss Judith Brook's medical care with Dr. Adam Brook, Dr. Adam Brook would have learned about the error that his mother was not receiving

metoprolol, and explained the importance of metoprolol for his mother to MMW staff.

476.    At MMW, Judith Brook was not permitted to walk to the bathroom, but was forced to lie for hours in her own stool. Page 3, Adam Brook January 20, 2020 email to Ruotolo.

477.    On January 19, Dr. Adam Brook emailed Ruotolo that his mother was not receiving proper medication and that "my mother could have a major bleeding episode". (Page 1)

478.    Judith Brook and her friend Rubenstone repeatedly telephoned Ruotolo and begged him to discharge Judith home or at least address the horrific conditions at MMW. Ruotolo refused.

479.    Being forced to lie in her stool for hours caused 80-year-old Judith Brook significant stress. MMW January 19, 2020 Nursing Progress notes document:

> Resident is shouting at the staff and refusing care including VS [having her vital signs measured]. She is saying "she wants to go home." (MMW Med Rec. P 229)

480.    As a result of the horrific conditions Judith Brook was subjected to, Judith Brook refused her medications repeatedly. (MMW Med Rec. P 8-10)

481.    No one at MMW notified Dr. Adam Brook that his mother was refusing to take her medications.

482.     As documented by Mary Manning Walsh medical records pages 8-10, even though Judith Brook had been judicially-declared "incapacitated" (January 3, 2020 Court Order), when Judith refused to take her medications, nursing-home staff repeatedly simply did not give Judith Brook her medications, including cardiac medications and pantoprazole, which prevents gastrointestinal bleeding.

483.     Ruotolo ignored Dr. Adam Brook's emails to him complaining about the horrific conditions his mother was subject to at Mary Manning Walsh, including that his mother was "lying in her feces", Mary Manning Walsh staff were not permitting his mother to walk to the bathroom with assistance, his mother was saying "I need help, I am dying here", and "my mother could have a major bleeding episode".

484.     Those responsible for Judith Brook's welfare failed to discharge their duties satisfactorily by failing to ensure Judith Brook received her medications, particularly where, as here, they were told that were problems with the medication administration and told that she "needs to be evaluated promptly by a competent medical professional." (Dr. Adam Brook's January 19, 7:01 AM email to Ruotolo)

485.     Had Dr. Adam Brook learned that his mother was not taking her medications, he would have talked with her, and she would have taken her medications because she listened to what her son said. In his mother's eyes, Adam Brook was her protector.

486.     But Dr. Adam Brook did not learn that his mother was not taking her medications because Ruotolo instructed MMW staff not to discuss Judith's medical care with Adam.

487.     Medications that NYP medical-staff directed that Judith Brook receive after discharge, but which she did not receive at MMW, included midodrine and magnesium. MMW Med Rec. P 110, January 17, 2020 4:22 PM NYP "DISCHARGE MEDICATION LIST"; *compare* MMW Med Rec. P 8-10, MMW Medication Administration Record, "Not Administered/Not Completed", indicating midodrine and magnesium were repeatedly not administered.

488.     Midodrine raises blood pressure; therefore, if midodrine had been given, it would have helped prevent Judith Brook from becoming unresponsive.

489.     Magnesium is critical for proper cardiac function.

490.     Another medication that NYP medical-staff directed that Judith Brook receive after discharge, but which she did not receive at MMW, was pantoprazole. (MMW Med Rec. P 8-9; *compare* MMW Rec. P 110)

491.     Pantoprazole prevents gastrointestinal-bleeding.

492.     Stress also causes gastrointestinal-bleeding.

493.     It is medical malpractice for an elderly woman with a history of gastrointestinal-bleeding—who has been prescribed pantoprazole by her

gastroenterologist (Dr. Srihari Mahadev)—not to be given pantoprazole, and for her simultaneously being subjected to extreme stress by being forced to lie in her own stool and not permitted to walk to the bathroom with assistance.

494.     In failing to administer Judith Brook her medications, MMW staff deviated from the standard of care.

495.     One would expect given these circumstances (not being administered pantoprazole; the stress of being forced to lie in one's own stool; the stress of being wrongfully stripped of all of one's civil and Constitutional rights, including the right to choose to go home; and the stress of the threat of being separated from one's sole surviving child) that Judith Brook would develop gastrointestinal-bleeding.

496.     That is exactly what happened. MMW physician assistant Eric Nowakowski's note for January 20, 2020 8:10 PM documents (MMW Med Rec. P 240) that Judith Brook had an episode of "dark/tarry stool". Dark/tarry stools are pathognomonic of gastrointestinal-bleeding. Incredibly, MMW staff ascribed the dark/tarry stools to "[r]eports that she is on iron supplement" (MMW Med Rec P. 240). But iron supplements cause dark stools, not dark/tarry stools.

497.     The development of dark/tarry stools in this elderly woman with a history of gastrointestinal-bleeding should have prompted immediate transfer to a hospital. But MMW staff did not transfer Judith Brook to a hospital. In failing to transfer Judith Brook to a hospital MMW staff deviated from the standard of care.

498.     MMW staff checked laboratory-values. Laboratory-values on blood collected January 21 12:00 AM include hemoglobin 7.2 (Med Rec. P 74) and BUN/Creatinine ratio of 45/1.06 (Med Rec. P 75). These values, a hemoglobin of 7.2, and a BUN/creatinine ratio of 42.4, are consistent with gastrointestinal-bleeding.[67] Failure to recognize that these laboratory value abnormalities (low hemoglobin, high BUN/creatinine ratio), in an elderly patient with a history of hereditary hemorrhagic telangiectasia and recurrent gastrointestinal bleeding, and who was actually having melena, indicated that Judith was having gastrointestinal bleeding constitutes a deviation from the standard of care.

499.     Moreover, the hemoglobin of 7.2 (normal range for white women 13.4-14.2[8]) indicated that Judith Brook's hemoglobin-level was much lower than what was needed for her heart to function properly. Judith Brook's cardiologists'

---

[6] Smith DL. Anemia in the elderly. Am Fam Physician. 2000 Oct 1;62(7):1565-72. PMID: 11037074.

[7] Ernst, Amy A., et al. "Usefulness of the blood urea nitrogen/creatinine ratio in gastrointestinal bleeding." *The American journal of emergency medicine* 17.1 (1999): 70-72.

[8] Ganji, Vijay, Mohammad, Kafai. "Hemoglobin and hematocrit values are higher and prevalence of anemia is lower in the post–folic acid fortification period than in the pre–folic acid fortification period in US adults." *Am. J. clinical nutrition* 89.1 (2009): 363-371.

experiences with Judith Brook was that her hemoglobin should be over 10 because of left ventricular outflow tract obstruction.

500.     Moreover, the failure by MMW physicians to adequately supervise a physician assistant and nursing staff constituted a deviation from the standard of care.

**Ruotolo failed to ensure Judith received proper treatment and medical care.**

501.     On January 17, 2020, Ruotolo directed that Judith Brook be placed in the Mary Manning Walsh Nursing-Home against her will and directed nursing-home staff not to discuss Judith Brook's medical condition or care with Dr. Adam Brook. Ruotolo ignored pleas from Judith Brook and Judith Brook's friend Rubenstone that Judith Brook be returned home.

502.     According to Ruotolo's timesheet, on January 18, 2020, Ruotolo visited Judith Brook at the Mary Manning Walsh Nursing Home and met with social worker Dori Shore and Judith Brook, Liz Rubenstone, and a home health aide (a visit for which Ruotolo later billed Judith Brook $997.50). Judith Brook subsequently reported that she had fired Ruotolo (January 26, 2020 audio recordings of Judith Brook and Dr. Adam Brook, discussed *infra*).

503.     At Mary Manning Walsh Nursing Home, nursing-home staff refused to allow Judith Brook to walk to the bathroom with assistance, and forced her to lie in her own stool.

504.     Upon information and belief, Ruotolo learned on January 18, 2020 that
Judith Brook was not being permitted to walk to the bathroom with assistance.

505.     Upon information and belief, Ruotolo also learned that Judith Brook
wanted to return home.

506.     Mary Manning Walsh medical records, entry for January 18, 2020,
10:22 AM is an entry by Mary Manning Walsh social worker Dori Shore, in which
Ms. Shore wrote: "Resident reports that she is eager to go home and is having
difficulty adjusting to facility which caused her to be awake most of the night.
Resident denies any issues with depression, appetite, or concentration."

507.     But Ruotolo, having wrongfully obtained his expanded power of
appointment over Judith's person and property forced Judith Brook to stay in the
Mary Manning Walsh Nursing Home against her will and did not let her go home.

508.     On January 19, 2020, 6:56 AM, Dr. Adam Brook emailed Ruotolo:

As you know, you volunteered to be my mother's healthcare proxy, and
were so appointed by Judge Kelly O'Neill-Levy. My mother Judith Brook,
who you stuck in the Mary Manning Walsh nursing home, just called me
and said "I need help, I am dying here." My mother is having excruciating
abdominal and back pain, and it is not being treated. My mother's friend
Elizabeth Rubenstone told me that the nursing staff has been giving her
Tylenol. Tylenol is contraindicated for her because it is hepatotoxic i.e. it
causes liver damage in her, and her bilirubin has been elevated. Given my
mother's preexisting elevated bilirubin, giving my mother Tylenol carries

with it a significant risk of causing her permanent liver damage. It is my expectation that you will ensure that these serious medical symptoms my mother is having are investigated, and addressed, expeditiously. Thank you in advance for your anticipated cooperation.

509.    On January 19, 2020, 7:01 AM, Dr. Adam Brook emailed Ruotolo:

I have now been told that a nurse came in and offered my mother ibuprofen.

Ibuprofen is contraindicated in my mother, who has hereditary hemorrhagic telangiectasia, because of ibuprofen's effects on hemostasis: my mother could have a major bleeding episode.

My [mother] needs to be evaluated promptly by a competent medical professional.

Thank you in advance for ensuring that will happen this morning.

510.    Ruotolo's timesheet has a January 19, 2020 entry for $47.50, "Rcd [received] emails from A. Brook re IP's [incapacitated person's] medications." However, Ruotolo failed to take any action to address the worsening condition of Judith Brook that Dr. Adam Brook had repeatedly advised Ruotolo of. In particular, Ruotolo failed to raise these concerns with Mary Manning Walsh medical staff.

511.    Mary Manning Walsh Nursing Home, medical records page 229, entry for January 19, 2020, 6:09 PM says: "Resident is shouting at the staff and refusing

care including VS [vital signs]. She is saying 'she wants to go home.' MD notified as well as Nursing Supervisor."

512.     But Ruotolo and the Mary Manning Walsh Nursing Home staff forced Judith Brook to remain in the Mary Manning Walsh Nursing Home against her will and would not let her return home. Ruotolo and Mary Manning Walsh Nursing Home staff did so even though they did not have any legal authority to do so. The January 3, 2020 Order expanding Ruotolo's powers as guardian did not include the power to change her residence or force Judith Brook into a nursing home against her will.

513.     Ruotolo's timesheet also has a January 19, 2020 entry billing $475 for 1 hour regarding "AM TC [telephone call] from L. Rubenstone re her TC with A brook this day, staying with IP [incapacitated person] overnight & her desire for IP to return home."

514.     Ruotolo's timesheet also has a January 19, 2020 entry for 0.1 hours, $47.50, "Received voice message from N. Hazard re IP's [incapacitated person's] desire to return home."

515.     Ruotolo's timesheet also has a January 19, 2020 entry for which Ruotolo billed $47.50, 0.1 hours, stating "Rcd [received] email from petitioner [Howard Muser] re IP's [incapacitated person's] return home."

516.     But Ruotolo and the Mary Manning Walsh Nursing Home staff ignored all these requests and forced Judith Brook to remain in the Mary Manning Walsh

Nursing Home against her will, being mistreated, and not receiving ordered and medically necessary medications. Doing so constituted both medical malpractice and intentional infliction of emotional distress.

517.    Ruotolo's timesheet contains an entry for January 20, 2020, for which Ruotolo billed Judith Brook $95, "Telephone call to Mary Manning Walsh (RN Tolentino) re IP and presence of aide and Ms. Rubenstone." By reason of Ruotolo's visit to MMW and communications with MMW staff, Ruotolo learned, or should have learned, that his ward Judith Brook was not being given medically necessary medications, and that his ward Judith Brook was not permitted to walk to the bathroom with assistance, but was forced against her will to lie in her own stool. Dr. Adam Brook sent 3 emails to Ruotolo raising specific concerns about the treatment of his mother by MMW staff, and had demanded that Ruotolo have Judith evaluated by a physician. Ruotolo made no efforts to address these problems, and in failing to address these problems Ruotolo breached his fiduciary duty to Judith Brook. Ruotolo's failure to address these problems was a proximate cause of the adverse medical events which lead to her death.

518.    Mary Manning Walsh Nursing Home medical records page 23, entry from Resident Care Manager Doris Bermudez on January 20, 2020, 11:21 AM says: "Resident received in bed awake with aide at the bedside. She is noted with disruptive behavior, she is verbally abusive and is using foul language with

personal aide and the unit staff, and is refusing care including vital signs. She states 'I want to go home' and 'get me out of here!' "

519.    But Ruotolo and the Mary Manning Walsh Nursing Home staff forced Judith Brook to remain in the Mary Manning Walsh Nursing Home against her will.

520.    Ruotolo's timesheet has an entry for $47.50 for January 20, 2020, "Telephone call to H. Muser re IP's stay at nursing home." Upon information and belief, Muser requested Ruotolo allow Judith Brook to return home as Ruotolo reported of his January 19 call with Muser, but Ruotolo refused.

521.    Mary Manning Walsh medical records pages 8 through 12 document that between January 18, 2020 and January 21, 2020, all of Judith Brook's medications were not administered with the exception of acetaminophen, which is the generic name for plain Tylenol.

522.    Ruotolo and the defendant Mary Manning Walsh healthcare providers responsible for the well-being and care of Judith, and MMW healthcare providers responsible for administering medications to Judith Brook were negligent in failing to adequately care for Judith and failing to administer medications to Judith. Ruotolo was made aware of these omissions and was negligent and breached his fiduciary duty to Judith in not having these deficiencies in care immediately corrected.

523.    One of the medications that Judith Brook had been prescribed but which
        was not administered was midodrine. Judith Brook's physicians had prescribed
        midodrine to raise Judith Brook's blood pressure. The failure to administer
        midodrine contributed to Judith Brook becoming unconscious on January 21,
        2021.

524.    Mary Manning Walsh medical records pages 8-10 document that the
        medications spironolactone and bumetanide were not administered to Judith
        Brook. Judith Brook's physicians had prescribed spironolactone and
        bumetanide in order to prevent heart failure. The failure to administer
        spironolactone and bumetanide contributed to Judith Brook developing heart
        failure.

525.    Judith Brook's gastroenterologist Dr. SriHari Mahadev had prescribed to
        Judith Brook the medication pantoprazole in order to prevent gastrointestinal
        bleeding. According to the medication administration record on pages 8-12 of
        Mary Manning Walsh medical records, Mary Manning Walsh healthcare
        providers failed to administer pantoprazole to Judith Brook.

526.    On January 20, 2020, 8:08 PM, Dr. Adam Brook emailed Ruotolo:

        I am writing to inform you that my mother is lying in her feces in the Mary
        Manning Walsh nursing home in which you have placed her. The nursing
        staff at Mary Manning Walsh refuse to allow my mother to walk to the
        bathroom. They also have not provided her with a walker. In addition, the
        home health aide assigned to be with my mother has told me that she has

been placed on "companion duty", meaning that she cannot change my mother's diaper. This means that my mother has to wait for one of the Mary Manning Walsh floor aides to be available before her diaper can be changed. The floor aides at Mary Manning Walsh have not been attentive, and my mother has waited hours to have her diaper changed. As a result of this, my mother developed inflammation of the perineum. This creates a significant risk of infection of the perineum and perineal gangrene. In addition, lying in her feces places my mother at risk of urinary tract infection. I cannot understand why my mother is being placed at such risk when my mother has requested to walk to the bathroom. It defies common sense. Thank you in advance for your anticipated attention to this very serious matter that needs to be addressed promptly.

527.    Ruotolo's timesheet has a January 20, 2020 entry, for which Ruotolo billed Judith Brook $47.50, "Rcd [Received] email from A. Brook regarding IP's [incapacitated person's] care at Mary Manning Walsh", indicating that Ruotolo received Dr. Adam Brook's email on January 20, 2020 regarding the horrendous conditions Judith Brook was subjected to at Mary Manning Walsh Nursing Home. But Ruotolo failed to take an action to address the horrendous conditions Judith Brook was subjected to at Mary Manning Walsh Nursing Home, and in failing to take action Ruotolo breached his fiduciary duty to Judith Brook.

528.    Mary Manning Walsh medical records page 240 contains a January 20, 2020, 8:10 PM entry by Eric Nowakowski, R.P.A.-C. which says:

> Received call from nurse. Patient having dark/tarry stool. Reports that she
> is on iron supplement and has had dark stool before. Will order stool guiac
> [*sic*] testing.

529.    As an initial matter, the Mary Manning Walsh Medication Administration
Record on pages 8-10 indicates that while iron had been prescribed for Judith
Brook, it was not given to her.

530.    This is one reason why taking iron tablets is a highly improbable cause for
the dark, tarry stools that the nurse reported on January 20, 2020 at 8:10 PM.

531.    But more importantly, while iron may cause dark stools, it does not cause
dark, tarry stools.

532.    The one and only cause of dark, tarry stools is gastrointestinal bleeding.
Dark, tarry stools are called "melena".

533.    Evidence of gastrointestinal bleeding, particularly in an elderly patient with
a history of hereditary hemorrhagic telangiectasia and gastrointestinal
bleeding, should have prompted immediate transfer to a hospital for
evaluation.

534.    But Mary Manning Walsh Nursing Home healthcare providers committed
medical malpractice by failing to immediately take Judith Brook to a hospital
for evaluation.

535.    On January 21, 2020 at approximately 8:55 AM, while still at MMW, Judith Brook became unresponsive and lost consciousness.  CPR was administered by MMW staff, and she was rushed by ambulance to the Emergency Room of NYP Hospital.

536.    Judith Brook became unresponsive as a result of: 1. The succession of errors including MMW healthcare providers observing that Judith Brook was having melena, but not transferring her to a hospital, and failing to administer medications including cardiac medications and pantoprazole; 2. MMW healthcare providers not communicating with Dr. Adam Brook as Dr. Adam Brook would have caught their errors and thereby prevented the devastating consequences of their errors.

537.    Mary Manning Walsh Nursing Home medical records page 243 has the entry by Mary Manning Walsh Nursing Home physician Dr. Florence Pua on January 21, 2020 at 9:26 AM. This entry is 13 hours after the January 20, 2020, 8:10 PM entry describing dark, tarry stools. Dr. Pua's January 21, 2020, 9:26 AM entry says:

Chief complaint

CC [Chief Complaint]: for f/u [follow up] of sudden seizure, LOC [loss of consciousness] suddenly while speaking with the nurse and developed cardiac arrest.

HPI [History of Present Illness]: Resuscitation was done, a pulse was regained, 911 came. Her guardian, Joseph Ruotolo was notified.

538.     By reason of the foregoing, Plaintiff alleges medical malpractice by Allegiant Home Care, Ann Reen, R.N., Mary Manning Walsh and each of the other physicians, nurses, and assistants whose names appear in the medical records of MMW on Judith Brook's case, and are therefore named herein as defendants, namely Allen Logerquist, M.D., Florence Pua, M.D., Eric Nowakowski, R.P.A.-C, Towana Moe, R.N., John Michael Natividad, R.N., Arthur Akperov, R.N., Doris Bermudez, R.N., Navjot Sepla, R.N., and Marie Sweet Mingoa, R.N.. As hereinabove alleged and in the Exhibits hereto, each of these malpractice defendants had a professional relationship and obligation to Judith Brook, failed as alleged herein to act with the proper standard of medical care, and proximately caused injury and damage to Judith Brook as hereinabove alleged, in an amount to be determined at trial.

539.     Ruotolo's timesheet has an entry for January 21, 2020, $47.50, "Telephone call from Mary Manning Walsh re IP [incapacitated person] in cardiac arrest." (Joseph Ruotolo's June 17, 2020 Order to Show Cause to Settle a Final Accounting)

540.     The next entry on Ruotolo's timesheet for January 21, 2020, $47.50, "Telephone call from Mary Manning Walsh re IP having a pulse & 9-1-1 called. Notified L. Rubenstone."

541.     Ruotolo failed to notify Dr. Judith Brook's son, Dr. Adam Brook, of this major adverse medical event for his mother, even though Adam Brook was a duly-licensed physician in New York State and wanted to be notified.

542.    Ruotolo's timesheet has a subsequent entry on January 21, 2020 for which Ruotolo is billing Judith Brook's estate $47.50, "Received telephone call from A. Brook demanding my presences [*sic*] at NY Presbyterian (no return call)."

543.    But Ruotolo did not go to the New York Presbyterian Emergency where Judith Brook had been brought on January 21, 2020 after undergoing CPR at Mary Manning Walsh Nursing Home.

544.    Nor did Ruotolo call Judith Brook's son, Dr. Adam Brook.

545.    Instead, according to Ruotolo's timesheet, Ruotolo went to Judith Brook's bank, First Republic Bank, to "marshal" Judith Brook's assets, while she lay in the NYP ER. Ruotolo's timesheet, entry for January 21, 2020, charge for $285 for 0.6 hours of "work". This entry on Ruotolo's timesheet says: "At First Republic Bank (225 B'way) marshaled IP's accounts/certified funds for home care."

546.    On January 21, 2020, New York Presbyterian Hospital staff resuscitated Judith and determined that the cause of her episode of unconsciousness was hypotension due to gastrointestinal bleeding.

547.    NYP staff determined that Judith had sustained a rib fracture as a result of the CPR she underwent at MMW.

548.    The rib fracture led to pneumonia and Judith Brook's death less than 2 months later.

549.     Thus, Ruotolo and the other defendants failed to ensure that Ruotolo's ward Judith Brook received proper treatment and medical care.

**Ruotolo prevents Adam Brook from visiting Judith Brook in New York Presbyterian Hospital, intentionally inflicting emotional distress on Judith Brook**

550.     On January 23, 2020, Judith Brook remained hospitalized on the geriatric ward of New York Presbyterian Hospital.

551.     Dr. Adam Brook went to visit Judith Brook on the geriatric ward at about 5:30 PM.

552.     Dr. Adam Brook was having a quiet visit with his mother when New York Presbyterian Hospital officer Craig and 3 other police officers showed up and politely escorted Dr. Adam Brook out of the building.

553.     On January 24, 2020, Dr. Adam Brook discussed this event with Warren Bobb, a patient care services representative at New York Presbyterian Hospital. A transcription of this telephone conversation provides:

> Warren Bobb: So there is a restriction on your visits and that was implemented by the court-appointed guardian Joseph Ruotolo.

> Adam Brook: And what was the—hold on a second—implemented by court-appointed --

> Warren Bobb: Guardian.

Adam Brook: Guardian Joseph Ruotolo, hold on a second I'm just writing this down. And what was the reason that he gave for that?

Warren Bobb: He doesn't have to give us a reason. He's the guardian, and he can make these decisions. (January 24, 2020 audio recording of telephone conversation between Adam Brook and Warren Bobb, N.P.; transcription of January 24 audio recording of telephone conversation between Adam Brook and Bobb)

554.    When Dr. Adam Brook's attorney James Kaplan raised this issue with Ruotolo, Ruotolo asserted in a January 24, 2020 email:

If your client is restricted from entering NY Presbyterian, that is something that is not under my control. I have no sway over NY Presbyterian. (January 24, 2020 email chain Kaplan-Ruotolo)

555.    If what Mr. Bobb reported was correct, then Ruotolo lied to Mr. Kaplan, because Ruotolo had given NYP the restriction to exclude Adam Brook from seeing his own mother in the hospital.

**Joseph Ruotolo prevents Dr. Adam Brook from obtaining his mother's medical records**

556.    Ruotolo's May 26, 2020 "Affirmation of Extraordinary Services" contains a timesheet with a January 23, 2020 entry, for which he sought payment by Judge O'Neill-Levy of $475, "at Mary Manning to deliver Court's 1/6/20 order re IP's medical records."

557.     Upon information and belief, Ruotolo went to the Mary Manning Walsh Nursing Home on January 23, 2020 and delivered the January 3, 2020 Court Order to the medical records department of the Mary Manning Walsh Nursing Home in order to prevent Dr. Adam Brook from obtaining Judith Brook's medical records, which Dr. Adam Brook was attempting to obtain in order to understand the reason why Judith Brook became unconscious at Mary Manning Walsh Nursing Home on January 21, 2020.

**Judith Brook reports to Adam Brook that she tried to fire Joseph Ruotolo**

558.     On January 26, 2020, while hospitalized at NYP, Judith Brook (who recovered consciousness on January 21), told Adam Brook that she tried to fire Ruotolo. On January 26, Adam Brook made 3 audio recordings of Judith Brook on his iPhone, which provide:

> **January 26, 2020 audio recording #1**
>
> Adam Brook: OK, my concern Mom is that, you know, here in New York Presbyterian you're safe with Dr. Siegler, because she's a good doctor, in my, from what I've seen of her work so far.
>
> Judith Brook: I'm with you with what I said. So I fired Ruotolo.
>
> Adam Brook: But I don't think you can fire him because see the Court has appointed him against your wishes --
>
> Judith Brook: Why can't I fire him?

Adam Brook: Why can't you fire him? Because the Judge – the Judge has assigned him to be your guardian.

Judith Brook: The Judge hasn't what?

Adam Brook: The Judge has made Mr. Ruotolo your guardian.

<Pause>

Judith Brook: Oh. <Pause> So what does that mean?

Adam Brook: That means that I don't think you can fire him, I think that until my lawyers can fix this and get the Appellate Division to fix this, I think that he has total control over you.

Judith Brook: Oh my God.

Adam Brook: It's pretty awful in my opinion. It's very scary.

Judith Brook: It is.

Adam Brook: So that's why I think it's important -- I don't have any input in your medical care at all, but as long as you're in New York Presbyterian even if Ruotolo's in charge, Dr. Siegler and her team can protect you and make sure nothing happens to you. But if you go home or if Ruotolo puts you in a nursing home then I'm very concerned that they'll screw up your medications and you'll get really it could be a life-threatening thing.

Judith Brook: I agree with you.

Adam Brook: So until, until you know my lawyers can get the Appellate Division to stay this very dangerous Order I think you're better off you know here because at least here at New York Presbyterian you're safe. It's

not ideal that I can't communicate with the physicians but Siegler from what I've seen of her work is a good doctor and so at least here you're safe if that makes any sense.

Judith Brook: No because I thought I fired Ruotolo.

Adam Brook: Yeah I don't think you can.

**January 26, 2020 audio recording #2**

Adam Brook: I'm sorry what were you saying Mom?

Judith Brook: I believe that we fired Ruotolo and we could fire him.

Adam Brook: OK you were telling me something about you're concerned about your money being under his control?

Judith Brook: Yes.

Adam Brook: And, specifically what are you concerned?

Judith Brook: Ruotolo will manage to take all my money.

Adam Brook: So, do you think he'll take it for your benefit, or do you think he's just going to steal it?

Judith Brook: He won't take it for my benefit. They'll just steal it.

Adam Brook: OK. Alright.


**January 26, 2020 audio recording #3**

Judith Brook: Ruotolo, and he takes my money, or, I don't, or Howard, let's say, takes my money, or Ian takes my money, there's nothing I can do about it.

Adam Brook: Well but I guess what I'm saying is I'm less concerned about the money than about your health because I don't think they can take all of your money. And you'll have enough money even if they –

Judith Brook: Adam, you don't know that.

Adam Brook: Well, I don't think they're going to be able to do that, and you'll still have money left over to take care of you. What I'm most concerned is that you know we'll have a repeat of you know them not being able to institute appropriate medical care for you and then you'll be in a dangerous situation and we'll have a repeat of what happened the other day when you had the CPR.

Judith Brook: Well, I do have shortness of breath now.

Adam Brook: Yeah, well I think that's because of the rib fracture you sustained, it's in part due to the rib fracture you sustained during the CPR. And the CPR -- I need to see the medical records from Mary Manning Walsh but certainly there's a very high suspicion that you actually did not have a cardiac arrest but got CPR anyway and you probably just had an episode of hypotension, that's low blood pressure, possibly, I think there's a fair likelihood related to inappropriate administration of medication or medication errors. So that's my thought. But we'll have a better sense of that once we get the records from Mary Manning Walsh.

**Joseph Ruotolo transfers Judith Brook back to Mary Manning Walsh Nursing Home**

559.    At New York Presbyterian Hospital, under the care of geriatrician Dr. Eugenia Siegler, Judith Brook made a gradual recovery.

560.    On February 5, 2020, despite the disastrous events of her prior four day stay from January 17–21 at Mary Manning Walsh Nursing Home, despite the fact that Judith Brook was having dyspnea and was not ready for discharge from New York Presbyterian Hospital, and without discussing the matter with his ward Judith Brook, Ruotolo directed that Judith Brook be returned to the Mary Manning Walsh Nursing Home.

561.    Ruotolo failed to discuss his February 5 plan to return Judith Brook to the Mary Manning Walsh Nursing Home with either Judith Brook or Dr. Adam Brook. In doing so, Ruotolo failed to consider Judith Brook's wishes, preferences and desires. In moving Judith Brook back to the Mary Manning Walsh Nursing Home without Judith Brook's consent, Ruotolo violated NYMHL §81.22(a)(9), which provides:

> [P]lacement of the incapacitated person in a nursing home ... shall not be authorized without the consent of the incapacitated person so long as it is reasonable under the circumstances to maintain the incapacitated person in the community, preferably in the home of the incapacitated person.

562.    Ruotolo moved Judith Brook back to the Mary Manning Walsh Nursing Home without Judith Brook's consent even though J. O'Neill-Levy's January 3, 2020 Order did not grant Ruotolo authority to move Judith Brook back to the Mary Manning Walsh Nursing Home without Judith Brook's consent.

563.    Immediately prior to her transfer back to Mary Manning Walsh Nursing Home, Dr. Adam Brook discussed with his mother Judith Brook her transfer back to Mary Manning Walsh Nursing Home, and made a recording on his iPhone. A transcription of the February 5, 2020 recording is as follows:

> Adam Brook: Mom, I've just heard that Mr. Ruotolo wants to send you back to the nursing home, what do you think about that?
>
> Judith Brook: I think that's terrible. I don't want to go back to the nursing home. And I don't want to see Mr. Ruotolo ever again.
>
> Adam Brook: OK.

564.    Paramedics took Judith Brook to the Mary Manning Walsh Nursing Home against her will. However, on arrival at Mary Manning Walsh Nursing Home the paramedics were so concerned about Judith Brook's condition, including the dyspnea that she was experiencing, that they insisted that a Mary Manning Walsh Nursing Home physician see her before they left. The paramedics waited an hour with Judith Brook until the MMW physician evaluated her.

565.     A Mary Manning Walsh Nursing Home physician came and evaluated Judith Brook. The physician determined that Judith Brook needed to return to New York Presbyterian Hospital.

566.     Judith Brook was then brought back to the New York Presbyterian Hospital Emergency Department and then was readmitted to the Hospital.

**On February 6, 2020, Judge Kelly O'Neill-Levy granted Mental Hygiene Legal Service and Diana Rosenthal's request to be relieved as counsel for Judith Brook and appointed Ken Barocas to be successor counsel for Judith Brook**

567.     On January 31, 2020, MHLS attorney Felice Wechsler emailed Judge O'Neill-Levy's Law Clerk Premila Reddy requesting that MHLS's appointment as counsel for Judith Brook be vacated.

568.     On February 6, 2020, Judge O'Neill-Levy granted MHLS's request that their appointment as attorney for Judith Brook be vacated. In the same order Judge O'Neill-Levy appointed defendant Kenneth Barocas as Judith Brook's attorney. According to public records, Judge O'Neill-Levy had previously appointed Kenneth Barocas to positions in guardianship litigations 8 times in 2018. *See* https://iapps.courts.state.ny.us/fiduciary/search/AppointmentSearchPage?0

569.     Even though Mr. Barocas knew that Judith Brook was ill in the hospital, Mr. Barocas made no attempts to visit Judith Brook, or even just telephone her, until February 18, 2020, 12 days after his appointment as Judith Brook's attorney.

570.     Mr. Barocas failed to represent Judith Brook's wishes that her son
Dr. Adam Brook supervise and be involved with her healthcare.

571.     Mr. Barocas failed to represent Judith Brook's wishes that if for any reason
that Judith's son was unable to serve as her power-of-attorney, healthcare-proxy,
or guardian, then Judith's daughter-in-law Nicole Hazard should serve in those
capacities.

572.     Barocas failed to represent Judith Brook and failed to ensure that Judith
Brook's wishes in regard to her care and her desire to return home, not to a
nursing home, were presented to the Court. Barocas failed to conduct a personal
interview with Judith Brook. Barocas failed to explain to Judith Brook her rights
and failed to counsel her regarding the nature and consequences of the
proceeding; Barocas failed to secure and present evidence and testimony in
support of her wishes; Barocas failed to provide vigorous cross-examination of
claimants seeking fees from Judith; and Barocas failed to offer arguments to
protect Judith Brook's rights.

573.     In fact, Mr. Barocas actively opposed his client Judith Brook's wishes that
her son Dr. Adam Brook supervise and be involved with her healthcare.

574.     Mr. Barocas actively opposed his client Judith Brook's wishes that if for
any reason her son was unable to serve as her power-of-attorney, healthcare-proxy,
or guardian, then her daughter-in-law Nicole Hazard should serve in those
capacities.

575.     Mr. Barocas never discussed his representation of Judith Brook with Judith
Brook's former court-appointed attorney Diana Rosenthal. Had Barocas done so,
and had Rosenthal then spoken honestly with Barocas, Mr. Barocas would have
learned from her that Judith Brook had not wanted to be declared incapacitated,
and had wanted her son to continue as her healthcare-proxy and power-of-
attorney.

576.     Barocas made no effort to learn why MHLS had withdrawn their
representation of Judith Brook, and made no effort to learn what errors MHLS
had made so that he could avoid making the same errors.

577.     Barocas never obtained the file and case notes from Diana Rosenthal
regarding her representation of Judith Brook.

578.     On February 14, 2020 Judge O'Neill-Levy held a telephone conference to
consider guardian Ruotolo's request that his powers be expanded to include the
right to place Judith Brook in hospice involuntarily, and guardian Ruotolo's
request that New York Presbyterian Hospital physicians not be required to
communicate with Dr. Adam Brook regarding his mother's medical condition or
medical care.

579.     Dr. Adam Brook was not permitted to participate in or attend the
telephone conference, but objected to those requests through his attorney James
Kaplan.

580.     Despite Kenneth Barocas never having spoken with Judith Brook, and
despite Judith Brook's clear statements on the transcript that she wanted her son
Dr. Adam Brook to make all decisions for her regarding her person, Kenneth
Barocas supported Ruotolo's request that his power be expanded to include
placing Judith Brook in hospice care against her will.

581.     Barocas failed to present Judith Brook's point of view to the Court that she
did not want Dr. Adam Brook limited in his ability to communicate with New York
Presbyterian physicians about his mother's care.

582.     Despite Kenneth Barocas never having spoken with Judith Brook, and
despite Judith Brook's clear statements on the prior transcript record that she
wanted her son Dr. Adam Brook to make all decisions for her regarding her
person, Kenneth Barocas supported Ruotolo's request that New York Presbyterian
medical staff not be required to discuss Judith Brook's medical condition and
medical care with Adam Brook.

583.     On February 14, 2020, after a telephone conference, Judge O'Neill-Levy
signed the Order expanding Ruotolo's powers to include placing Judith Brook in
hospice and stating that New York Presbyterian physicians were not required to
discuss Judith Brook's medical condition or medical care with Dr. Adam Brook.

**On February 15, 2020, Dr. Adam Brook discovers his mother unresponsive at
New York Presbyterian Hospital**

584.    On February 15, 2020, at approximately 7 AM, Dr. Adam Brook found his mother unresponsive at NYP.

585.    For 17 hours, New York Presbyterian medical staff failed to treat Judith Brook as a "full code" (adverse cardiac event) until a Dr. Barbar arrived.

586.    Once Dr. Barbar arrived, aggressive treatment began. Judith Brook was found to have another gastrointestinal bleed which was treated. Judith Brook remained intubated but the next day regained consciousness.

587.    However, the following day Judith Brook fell back into a coma.

588.    Judith Brook entering a coma on February 15, 2020 would have been avoidable had New York Presbyterian Hospital medical staff been required to communicate with Dr. Adam Brook, a Board-Certified cardiothoracic surgeon. In particular, Dr. Adam Brook would have urged New York Presbyterian medical staff to treat Judith Brook's gastrointestinal bleeding aggressively and to obtain cardiology consultation.

**Judith Brook's daughter-in-law Nicole Hazard submits a petition to become Judith Brook's guardian**

589.    At the October 18, 2019 hearing, during cross-examination when asked who was her power-of-attorney and healthcare-proxy, Judith Brook stated on the record: "If something happened to my son I have to have somebody oversee him. And the person that would oversee him would be Nicole Hazard." (Tr. 163)

590.     Judith Brook then added: "She's very competent." (Tr. 163)

591.     After the January 3 Order, Judith Brook was distraught that Adam Brook's power-of-attorney and healthcare-proxy had been vacated by the Judge.

592.     Judith Brook then asked her daughter-in-law Nicole Hazard, Esq., L.C.S.W. to become her guardian.

593.     On January 27, 2020 Nicole Hazard, Esq. filed a petition for guardianship of Judith Brook.

594.     It has long been the law in New York State, under both article 81 of the Mental Hygiene Law and its precursors, that strangers will not be appointed guardian of the person or property of the incompetent, unless it is impossible to find within the family circle, or their nominees, one who is qualified to serve.

595.     On February 27, 2020, court-appointed court-evaluator Ira Salzman opposed Nicole Hazard replacing Ruotolo as Judith Brook's guardian. Salzman offered a strained and purely pretextual justification for opposing Nicole Hazard as guardian, notwithstanding the disastrous events of Ruotolo's guardianship in which Judith Brook suffered grievous injuries only 18 days after Ruotolo's appointment:

> Q. [ADAM'S ATTORNEY SALVATORE CANDELA] I think the will just states differently but – about that position. When you said that Nicole would be wearing a kick me sign, can you just elaborate on that?

A. ... [W]e talked about the possibility of what happens if Dr. Judith Brook went home and Adam didn't cooperate with the provision of home care which has happened in the past. She said, well, she said casually you have to leave the apartment. That's a -- that's -- first of all, reaching that decision, that's his home so she is going to be in a position where she is going to take, you know, someone who I think she loves and have to throw them out. Why should she be in that position. (February 27, 2020 hearing, Tr. 37–38)

596.     Thus, Salzman testified that Adam's sister-in-law Nicole Hazard, Esq. would not be a proper guardian because she would be wearing a "kick me" sign, and was not tough enough to begin eviction proceedings against Adam from the apartment that Adam shared with his mother if needed, and had a conflict-of-interest not to spend money on Judith because Hazard's daughters (Judith's granddaughters) were Judith's heirs. (February 27, 2020 hearing, Tr. 35-41)

597.     As previously alleged, Salzman had financial motives to stay in Ruotolo's good graces in anticipation of another guardianship case where Salzman might need support from Ruotolo in a different capacity. This fully explains why Salzman offered this strained and dishonest "justification" for opposing the settled practice in New York State of having family members, or their nominees as guardians, rather than strangers.

598.     During the February 27, 2020 hearing date on whether Nicole Hazard should be appointed guardian, Ken Barocas, successor attorney for Judith Brook, also actively attempted to prevent Nicole Hazard from becoming Judith Brook's

guardian. In doing so, Barocas was actively opposing his client Judith Brook's wishes, which Judith Brook expressed in court on October 18, 2020. Barocas was negligent in either not reading the prior record or in disregarding his client's wishes.

599.     Barocas thus failed to represent Judith Brook's wishes both at the February 14, 2020 telephone conference, and at the February 27, 2020 hearing on Nicole Hazard's request to be the guardian. At the February 27 hearing, Barocas cross-examined Judith Brook's daughter-in-law, Nicole Hazard, Esq., and tried to demonstrate that Ms. Hazard was unsuitable to be Judith Brook's guardian, notwithstanding that Judith Brook had explicitly stated on the record at the October 18, 2020 hearing that if her son Dr. Adam Brook could not be her power-of-attorney and healthcare-proxy, she wanted Nicole Hazard to assume those roles. (October 18, 2019 hearing, Tr. 163). Barocas, who Judge O'Neill-Levy appointed 8 times to positions in guardianships in 2018, wanted to maintain his colleague Ruotolo in the lucrative position of guardian of Judith Brook, for the same financial reasons that Salzman worked to maintain Ruotolo as guardian, because Salzman might be dependent on Ruotolo in a future guardianship matter. Thus Barocas improperly took the position against his client's previously expressed wishes, and, contrary to the terms of NYMHL §81.10 and its Law Revision Commission Comments, worked to ensure that Nicole Hazard not become Judith Brook's guardian and replace Ruotolo. The foregoing acts and omission of Barocas are legal malpractice for which he is liable.

600.     Judge O'Neill-Levy denied Nicole Hazard, Esq.'s petition for guardianship.

**Judith Brook dies on March 15, 2020**

601.     Judith Brook never recovered from the coma she went into on February 17, 2020. Judith Brook died while still in NYP on March 15, 2020.

**In his efforts to increase his fees, Ruotolo damaged Judith's estate plan**

602.     Forensic-accountant Dr. Eric Kreuter's November 10, 2020 affidavit provides:

> During his time as the guardian of Judith Brook, Mr. Ruotolo liquidated a portion of Apple stock in Judith Brook's Charles Schwab account as well as liquidated securities from her TIAA account and put the cash proceeds into a checking account. Based on my review of underlying bank and investment statements, as of February 29, 2020 (since the Apple stock was sold and TIAA was transferred during February), there was $138,836.94 of available cash prior to these transactions.

603.     There was therefore no need for Ruotolo to disrupt Judith Brook's Estate plan by massive transfers and sales of securities, generating enormous tax liabilities, and directing money away from named-beneficiaries in Judith Brook's various accounts.

604.     But that is exactly what Ruotolo did.

605.     Forensic-accountant Dr. Kreuter's November 10, 2020 affidavit says:

During his time as the guardian of Judith Brook, Mr. Ruotolo liquidated a portion of Apple stock in Judith Brook's Charles Schwab account. If proper diligence were performed prior to the sale of any Apple stock, consideration for tax implications would have been made. If proper tax harvesting of the various investment accounts were considered, there were various options in other investment accounts to sell assets, such as the Fidelity account ending in 0204, which had lower amounts of unrealized gains/losses. These assets could have been used to offset each other (tax efficiency). By ignoring all other options, unnecessary capital gains were incurred by Judith Brook personally. Additionally, if proper diligence for estate planning was considered, there should have been further consideration given to the fact that there would be a significant step-up in basis of the Apple stock inuring to the benefit of the beneficiaries of Judith Brook's estate. Lastly, there was significant appreciation in Apple stock from the date of sale to the present time, which demonstrates the added impact on the value of the Estate.

The table below summarizes the tax impacts on what could have been step-ups in basis (this table was taken from the attached schedule):

| Date Sold | Units Sold | Total Proceeds | Cost Basis | Realized Gain |
|---|---|---|---|---|
| 2/11/2020 | 162.1944 | $52,066.57 | $4,037.48 | $48,029.09 |
| 2/11/2020 | 460.8056 | 147,924.75 | 23,137.28 | 124,787.47 |
| 2/28/2020 | 239.1944 | 63,204.67 | 12,010.07 | 51,194.60 |
| 2/28/2020 | 210.0000 | 55,490.35 | 11,136.05 | 44,354.30 |
| 2/28/2020 | 140.0000 | 36,993.57 | 7,534.55 | 29,459.02 |
| 2/28/2020 | 70.0000 | 18,496.78 | 4,048.05 | 14,448.73 |
| 2/28/2020 | 10.8056 | 2,855.27 | 762.39 | 2,092.88 |
| | | | | |
| | Total | $377,031.96 | $62,665.87 | $314,366.09 |
| | | Times Tax Rate (L/T Cap Gains @ 20%) | | 20% |
| | Unnecessary Taxes if Step-up in Basis was Utilized | | | $62,873.22 |

The table below summarizes the impact of the loss of appreciation of Apple stock (this table was taken from the attached schedule):

| | | |
|---|---|---|
| | Value of Apple at 9/28 | 114.96 |
| | Times 4 (stock split) | 459.84 |
| | | |
| | Shares sold | 1293.00 |
| | Total Value if Held | 594,573.12 |
| | | |
| | Value of Liquidation | 377,031.96 |
| | Loss of Appreciation | 217,541.16 |
| | | |
| Times Tax Rate (L/T Cap Gains – 20%) | | 43,508.23 |
| Loss of Appreciation Net of Tax | | $174,032.93 |
| | | |
| Times Tax Rate (L/T Cap Gains – 15%) | | 32,631.17 |
| Loss of Appreciation Net of Tax | | $184,909.99 |

The tables above summarize the negative impact on the estate of Judith Brook in the amount of **$62,873.22 (additional taxes paid that could have been avoided) and $174,032.93 to $184,909.99 (loss of appreciation in stock value)** (See attached schedule). Based on the financial data reviewed and my analysis, I believe that the quantification of the economic impact on the Estate is accurate within a reasonable degree of certainty. (November 10, 2020 Kreuter affidavit)

606.    Additionally, on March 11, as Judith Brook lay dying in a coma with a breathing-tube down her throat, Ruotolo transferred $2,788,100 in securities and cash from Judith Brook's Fidelity accounts to accounts under Ruotolo's control at UBS.

607.    The Fidelity accounts had named beneficiaries (Juliette and Cassie each receive 25%, Adam Brook receives 50%). The UBS accounts Ruotolo created to receive these funds did not. By eliminating the beneficiaries of the Fidelity accounts, the funds would become part of the Estate and be distributed in a more limited fashion via a trust under the Will, instead of to Judith Brook's heirs directly as UBS beneficiaries. This cost Judith's Estate tens-of-thousands of dollars in legal-fees to address.

608.    Though on March 11 Ruotolo directed the asset-transfers to occur, the asset-transfers did not actually start until March 16, after Judith Brook's March 15 death.

609.    March 2020 Fidelity statements, listing transfers for accounts Z50-200204

(page 2: $1,371,918 securities, $129363 cash), 225-546369 (page 2: $546,193

securities, $55,005 cash), and 413-141686 (page 2: $671,931 securities, $13,690

cash).

610.    Forensic-accountant Dr. Kreuter's affidavit explained that as a result of

Ruotolo not maintaining the beneficiaries designated in the UBS accounts:

> 6. Upon the death of Judith Brook, Mr. Ruotolo transferred substantially
> all the assets out of the three Fidelity investment accounts (ending in 0204
> I 6369 I 1686) and into newly opened UBS investment accounts (ending in
> 1741 / 2741 / 2841). In the Fidelity account, specific individuals were
> designated as beneficiaries: Dr. Brook, who is entitled to a 50% share of the
> account, and his two nieces, Cassandra Brook and Juliette Brook, each of
> whom would be entitled to a respective 25% share of the account. The
> newly opened UBS accounts did not have any such designation and, in
> doing so, Mr. Ruotolo changed the nature of the beneficiaries from the
> three individuals in the Fidelity accounts to the general Estate, which is to
> be passed on through the designations of the will. According to the terms
> of the will, the investments were required to be put into separate trusts and
> Dr. Brook was entitled to $80,000 per year with increases for inflation to
> be linked to an index for consumer prices. Upon Dr. Brook's death, the
> remaining balance in his trust would then be distributed to Cassandra's and
> Juliette's respective trusts equally. Assuming an inflation rate of 3% and
> return on assets invested in the trust of 8% it would take Dr. Brook over 34
> years to receive 100% of the funds, as opposed to receiving the funds
> immediately upon the death of Judith Brook. If there is no change in the

manner Dr. Brook would receive distributions, then he potentially is impacted by any difference between his investment returns (controlling all of the money) and the investment returns in UBS (when he is not controlling the money).

7. In addition, the change that Mr. Ruotolo has effected by transferring funds from beneficiary accounts to non-beneficiary accounts significantly impacts when Juliette and Cassandra Brook would begin to receive funds by delaying the onset of their receiving funds for 17 and 20 years, respectively, and dramatically decreasing the amount of funds they would receive. If there is no change in the manner Juliette and Cassandra Brook would receive distributions, then they are impacted by any difference between their investment returns (controlling all of the money) and the investment returns in UBS (where they are not controlling the money). Under the terms of the will, Juliette and Cassandra Brook are entitled to $35,000 per year, with increases for inflation, starting when they turn age 35. Due to the projected growth (at 8%) in Juliette's and Cassandra's trusts, between their current age and when they reach age 35, they will each never be able to receive 100% of the funds in their respective trust accounts. (November 10, 2020 Kreuter affidavit)

611.    Just to attempt to correct or mitigate the damages to the Estate and damage to the trusts' beneficiaries (Adam, Cassie and Juliet) caused by Ruotolo cost the Estate and plaintiff personally in excess of $300,000 in legal and accounting fees.

612.    Ruotolo's accounting schedule B lists these asset-transfers as "changes to principal". Ruotolo initiated these transfers not to benefit Judith Brook, but to

run-up "changes to principal" and "justify" a higher commission. In his fee-requests, Ruotolo has requested, as a commission to be paid to him at the Court's direction, a sliding-scale percentage of the "changes to principal".

613.    These transfers did not benefit Judith Brook, who was hospitalized, critically ill, and not in immediate need of such massive funds.

614.    Ruotolo's accounting Schedule E lists these transfers as totaling $3,972,751. His Schedule F calculates a $54,159.39 "commission" for Ruotolo on these transfers, showing that obtaining the commission was Ruotolo's motive for the transfers.

615.    Ruotolo manipulated the guardianship process, in conspiracy with the identified co-defendants, for his own financial benefit.

**Irregularities in Ruotolo's final accounting of his guardianship of Judith Brook reveal that Ruotolo's motive for his conduct in the guardianship proceeding was to loot Judith Brook's assets**

616.    In conjunction with his requests for payments of fees for his guardianship, Ruotolo submitted his final accounting.

617.    Ruotolo's guardianship ended by law on March 15, 2020, when Judith Brook died. Ruotolo improperly based his accounting on April 30, 2020 values.

618.    Ruotolo used the April 30, 2020 values because Judith Brook's assets were worth much more on April 30, 2020 than March 15, 2020 due to the March 13–16,

2020 market crash. This way, Ruotolo reasoned, he could be paid a higher commission based on a percentage of Judith Brook's assets.

619.    Ruotolo counted TIAA assets twice, once under undated listings under TIAA, and a second time under the Chase banking-account where he transferred $139,721.81 from TIAA.

620.    Ruotolo listed, under securities transferred, distributions from Judith Brook's Fidelity and Schwab accounts to Adam Brook in April 2020 which were improper because the distributions occurred *after* Judith Brook's death.

621.    Ruotolo even listed, as "changes to principal" on which he requested an award of commissions, Fidelity and TIAA distributions to Judith Brook's beneficiaries that had not happened. Ruotolo listed these distributions as "pending".

622.    There is no statutory authority for awarding commissions to a temporary-guardian for distributions of Estate assets to beneficiaries.

623.    Ruotolo listed, as "Income Collected", $60,588.52 in interest and dividend payments from Judith's assets at Fidelity, Schwab, TIAA and at the UBS accounts that Ruotolo created. Ruotolo requested a commission on this income even though these payments came as a matter-of-course from Judith Brook's investments without any action by Ruotolo.

624.     Ruotolo listed under "Schedule D Disbursements" a total of 15 checks

that he wrote prior to Judith Brook's death, totaling $63,073.55, from Chase, and

2 ACH transfers from First Republic Bank to Allegiant totaling $79,929.21.

Ruotolo refused to produce documentation supporting these disbursements

despite multiple email-requests by Adam Brook, who is a personal representative

of Judith Brook's estate.

625.     Ruotolo listed a disbursement of $15,560 to Allegiant Home Care on

March 17, 2020.  This was also manifestly improper since after an incapacitated

person's death, a guardian may not pay a claim to a healthcare-provider, and

Ruotolo had no authority to transfer, or allow to be transferred based on his

authorization, those funds from Judith Brook to Allegiant Home Care. Plaintiff

asserts a claim on behalf of the estate of Judith Brook for Ruotolo paying Allegiant

Home Care when Ruotolo lacked authority to do so.

626.     The financial irregularities and machinations in Ruotolo's fee and

compensation requests made to Justice O'Neill-Levy seeking an court-ordered

award of improper payments from Judith Brook's estate to Ruotolo are strong

evidence that Ruotolo's sole motive in the guardianship proceeding was looting

Judith Brook's assets, not assuring Judith Brook's welfare.

627.     Ruotolo requested J. O'Neill-Levy award him $318,129.81 for a

guardianship in which he had his expanded powers as guardian of the person and

property of Judith Brook for only 71 days, during which time he rapidly destroyed

Judith Brook and damaged her financial affairs and estate plan.

628.     The defendants through their wrongful conduct also cost Dr. Judith Brook legal and accounting fees in an amount to be determined at trial but believed to be in the hundreds-of-thousands or millions of dollars.

629.     The defendants through their wrongful conduct also cost the Estate of Judith Brook legal and accounting fees in an amount to be determined at trial but believed to be in the hundreds-of-thousands or millions of dollars.

630.     The defendants through their wrongful conduct also cost Dr. Adam Brook legal and accounting fees in an amount to be determined at trial but believed to be in the hundreds-of-thousands or millions of dollars.

**Allegiant Home Care and Ruotolo refused to provide documentation required to review his accounting as guardian**

631.     Allegiant and Ruotolo refused to produce Allegiant's invoices after Ruotolo was appointed temporary-guardian. (Dr. Adam Brook's June 16–30, 2020 email-chain with Allegiant Director of Operations Pena; Dr. Adam Brook's July 4, 2020 email to Ruotolo, which was unanswered.)

632.     Forensic-accountant Dr. Kreuter's affidavit says:

> We were unable to determine whether the amounts Mr. Ruotolo paid to Allegiant were correct because Mr. Ruotolo did not produce 2020 Allegiant invoices when requested.

**Allegiant Home Care, L.L.C. committed billing fraud and sought to enrich itself unjustly**

633.     Allegiant committed billing fraud in several different ways.

634.     Ruotolo and Allegiant insisted on private duty nurses 12 hours-a-day, 7 days-a-week, even though only home health aides rather than private duty nurses were required.

635.     On numerous occasions, Allegiant billed for private duty nurses in excess of 12 hours-a-day. As several examples, Allegiant's invoices include the following charges for private duty nursing services in excess of 12 hours-a-day:

> 7/4 Moore 13 hours x 125/hour
>
> 7/19 Mitchell 13:45 hours x 125/hour
>
> 7/21 Moore 12:15 hours x 125/hour
>
> 7/24 Moore 12:30 hours x 125/hour
>
> 7/26 Moore 12:30 hours x 125/hour
>
> 8/4 Mitchell 12:30 hours x 125/hour
>
> 8/7 Mitchell 12:15 hours x 125/hour
>
> 8/9 Mitchell 12:30 hours x 125/hour
>
> 8/10 Ramsubhag 12:15 hours x 125/hour
>
> 8/21 Moore 12:15 hours x 125/hour

636.     Allegiant also improperly billed for "companionship" services at the rate

of a private duty nurse. Examples of these charges as demonstrated by Allegiant

invoices in plaintiff's possession include:

> 7/12 Muldoon 12 hours x 125/hour
>
> 7/15 Krupa 12 hours x 125/hour
>
> 7/16 Muldoon 12 hours x 125/hour
>
> 7/17 Krupa 12 hours x 125/hour
>
> 7/19 Mitchell 13:45 hours x 125/hour
>
> 7/20 Mitchell 12 hours x 125/hour
>
> 7/21 Moore 12:15 hours x 125/hour
>
> 8/18 McClintock 12 hours x 125/hour
>
> 8/19 Moore 12 hours x 125/hour
>
> 8/20 Moore 12 hours x 125/hour
>
> 8/22 McClintock 12 hours x 125/hour

637.     Allegiant billed between $32 and $48 per hour for home health aides, and

$125 per hour for private duty nursing services. Since these were services that

Judith Brook was compelled to accept by the conspiracy, these services are

tantamount to fraudulent charges and are unjust enrichment. On the other hand,

plaintiff does not dispute that Judith Brook required home health aides starting

from May 31, 2019 until her death on March 15, 2020 except for when Judith

Brook was in a coma with a breathing tube down her throat, at which time the continued provision of home health aides by Allegiant Home Care was fraudulent. Accordingly, plaintiff concedes that charges at the quantum meruit rate for home health aides provided by an agency in Manhattan are appropriate for the time period starting from May 31, 2019 (except for the period when Judith Brook was in a coma, February 15, 2020 through March 15, 2020). Since the largest and most well-known homecare provider in New York, Visiting Nurse Service of New York, charged $29 per hour for home health aide services during the entire May 31, 2019–March 15, 2020 time period, plaintiff claims that Allegiant be required pay the Estate the difference between what was paid to Allegiant on behalf of Judith Brook and what the charges would have been had the services been provided at $29 per hour for the time period from May 31, 2019 and the January 3, 2020 date when the temporary guardian's powers were expanded.

638.    Further, since the January 3, 2020 expanded appointment was obtained by the unlawful conspiracy in violation of 42 U.S.C. §1983 and by means of the false and misleading testimony and lack of due process, but for those violations the guardian would have been discharged on January 3, 2020, Dr. Adam Brook would have immediately fired Allegiant Home Care and brought in privately-hired home health aides, who were recommended by New York Presbyterian Hospital, to care for his mother at $20 per hour. Accordingly, Judith Brook's estate should be restored to the position it would have occupied but for the wrongful expansion of the guardian's appointment of the person and property of Judith Brook. Thus the

Estate should be awarded damages equal to the payments to Allegiant for services provided during the January 3–February 15, 2020 time period  except for a charge of $480 per day for the January 3–February 15, 2020 time period (at what the charge would have been without the conspiracy).

639.　　　Allegiant repeatedly billed for home care and private duty services *in excess of 24 hours a day*. Just a few examples of the many times Allegiant billed in excess of 24 hours a day include the following:

6/4 billed 24:30 hours

6/13 24:15

6/15 24:15

6/17 24:15

6/24 24:15

6/25 25:45

6/30 25:30

7/1 25:15

7/2 26:00

7/4 24:30

7/6 26:00

7/10 28:00

7/16 24:15

7/19 24:15

7/21 24:15

7/24 24:30

7/26 24:30

8/4 24:30

8/7 24:15

8/10 26:15

8/21 24:15

640.     There are additional examples where Allegiant billed as many as 28 hours per day for homecare and nursing services.

641.     Review of Allegiant's invoices also indicates that Allegiant billed for services that were not provided:

7/6 Reen 2 hours x 175/hour for "G0506"

642.     Allegiant also billed for "overtime" for home health aides at rates of $40-48 per hour, when rates for home health aides in New York usually are $15-20 per hour when hired privately, and $29 per hour when provided by an agency.

643.     In addition, despite repeated requests by plaintiff, Allegiant refuses to produce invoices corresponding to payments made by the temporary guardian,

Ruotolo. Upon information and belief, these invoices also contain fraudulent charges, so that a correct calculation of damages will be made after Allegiant produces all invoices for services provided to Judith Brook. On repeated occasions, plaintiff and others personally observed Allegiant home health aides asleep on the job, including at night when they were supposed to be watching Judith Brook, such as on October 11, 2019, October 24, 2019, November 3, 2019, November 26, 2019, January 5, 2020, and January 6, 2020, when Dr. Adam Brook discovered the Allegiant Home Care home health aide who was supposed to be caring for Judith Brook asleep on the job. Judith Brook should not have been required to pay Allegiant Home Care for services provided by Allegiant home health aides who were asleep on the job. Additionally, Allegiant Home Care home health aides being asleep on the job created a dangerous situation for Judith Brook, such as on October 24, 2019, when an Allegiant home health aide failed to report that Judith Brook was having a serious nosebleed with the result that it was not treated until Dr. Adam Brook discovered that his mother was having a nosebleed. The Allegiant home health failed to recognize that there was a nosebleed because the Allegiant home health aide was asleep on the job.

644.     Allegiant also charged Judith Brook when Allegiant cancelled a nurse's visit. For example, Allegiant charged Judith Brook $1500 for an "RN cancellation" on September 10, 2019 on invoice 663632 when Allegiant previously charged Judith Brook for 24 hours of home health aides on September 10, 2019 on invoice 662005.

**Ruotolo, Ian Shainbrown, the Shainbrown Firm, L.L.C., Karl Huth, and Huth, Reynolds, L.L.P. committed billing fraud and sought to enrich themselves unjustly**

645.     As one example, Ruotolo visited Judith Brook's home on June 6, 2019. Ruotolo's timesheet includes a 6/6/19 entry, "At AIP's [alleged incapacitated person's] home w/RN & A. Brook for inspection.", "475" dollars per hour, "1.8" hours, "$855.00".

646.     Unbeknownst to Ruotolo, Adam Brook secretly recorded the entire visit on his iPhone. The visit lasted 29 minutes, 53 seconds.

647.     Ruotolo's timesheets and requests to the Court for payment are riddled with numerous fraudulent billing entries.

648.     Thus, Ruotolo repeatedly committed billing fraud and has sought to unjustly enrich himself at the expense of Judith Brook, the Estate of Judith Brook, and Adam Brook, against equity and good conscience.

649.     Defendants Ian Shainbrown, the Shainbrown Firm, L.L.C., Karl Huth, and Huth, Reynolds, L.L.P. also submitted fraudulent bills to the Court, including bills for duplicate work and bills for unnecessary services.

650.     For example, Shainbrown and Huth sought to bill for identical services, as documented on their timesheets, and their timesheets are replete with numeours,

nearly identical entries for the same services. There was no need for two lawyers to perform the very same tasks.

651.        Shainbrown also claimed that his "usual rate" as an attorney of the Shainbrown Firm, L.L.C. was $975 per hour, but Shainbrown had no "usual rate" at the Shainbrown Firm, because, upon information and belief, the Shainbrown Firm had no clients other than Shainbrown's father-in-law Howard Muser, and the only legal services the Shainbrown Firm performed was in conjunction with the guardianship proceeding of Judith Brook. Shainbrown went so far as creating a website for the Shainbrown Firm to deceive the Court into believing that the Shainbrown Firm had business other than the guardianship proceeding before it.

## **FIRST CAUSE OF ACTION**

## **(42 U.S.C. §1983 — Civil Action for deprivation of rights)**

652.        Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

653.        Defendants Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, Kenneth Barocas, Esq., Ian Shainbrown, Esq., the Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.P., and Howard Muser, as hereinabove alleged, engaged in a conspiracy with Justice O'Neill-Levy to wrongfully find Judith Brook incapacitated, to wrongfully find Adam Brook, M.D., Ph.D. to have breached his fiduciary duty to his own mother, to wrongfully void the healthcare-proxy and

power-of-attorney that Adam Brook held for his mother, and to wrongfully strip Judith Brook of all of her Constitutional and civil rights.

654.     To accomplish this end, these conspirators repeatedly and egregiously denied Judith Brook and Adam Brook due process, including such due process rights and guarantees of fair procedure provided by the Fourteenth, Fifth, and Sixth Amendments, as described in detail above. The due process violations in the guardianship proceeding, described and cataloged above, were egregious and shock the conscience.

655.     Based on the record in the Article 81 case, as hereinabove alleged, the Guardianship judge, in conspiracy with the identified co-conspirator defendants, committed the following Constitutional violations, lack of due process, and breach of evidentiary requirements in this proceeding continuing up to at least January 3, 2020.

1.   Ignoring and finding contrary to Judith's rational, competent testimony in court at the September 6 and October 18, 2019 hearings and finding against her explicit wishes that she needed no guardian appointed for her and that her son Adam Brook's powers and proxy given under duly executed documents in 2006 should continue;

2.   Allowing court-evaluator Crowley to resign because she was repeatedly purportedly "too ill" to undergo cross-examination on her report, but then

allowing successor court-evaluator Salzman to rely on Crowley's report and accepting Salzman's report;

3. Denying Adam Brook and his attorney James Kaplan any time to gather evidence and prepare for the January 3, 2020 hearing, so that they could respond to new allegations in Salzman's successor court-evaluator report, which Salzman did not release to Kaplan until January 2, 2020 at 4:14 PM, 16 nighttime hours before the January 3 hearing. Salzman has previously engaged in such "Bum's rush" tactics. *See Black v. Wrigley*, No. 1: 17-cv-00101 (N.D. Ill. 2019);

4. Refusing to postpone the January 3 hearing so that Judith could be present, thereby denying Judith her statutory, common-law, and Constitutional-rights, including her due process right to be heard and to confrontation in a proceeding that resulted in complete deprivation of her civil-rights;

5. Refusing to allow Adam Brook to present evidence that he had made $235,316 in payments to Allegiant for homecare-services over a 7-month period and relying on that alleged lack of payments to rule against Adam Brook;

6. Denying Judith legal-representation by an attorney who actually would meet and confer with Judith, and advocate for Judith's wishes not against them;

7. Allowing substantial admission in evidence of and reliance on hearsay and demonstrably false testimony and unsworn submissions by the co-conspirators;

8. Improperly shifting the burden-of-proof to Judith, instead of maintaining the statutorily required burden-of-proof to show by clear-and-convincing evidence on petitioner Muser, where it properly resided, *see Ha*, 174 A.D.3d 704, 705 (2nd Dept. 2019) ("'The burden of proof shall be on the petitioner" (Mental Hygiene Law §81.12[a])");

9. Vacating Adam Brook's longstanding power-of-attorney and healthcare-proxy and finding incapacity of Judith without clear-and-convincing evidence, *see Chaim*, 26 Misc. 3d 837, 847 (Surrogate's Court, New York 2009) ("Article 81 requires proof by clear and convincing evidence (NY Mental Hygiene Law §81.12[a])"), and finding a breach of fiduciary duty which was against the weight of the evidence, in order to vacate the power-of-attorney and healthcare-proxy.

656. These procedural and substantive due-process violations were not accidental or harmless, but at the heart of the proceeding.

657. By stripping Judith Brook of all of her Constitutional and civil rights, these defendants deprived Judith Brook of rights, privileges, and immunities secured by the Constitution and laws of the United States.

658.     In so doing, defendants deprived the Estate of Judith Brook of property rights secured by the Constitution and laws of the United States.

659.     By wrongfully finding Adam Brook, in a "show" trial with multiple violations of due process and evidentiary requirements, to have breached his fiduciary duty to his own mother, and by vacating the power-of-attorney and healthcare-proxy Adam Brook held for his mother, defendants deprived Adam Brook of rights, privileges, and immunities secured by the Constitution and laws of the United States.

660.     Joseph Ruotolo, Esq. then deprived Judith Brook of her Constitutional rights under the Fourteenth, Fifth, and Fourth Amendments by dumping Judith Brook in a nursing home against her will, without a statutorily-required court order, *see* (NYMHL §81.22(a)(9)), and refused to allow her to return home as she wished.

661.     The conduct complained of was committed by these defendant co-conspirators acting under color of state law, since these individuals were conspiring with the judge and with each other to reach a pre-ordained common goal using a state court proceeding and under state laws unconstitutionally applied, in violation of 42 U.S.C. § 1983.

662.     As a direct and proximate result of the aforesaid defendants' wrongful acts, plaintiff, Judith Brook personally, and Judith Brook's estate have in the past

suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

## (42 U.S.C. §1988—Proceeding in vindication of civil rights)

663.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

664.     Defendants Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, Kenneth Barocas, Esq., Ian Shainbrown, Esq., the Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.P., and Howard Muser, as hereinabove alleged, conspired with Justice O'Neill-Levy to wrongfully strip Judith Brook of all of her civil rights.

665.     These defendants, acting under color of state law in conspiracy with Justice O'Neill-Levy, wrongfully deprived Adam Brook and the Estate of Judith Brook of their civil rights in violation of in violation of 42 U.S.C. § 1988.

666.     As a direct and proximate result of defendants' wrongful acts, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial. The award of damages should include payments of attorneys' fees.

## THIRD CAUSE OF ACTION

## (Constitutional tort for violation of rights provided by the New York State Constitution)

667.    Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

668.    Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, Kenneth Barocas, Esq., Ian Shainbrown, Esq., the Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.P., and Howard Muser, as hereinabove alleged, conspired with Justice O'Neill-Levy to deprive Judith Brook and Adam Brook of their rights under the New York State Constitution.

669.    Article I of the New York State Constitution, including §6, provides guarantees of due process and fair procedure in civil proceedings, such as allowing the person accused to appear and defend in person and with counsel and be informed of the nature and cause of the accusation and be confronted with the witnesses against her. These defendants, in conspiracy with Justice O'Neill-Levy, concededly egregiously denied Judith Brook of all of her rights guaranteed by Article I of the New York State Constitution.

670.    Defendants also egregiously denied Adam Brook his rights to due process and fair procedure guaranteed by the New York State Constitution.

671.    These deprivations of Judith and Adam Brook's rights under the New York State Constitution constituted wrongful acts.

672.    As a direct and proximate result of such wrongful acts by defendants, Judith Brook, Adam Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Wrongful death)

673.    Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

674.    Defendants including Ruotolo, Mary Manning Walsh Nursing Home, Allen Logerquist, M.D., Florence Pua, M.D., Eric Nowakowski, P.A.-C., Towana Moe, R.N., John Michael Natividad, R.N., Arthur Akperov, R.N., Doris Bermudez, R.N., Navjot Sepla, R.N., and Marie Sweet Mingoa, R.N. caused Judith Brook's death through their acts of negligence, recklessness, and intentional misconduct.

675.    Judith Brook's surviving distributees and next of kin include Judith Brook's son Adam Brook and Judith Brook's teenaged granddaughters Juliette Brook and Cassandra Brook.

676.    Judith Brook's death gave rise to a cause of action that could have been maintained at the moment of death by Judith Brook if death had not ensued.

677.     Distributees including Adam Brook, Juliette Brook, and Cassandra Brook suffered pecuniary loss by reason of the death, including loss of support, medical expenses incident to death, and funeral expenses, as well as loss of inheritance, including not only legal and accounting fees, but also loss of inheritance by loss of continued growth of Judith Brook's assets in what had been tax-sheltered accounts before the actions of said defendants,  and the expense of payment of New York State estate tax that Judith Brook's estate would not have had to pay had Judith Brook lived because of her known plan to move to Florida.

678.     Adam Brook has been duly appointed a personal representative of Judith Brook's estate.

679.     As a direct and proximate result of the aforesaid defendants' wrongful acts causing Judith's wrongful death, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## (Survivorship)

680.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

681.     Defendants including Ruotolo, Mary Manning Walsh Nursing Home, Allen Logerquist, M.D., Florence Pua, M.D., Eric Nowakowski, P.A.-C., Towana

Moe, R.N., John Michael Natividad, R.N., Arthur Akperov, R.N., Doris Bermudez, R.N., Navjot Sepla, R.N., and Marie Sweet Mingoa, R.N. caused Judith Brook's death through their acts of negligence, recklessness, and intentional misconduct.

682.     Judith Brook suffered pain and suffering as a result of said defendants' negligent, reckless, and intentional acts of misconduct.

683.     As a direct and proximate result of defendants' wrongful acts, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

### (Breach of fiduciary duty)

684.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

685.     Defendants including Joseph Ruotolo, Ira Salzman, Diana Rosenthal, Felice Wechsler, Mental Hygiene Legal Service, and Kenneth Barocas breached their fiduciary duty to Judith Brook.

686.     Joseph Ruotolo owed Judith Brook a duty of care as Judith Brook's court-appointed temporary guardian. Joseph Ruotolo breached that fiduciary duty in several distinct ways: failing to take action to communicate to Mary Manning

Walsh Nursing Home the need for Judith Brook to be evaluated by a physician when informed by Dr. Adam Brook and others of the need to do so; directing Judith Brook's healthcare providers not to communicate with Dr. Adam Brook, notwithstanding that Dr. Adam Brook was a Board-Certified cardiothoracic surgeon; failing to address the horrendous mistreatment Judith Brook was subject to at Mary Manning Walsh Nursing Home when Ruotolo was informed of such mistreatment; forcing Judith Brook into the nursing home against her will; giving false testimony to procure the guardianship of Judith Brook by fraud, which including the stripping of all of Judith Brook's Constitutional and civil rights; and, in conspiracy with Ira Salzman, the other attorneys in the guardianship proceeding, and Justice O'Neill-Levy, rigging the January 3, 2020 hearing, including Ruotolo and Salzman plotting how they were going to rig the January 3, 2020 hearing the day beforehand by their January 2, 2020 telephone call concededly discussing the January 3, 2020 hearing which led Ruotolo to immediately draft an order on January 2, 2020, to appoint himself as Guardian, before the January 3, 2020 hearing, thus confirming this outcome was preordained by the co-conspirators. Ruotolo also breached his fiduciary duty to Judith Brook by his financial mismanagement of Judith Brook's assets.

687.     Ira Salzman owed Judith Brook a duty of care to conduct a fair guardianship evaluation, including a fair assessment of her competence, a fair respect of her wishes not to be declared incapacitated and for her son to continue as her power-of-attorney and healthcare-proxy, and a fair evaluation of Adam

Brook's conduct as power-of-attorney and healthcare-proxy. Ira Salzman breached his fiduciary duty to Judith Brook by conspiring with Joseph Ruotolo, the other co-conspirator attorneys, and Justice O'Neill-Levy to rig the guardianship proceeding to achieve the preordained outcome to declare her incapacitated; giving false sworn testimony; making false statements in his court evaluator reports; without investigation, relying on Joseph Ruotolo's claims that Adam Brook was not making payments for homecare services and Margaret Crowley's claims that Adam Brook was financially exploiting his parents; introduction of double and triple hearsay "evidence", and efforts to deprive Judith Brook and Adam Brook of due process and fair procedure, including encouraging Justice O'Neill-Levy to conduct the proceeding without Judith Brook's presence, over what they were informed was Judith Brook's objection; encouraging Justice O'Neill-Levy to deny Adam Brook and his counsel an adjournment so that they could address the new allegations in Salzman's lengthy court evaluator report; and writing a biased, sexist court-evaluator report, and giving biased, sexist testimony, that Judith Brook's daughter-in-law Nicole Hazard, Esq. was unfit to serve as Judith Brook's guardian.

688.     Diana Rosenthal, Felice Wechsler, Mental Hygiene Legal Service, and Kenneth Barocas, as court-appointed attorneys for Judith Brook, owed Judith Brook a fiduciary duty to provide Judith Brook with competent legal representation. Rosenthal, Wechsler, Mental Hygiene Legal Service, and Barocas breached their fiduciary duty to Judith Brook by failing to represent Judith Brook competently and failing to ensure that Judith Brook's point of view was presented

to the court. These attorneys failed to conduct minimally adequate personal interviews with Judith Brook; failed to explain to Judith Brook her rights, failed to counsel Judith Brook regarding the nature and consequences of the proceeding; failed to secure and present evidence and testimony in support of Judith Brook's expressed wishes; failed to provide vigorous cross-examination; and failed to offer arguments to protect Judith Brook's rights. These attorneys actually actively sought to defeat Judith Brook's wishes, including by waiving Judith Brook's appearance at the January 3, 2020 hearing over Judith Brook's objection and without consulting with Judith Brook, opposing Adam Brook's attorney Kaplan's request for an adjournment, opposing Adam Brook's attorney Kaplan's attempts to introduce evidence of Adam Brook's payments for healthcare services, conspiring with the other attorneys and Justice O'Neill-Levy to deny Judith Brook of due process, including compliance with evidentiary requirements, encouraging the admission of false and misleading double and triple hearsay "evidence", opposing Nicole Hazard as guardian against Judith Brook's wishes, and failing to oppose the co-conspirator attorneys' wrongful requests for improper payments to them from Judith Brook and her Estate.

689.    Damages Judith Brook sustained as a result of these defendants' breach of fiduciary duty include the wrongful stripping of all of Judith Brook's Constitutional and civil rights, pain and suffering, and financial damage to Judith Brook and her Estate.

690.    As a direct and proximate result of defendants' breach of fiduciary duty, Judith Brook and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

## (Medical malpractice)

691.    Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

692.    Defendants Mary Manning Walsh and the doctors and medical professionals hereinabove identified and alleged to have been employed and engaged at Mary Manning Walsh to provide medical care for Judith Brook as shown by the medical records of her care, and Allegiant Home Care, L.L.C., and Ann Reen, who also were employed and engaged to provide medical care for Judith Brook, did not use reasonable care and deviated from the applicable standard of care, and were careless and negligent in their aforesaid treatment and medical care provided to Judith Brook.

693.    As a direct and proximate result of the aforesaid defendants' wrongful acts and negligence, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

## (Legal malpractice)

694.    Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

695.    Defendants Diana Rosenthal, Felice Wechsler, Mental Hygiene Legal Service, and Kenneth Barocas were appointed as attorneys to represent Judith Brook in the Article 81 case and had an attorney-client relationship with her.

696.    The aforesaid defendants in their advice and legal representation of Judith Brook failed to provide to her and to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, in the specific manners hereinabove alleged.  These were not mere errors of judgment or choices among reasonable alternatives. In fact, said defendants acted contrary to Judith Brook's interests and breached their duties to her by supporting her adversaries by objections to evidence and requests of Adam Brook and others who supported Judith Brook's rights and wishes.

697.    As a direct and proximate result of defendants' wrongful acts and negligent practice, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

## (Fraudulent billing)

698.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

699.     Defendants Allegiant Home Care, Ann Reen, Joseph Ruotolo, Ian Shainbrown, the Shainbrown Firm, Karl Huth, and Huth, Reynolds, L.L.P. rendered false bills and invoices for services allegedly provided to Judith Brook including invoices for services not rendered, invoices for duplicative services, and invoices for services not necessary and customary and at excessive billing rates, as hereinabove alleged.

700.     Such false bills and invoices were rendered with knowledge and intent to overcharge and obtain payment of excessive fees for services, as hereinabove alleged.

701.     Judith Brook, Judith Brook's court-appointed guardian Joseph Ruotolo, Plaintiff Adam Brook and the estate of Judith Brook relied on said invoices to pay them to Allegiant Home Care, and did pay such invoices, as hereinabove alleged, or will be ordered to make such payments by the Guardianship Court.

702.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

## (Unjust enrichment)

703.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

704.     Defendants Allegiant Home Care, L.L.C., Ann Reen, and Joseph Ruotolo by their actions to obtain money from plaintiff and the estate of Judith Brook were enriched wrongfully at the expense of plaintiff, Judith Brook, and the Estate of Judith Brook, as hereinabove alleged. Ian Shainbrown, the Shainbrown Firm, L.L.C., Karl Huth, and Huth Reynolds, L.L.P. are expected to be enriched wrongfully at the expense of plaintiff, Judith Brook, and the Estate of Judith Brook by awards expected to be made the Guardianship Judge, who is in conspiracy with the Guardianship Defendants in the Guardianship proceeding.

705.     It is against equity and good conscience to permit said defendants to retain what is sought to be recovered.

706.     As a direct and proximate result of defendants' wrongful acts, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

## (§487 of the Judiciary Law—Deceit or collusion by an attorney)

707.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

708.     Defendants Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Mental Hygiene Legal Service, Ian Shainbrown, Esq., the Shainbrown Firm, L.L.C., Karl Huth, Esq., and Huth, Reynolds, L.L.P. committed acts of deceit, as hereinabove alleged, in the pleadings, testimony, and other evidence and representations they prepared, made and submitted in the Article 81 case, and to the plaintiffs, which said defendants knew were false and misleading, made knowingly or recklessly with the intent that the court and the other parties would rely thereon, all in violation of NY Judiciary Law Section 487.

709.     Said other parties did so rely on said false and misleading submissions.

710.     As a direct and proximate result of defendants' wrongful acts, plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### (Fraud on the court)

711.     Plaintiff repeats and re-alleges the allegations stated above as if fully set forth herein.

712.     In the alternative, Defendants Joseph Ruotolo, Esq., Ira Salzman, Esq.,
Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service,
Kenneth Barocas, Esq., Ian Shainbrown, Esq., the Shainbrown Firm, L.L.C., Karl
Huth, Esq., Huth, Reynolds, L.P., and Howard Muser, committed fraud on the
court in the Article 81 case, as hereinabove alleged, in the pleadings, testimony,
and other evidence and representations they prepared, made and submitted in the
Article 81 case, which said defendants knew were false and misleading, made
knowingly or recklessly  with the intent that the court and the other parties would
rely thereon.

713.     The court did so rely on said false and misleading submissions, especially
insofar as it supported the conspirators' intent to find Judith Brook incapacitated
by any means necessary.

714.     As a direct and proximate result of defendants' wrongful acts, plaintiff,
Judith Brook, and Judith Brook's estate have in the past suffered, and will in the
future continue to suffer, substantial damages in an amount to be determined at
trial.

## THIRTEENTH CAUSE OF ACTION

### (INTENTIONAL INFLICTION OF MENTAL DISTRESS)

715.     Defendants Joseph Ruotolo and Mary Manning Walsh in their conduct
and actions directed at Judith Brook, as hereinabove alleged, committed acts

which were repugnant and shocking, done intentionally, or with disregard for the very high risk of causing debilitating mental and emotional distress.

716.     The aforesaid acts by said Defendants did in fact cause Judith Brook to suffer actual debilitating and harmful emotional distress.

717.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff, Judith Brook, and Judith Brook's estate have in the past suffered, and will in the future continue to suffer, substantial damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1.  Adjudge that Defendants Joseph Ruotolo, Esq., Ira Salzman, Esq., Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, Kenneth Barocas, Esq., Ian Shainbrown, Esq., The Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.L.P., Howard Muser, Allegiant Home Care, and Ann Reen, R.N., are liable for violation of 42 U.S.C. §1983 and the other Constitutional violations of plaintiff's and Judith Brook's rights as hereinabove alleged;

2.  Adjudge the Defendant Joseph Ruotolo, Esq. is liable for breach of fiduciary duty, fraud on the court, fraudulent billing, intentional infliction of mental distress, and proximately causing the wrongful death of Judith Brook;

3. Adjudge that Defendants Diana Rosenthal, Esq., Felice Wechsler, Esq., Mental Hygiene Legal Service, and Kenneth Barocas are liable for breach of fiduciary duty, legal malpractice, and fraud on the court;

4. Adjudge that Mary Manning Walsh, Allen Logerquist, M.D., Florence Pua, M.D., Eric Nowakowski, R.P.A.-C, Towana Moe, R.N., John Michael Natividad, R.N., Arthur Akperov, R.N., Doris Bermudez, R.N., Navjot Sepla, R.N., and Marie Sweet Mingoa, R.N. are liable for medical malpractice, intentional infliction of mental distress, and wrongful death of Judith Brook;

5. Adjudge that Allegiant Home Care and Ann Reen, R.N. are liable for medical malpractice, fraudulent billing and unjust enrichment;

6. Adjudge the Defendants Ian Shainbrown, the Shainbrown Firm, L.L.C., Karl Huth, Esq., and Huth, Reynolds, L.L.P. are liable for fraudulent billing and unjust enrichment;

7. Adjudge that Defendants Joseph Ruotolo and Mary Manning Walsh Nursing Home are liable for intentional infliction of mental distress;

8. Adjudge that Ira Salzman, Esq, is liable for breach of fiduciary duty and fraud on the court;

9. Adjudge that Defendants Ian Shainbrown, Esq., The Shainbrown Firm, L.L.C., Karl Huth, Esq., Huth, Reynolds, L.L.P., and Howard Muser are liable for fraud on the court;

10. Adjudge that Joseph Ruotolo, Esq., Ira Salzman, Esq., Ian Shainbrown, Esq. and Karl Huth, Esq. are liable for violation of New York Judiciary Law §487;

11. Adjudge Joseph Ruotolo, Esq. is liable for fraudulent billing and unjust enrichment;

12. Award judgment in favor of Plaintiff and against each defendant for monetary damages in an amount to be determined at trial;

13. Award Plaintiff costs and attorneys' fees incurred in this action to the extent allowed by law; and

14. Grant such other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all causes of action asserted within this pleading.

Dated: July 20, 2022

Adam Brook, M.D., Ph.D.

813 Delmar Way Apt 306

Delray Beach, FL  33483

(646) 774-0971

brook1231@gmail.com

Plaintiff *pro se*