Hon. Edgardo RamosOctober 17, 2022
Thurgood Marshall U.S. Courthouse
40 Foley Square Courtroom 619
New York, NY 10007

Sent to the court on October 17, 2022

Re: *Brook v. Ruotolo et al.*, 22 Civ. 6173 (S.D.N.Y.)

Your Honor:

I am the Plaintiff *pro se* and write in accordance with your individual practice rules, §2(A)(ii).

On October 12, 2022, defendant Eric Nowakowski, P.A.-C. filed a letter requesting a pre-motion conference "to obtain permission to move for dismissal of the complaint against me under rule 12(b)1 (lack of diversity) and 12(b)6 (lack of capacity)."

The Complaint (ECF-1) ¶494–497 provides:

> 494. In failing to administer Judith Brook her medications, MMW staff deviated from the standard of care.
>
> 495. One would expect given these circumstances (not being administered pantoprazole; the stress of being forced to lie in one's own stool; the stress of being wrongfully stripped of all of one's civil and Constitutional rights, including the right to choose to go home; and the stress of the threat of being separated from one's sole surviving child) that Judith Brook would develop gastrointestinal bleeding.
>
> 496. That is exactly what happened. MMW [Mary Manning Walsh Nursing Home] physician assistant Eric Nowakowski's note for January 20, 2020 8:10 PM documents (MMW Med Rec. P 240) that Judith Brook had an episode of "dark/tarry stool". Dark/tarry stools are pathognomonic of gastrointestinal-bleeding. Incredibly, MMW staff ascribed the dark/tarry stools to "[r]eports that she is on iron supplement" (MMW Med Rec P. 240). But iron supplements cause dark stools, not dark/tarry stools.
>
> 497. The development of dark/tarry stools in this elderly woman with a history of gastrointestinal-bleeding should have prompted immediate transfer to a hospital. But MMW staff did not transfer Judith Brook to a hospital. In failing to transfer Judith Brook to a hospital MMW staff deviated from the standard of care.
>
> 498. MMW staff checked laboratory-values. Laboratory-values on blood collected January 21 12:00 AM include hemoglobin 7.2 (Med Rec. P 74) and BUN/Creatinine ratio of 45/1.06 (Med Rec. P 75). These values, a hemoglobin of 7.2, and a BUN/creatinine ratio of 42.4, are consistent with gastrointestinal bleeding.[6][7] Failure to recognize that these laboratory value abnormalities (low

---

[6] Smith DL. Anemia in the elderly. Am Fam Physician. 2000 Oct 1;62(7):1565-72. PMID: 11037074.

[7] Ernst, Amy A., et al. "Usefulness of the blood urea nitrogen/ creatinine ratio in gastrointestinal bleeding." *The American journal of emergency medicine* 17.1 (1999): 70-72.

1

> hemoglobin, high BUN/creatinine ratio), in an elderly patient with a history of hereditary hemorrhagic telangiectasia and recurrent gastrointestinal bleeding, and who was actually having melena (dark/tarry stool), indicated that Judith was having gastrointestinal bleeding constitutes a deviation from the standard of care.
>
> 499. Moreover, the hemoglobin of 7.2 (normal range for white women 13.4-14.2[8]) indicated that Judith Brook′s hemoglobin-level was much lower than what was needed for her heart to function properly. Judith Brook′s cardiologists′ experiences with Judith Brook was that her hemoglobin should be over 10 because of left ventricular outflow tract obstruction.
>
> 500. Moreover, the failure by MMW physicians to adequately supervise a physician assistant and nursing staff constituted a deviation from the standard of care.

"″'The requisite elements of proof in a medical malpractice action are a deviation or departure from accepted community standards of practice and evidence that such departure was a proximate cause of injury or damage″ (*Geffner v North Shore Univ. Hosp.,* 57 AD3d 839, 842; *see Flanagan v Catskill Regional Med. Ctr.,* 65 AD3d 563, 565; *Rebozo v Wilen,* 41 AD3d 457, 458)." *Shirley v. Falkovsky*, N.Y. Slip Op 4659 (App.Div.2022) Here, Mr. Nowakowski and others deviated from accepted community standards of practice by, upon learning that Judith Brook was having melena, not transferring her immediately to a hospital for resuscitation and evaluation by a gastroenterologist. Such departure was a proximate cause of Judith Brook fainting from anemia and low intravascular volume, which finally caused MMW to call 911 for emergency ambulance to the hospital and MMW staff initiating CPR, causing a rib fracture. The rib fracture proximately caused pneumonia in this 80-year-old patient, which led to Judith Brook's premature death.

The claims against MMW and Mr. Nowakowski are properly addressed in this lawsuit wherein Joseph Ruotolo and his conspirators are sued. Had Joseph Ruotolo not dumped Judith into a nursing home without court approval or medical consultation and with substandard medical care, especially for an elderly ward, and had Ruotolo not told MMW staff *not to communicate with me*, a Board-Certified cardiothoracic surgeon, *see* Complaint ¶486, then MMW staff would have communicated with me regarding the medical care of my mother including the observed melena, and the malpractice committed by MMW and its contractors would have been avoided. A single jury should hear both the conspiracy by the guardianship attorneys and the consequences of the conspiracy, *i.e.*, Judith Brook being dumped in a nursing home against her will where she was subjected to egregious malpractice.

Because the guardianship conspirators violated my mother's Constitutional rights and my constitutional rights, this action properly resides in federal court. *Great Western v. Fox Rothschild*, 615 F.3d 159 (3d Cir.2010) (conspiracy of defendants with state judge and state court makes all conspirators state actors under §1983).

Additional grounds for federal court jurisdiction are the complete diversity of the parties. Plaintiff *pro se* will show that the amendment in 28 U.S.C.§1332(c)(2) deeming an estate representative a citizen of the decedent's domicile at death, is an unconstitutional enactment, intended to deprive politically powerless

---

[8] Ganji, Vijay, Mohammad, Kafai. "Hemoglobin and hematocrit values are higher and prevalence of anemia is lower in the post-folic acid fortification period than in the pre-folic acid fortification period in US adults." *Am. J. clinical nutrition* 89.1 (2009): 363-371.

beneficiaries of estates of federal court jurisdiction at the behest of the political powerful entities (banks, insurance companies, attorneys, *etc.*) that want these actions tried in state courts where the estate representatives are actually citizens of foreign states. Thus, §1332(c)(2) wrongfully deprives out-of-state estate representatives chosen (as here) by the decedent long prior to death, of their Constitutional right to diversity jurisdiction granted by the plain language of the U.S. Constitution Art.3 §2. The ratifiers of the Constitution approved Art.3 §2 because they believed state courts would be biased in favor of politically powerful parties from their own state, a concern that extends to the present day.

Since the state claims are so interrelated with the §1983 federal claims (*see* 28 U.S.C. §1367(a)), judicial economy is also promoted by a single lawsuit in federal court, rather than a lawsuit in federal court against the guardianship attorneys and a separate lawsuit in state court against the healthcare providers.

Sincerely,

Adam Brook, M.D., Ph.D.

Plaintiff *pro se*

813 Delmar Way Apt. 306

Delray Beach, FL  33483

(415) 516-0787

brook1231@gmail.com